PRIMAVERA FAMILIENSTIFUNG,
Plaintiffs,

v.

David J. ASKIN, et al., Defendants.

ABF Capital Management,
et al., Plaintiffs,

v.

Askin Capital Management,
L.P., et al., Defendants.

Granite Partners, L.P.,
et al., Plaintiffs,

v.

Donaldson, Lufkin & Jenrette
Securities Corporation, et
al., Defendants.

Montpellier Resources Limited,
et al., Plaintiffs,

v.

Askin Capital Management,
L.P., et al., Defendants.

Richard Johnston, as Trustee for The
Demeter Trust, et al., Plaintiffs,

v.

Askin Capital Management,
L.P., et al., Defendants.

Bambou Inc., et al., Plaintiffs,

v.

David J. Askin, et al., Defendants.

AIG Managed Market Neutral
Fund, et al., Plaintiffs,

v.

Askin Capital Management,
L.P., et al., Defendants.

Nos. 95 Civ. 8905(RWS), 96 Civ.
2978(RWS), 96 Civ. 7874(RWS), 97 Civ.
1856(RWS), 97 Civ. 4335(RWS), 98 Civ.
6178, 98 Civ. 7494(RWS).

United States District Court,
S.D. New York.

Feb. 5, 2001.

As Amended March 1, 2001.

Swidler Berlin Shereff Friedman, New York, NY, By: David S. Hoffner, for Askin Capital Management, L.P. and David J. Askin, of counsel.

Friedmán Kaplan & Seiler, New York, NY, By: Eric Seiler, Robert J. Lack, Katherine L. Pringle, Lee D. Sossen, Berlack, Israels & Liberman, New York, NY, By: Steven E. Greenbaum, Scott M. Berman, Anne M. Cunningham, Melissa A. Sarubbi, for Granite Partners, of counsel.

Bragar Wexler Eagle & Morgenstern, New York, NY, By: Peter D. Morgenstern, Paul D. Wexler, Lawrence P. Eagel, Lisa K. Eastwood, for Montpellier Resources Limited, of counsel.

Morgan, Lewis & Bockius, New York, NY, By: Catherine A. Ludden, for Donaldson, Lufkin & Jenrette Securities Corp., of counsel.

Cleary, Gottlieb, Steen & Hamilton, New York, NY, By: Thomas J. Moloney, Mitchell A. Lowenthal, Carmine D. Boccuzzi, Allyson W. Haynes, Kesari Ruza, for Kidder, Peabody & Co., Incorporated, of counsel.

Brown & Wood, New York, NY, By: A. Robert Pietrzak, Andrew W. Stern, Madeleine J. Dowling, Jonathan J. Brennan, Kimberly A. Johns, for Merrill Lynch, Pierce, Fenner & Smith Inc., of counsel.

Gold Bennett Cera & Sidener, San Francisco, CA, By: Solomon B. Cera, Bernstein Litowitz Berger & Grossmann, New York, NY, By: Jeffrey A. Klafter, for Primavera Familienstiftung, Bambou, Inc., Loukoum Inc., Samta Investment Inc., and Hubert Looser, of counsel.

## OPINION

SWEET, District Judge.

The defendants in seven related securities fraud actions have moved for summary judgment as to various claims. The plaintiffs have opposed these motions, and certain plaintiffs have made cross-motions for summary judgment.

Specifically, Kidder, Peabody & Co. ("Kidder") and Donaldson, Lufkin & Jenrette Securities Corp. ("DLJ"), the broker defendants (collectively, the "Brokers") in the six actions entitled *ABF Capital Mgmt. v. Askin Capital Mgmt.*, No. 96 Civ. 2978 (the "ABF Action"), *Johnston v. Askin Capital Mgmt.*, 97 Civ. 4335 (the "Johnston Action"), *Primavera Familienstiftung v. Askin*, No. 95 Civ. 8905 (the "Primavera Action"), *Montpellier Resources Ltd. v. Askin Capital Mgmt.*, No. 97 Civ. 1856 (the "Montpellier Action"), *Bambou Inc. v. Askin*, No. 98 Civ. 6178 (the "Bambou Action"), and *AIG Managed Market Neutral Fund v. Askin Capital Mgmt.*, No. 98 Civ. 7497 (the "AIG Action") (collectively, the "Investor Actions"),[1] have moved for summary judgment against all plaintiffs (the "Investors") on Count II of the complaint, which is the sole count remaining against them and which alleges aiding and abetting fraud. Kidder has also moved separately against certain Investors on statute of limitations grounds, and against those Investors who invested in the Quartz Hedge Fund ("Quartz") on grounds specific to those Investors (the "Quartz Investors"). Defendants Askin Capital Management, L.P. ("ACM") and David J. Askin ("Askin") (collectively, the "ACM Defendants") have joined in the motions by DLJ and Kidder to the extent applicable.[2]

In addition, defendants Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill") and DLJ (collectively, the "Brokers")[3] have moved for summary judgment in the seventh related action, entitled *Granite Partners, L.P. v. Bear Stearns & Co., Inc.*, No. 96 Civ. 7874 (the "Funds Action"), against Granite Partners, L.P. ("Granite Partners), Granite Corporation ("Granite Corp."), and Quartz (collectively, the "Funds"), suing by and through the Litigation Advisory Board (the "LAB"). DLJ has moved for summary judgment on Count I of the Second Amended Complaint, which count alleges breach of contract by DLJ for wrongful margin calls. Merrill has moved for summary judgment on the three counts remaining against it, namely, Count I, alleging breach of contract for improper margin calls, Count II, alleging breach of contract for bad faith liquidations, and Count VIII, alleging commercially unreasonable liquidations in violation of Article 9 of the Uniform Commercial Code (the "U.C.C."). Merrill has also moved to strike the expert reports submitted by the Funds in connection with the motions for summary judgment. The Funds have cross-moved against Merrill on Counts I, II and VIII. In addition, the Funds have cross-moved against DLJ on Count X of the Second Amended Complaint, which count objects to DLJ's deficiency claim against the Funds in the related bankruptcy proceeding, and Count IX, which count alleges that DLJ failed to turn over certain principal and interest payments owed to the Funds.

Finally, the ABF Plaintiffs have moved for an order removing the "confidential designation" from documents produced by DLJ and Kidder, and from the deposition testimony of present or former employees of those firms, in the Investor Actions.

For the reasons set forth below, the motions will be denied in part and granted in part.

### The Parties and Prior Proceedings

The parties in the instant actions are set forth in the prior opinions of this Court, familiarity with which is assumed. *See Granite Partners, L.P. v. Bear, Stearns &*

---

1. These six actions were consolidated for purposes of discovery.

2. The Brokers are alleged to have aided and abetted a primary fraud committed by the ACM Defendants. Thus, the Brokers' motions challenge *inter alia* the Investors' ability to prove the primary fraud.

3. In the context of the Investor Actions, "the Brokers" refers to Kidder and DLJ, while in the context of the Funds Action it refers to Merrill and DLJ.

*Co.,* 17 F.Supp.2d 275 (S.D.N.Y.1998) (*"Granite I"*); *Granite Partners, L.P. v. Bear, Stearns & Co.,* 58 F.Supp.2d 228 (S.D.N.Y.1999); *ABF Capital Mgmt. v. Askin Capital Mgmt., L.P.,* 957 F.Supp. 1308 (S.D.N.Y.1997) (*"ABF I"*).

Previous proceedings are also set forth in the prior opinions of this Court. Extensive discovery has been had in these actions, involving the exchange of tens of thousands of pages of documents and the deposition of dozens of witnesses. Proceedings relevant to the instant motions are set forth below.

The summary judgment motions in the Investor Actions were filed on or about May 12, 2000, and submissions were received through September 1, 2000, at which time the matter was deemed fully submitted. The summary judgment motions in the Funds Action were filed on or about June 6, 2000, and submissions were received through July 28, 2000, at which time the matter was deemed fully submitted. Kidder's motion in the Funds Action to strike the Funds' expert reports was filed on July 12, 2000, and was heard and deemed fully submitted on September 20, 2000. The ABF Plaintiffs' motion in the Investor Actions to strike the "confidential" designation from discovery materials was filed by letter of September 20, 2000, and was heard and deemed fully submitted on October 11, 2000.

### The Facts

The following facts are drawn from the parties' Rule 56.1 Statements and other submissions and, as required, are construed in the light most favorable to the non-movant, as applicable. They do not constitute findings of fact by the Court.

### Overview of the Transactions and the Funds' Collapse

The Funds were "hedge funds" which made leveraged investments in the mortgage-backed securities market, including collateralized mortgage obligations ("CMOs"). CMOs are bonds created from and collateralized by mortgage-backed securities formed from pools of residential mortgages or securities backed by such mortgages. CMOs are not listed or traded on a public exchange.

The Granite Partners and Granite Corp. Funds (collectively, the "Granite Funds") were established in 1990. Between the time of their creation and September 1991, the investment advisor for these Funds was New Amsterdam, run by Tony Estep ("Estep"). In September 1991, Askin joined the Funds as their president and investment advisor, and in September 1993, ACM was created as the Funds' investment advisor. The Quartz Fund was established in January 1994 with ACM as its investment advisor.

The Investors, who include both individuals and institutional investors, were shareholders and/or limited partners in the Funds. The earliest purchase of an interest in the Funds occurred in or about September 1990, and the latest occurred in March 1994. A number of the Investors acquired additional interests in the Funds after their initial investment.

Askin and ACM purchased CMOs for the Funds from various brokers,[4] including Merrill, DLJ, Bear Stearns, and Kidder. The brokers created the CMOS.[5]

CMOs are created from and divided into various classes, or "tranches," each of which is entitled to a different portion of the principal and/or interest payments made by the underlying mortgage obligors. The tranches differ from one another with respect to their sensitivity to interest rate changes and the certainty with

---

**4.** The parties refer variously to "brokers," "broker-dealers," and "dealers." The term "brokers" will be used herein for simplicity's sake.

**5.** Askin's tenure began before the creation of ACM. However, for the sake of simplicity, and unless the distinction is material, Askin and ACM will be used interchangeably in this opinion to describe actions by the Funds' investment advisor.

which their reaction to such changes can be predicted.

The mortgage-backed securities market is complex and relatively illiquid. Although mortgage-backed securities, including CMOs, count among their benefits relatively high yields, these securities also carry with them certain risks. The two primary risks associated with these instruments are interest rate risk and prepayment risk. The interest rate risk is the risk that the price of the security will decrease in response to interest rate increases. The prepayment risk is the risk that homeowners may prepay their mortgages, with the result that cash flows generated by a pool of mortgages may fluctuate as homeowners pay down their mortgages at faster or slower rates. Movements in interest rates, among other factors, affect prepayment speeds.

The Granite Funds were intended to take advantage of the mortgage-backed securities' potential for high returns while being market-neutral by constructing portfolios comprised of a balanced mix of "bullish" and "bearish" securities. A bullish security is likely to increase in value when interest rates fall and decrease in value when interest rates rise, and is more volatile. A bearish security is likely to decrease in value when interest rates fall and increase in value when interest rates rise, and is more stable. The Quartz Fund was intended to be market-directional, that is, it was to maintain a bullish or bearish portfolio depending on the predicted direction of interest rates.

The Granite Funds purchased many of the most complex and esoteric CMOs in existence. The more complex and esoteric CMOs are relatively illiquid. Indeed, the Brokers referred to the riskiest tranches—those most prone to large and unpredictable swings in value—as "toxic" or "nuclear waste."

The Funds primarily acquired their CMOs pursuant to repurchase agreements or "repos."[6] A repo is a financing mechanism that allowed the Funds to pay only a fraction of the cost of each CMO in cash, borrowing the balance from the brokers. In such a transaction, one party to the agreement agrees to sell a security to a buyer/lender for a given sum (the "repo amount") and to buy the security back from the buyer/lender at a later date (the "buy-back date") for the repo amount plus a market rate of interest (the "repo rate"). The buyer/lender holds the security in a "repo account." Although repos were a means for the Funds to acquire CMOs, in these transactions the Funds acted as a "seller" and the broker acted as a "buyer" of CMOs.

In effect, repos are collateralized loans. The Brokers loaned the Funds most of the purchase price for each CMO and took possession of the CMOs as security, *i.e.*, collateral, for the Funds' performing their obligations to repurchase the CMOs, *i.e.*, repay the loan, with interest, on the buy-back date. The repo buyer (the broker) obtained a security interest in the transferred securities.[7] The use of repos benefitted the Brokers by allowing the Funds to increase their purchases of CMOs from the Brokers.

The repo buyer (the broker) always paid (loaned) an amount less than the actual value of the security sold (transferred as

---

**6.** At times the Brokers refer to "reverse repurchase transactions" or "reverse repos." A repurchase transaction—or repo—from the Funds' perspective is a reverse repurchase transaction—or reverse repo—from the Brokers' perspective.

**7.** The parties disagree as to whether the repos were secured loans or arrangements for the sale and purchase of securities. In *Granite I* this Court observed that "[t]he legal status of

repo agreements is not easily subject to characterization—the purchase-and-sale framework incorporates characteristics of other transactional forms, including financings." 17 F.Supp.2d at 298. Thus, terms such as "pay," "purchase," "loan," "borrow," are used for the sake of convenience and are not intended to express any conclusion regarding this legal question.

security for the loan) by the repo seller (the Fund) as protection against default on the obligation to repurchase the security (pay back the loan). The difference between the amount loaned and the security's value is the "haircut." Thus, if a broker took a 20 percent haircut on a security valued at $100,000, then the repo amount (the amount loaned) to the Fund was $80,000 for that $100,000 security.

If the value of the securities in a repo account fell below an amount agreed upon by the parties, the "margin amount," then there was a "margin deficit" and the broker had the right to make a "margin call," i.e., to demand money or additional securities as collateral for the loan. If a proper margin call was not met, the broker had the right to liquidate the securities in the repo account.

On February 4, 1994, the Federal Reserve Board raised interest rates by a quarter of a point, which was the first rate increase in approximately five years. Interest rates were raised again on March 22, 1994. As interest rates rose, prepayments on the underlying mortgage obligations for mortgage-backed securities fell. ACM magnified the effect of these market conditions by purchasing inappropriately bullish securities that were particularly sensitive to these adverse market conditions. In addition, the Funds were highly leveraged and had an excessive degree of negative convexity.[8] The value of the Funds' portfolios plummeted during this period.

Between March 28 and March 31, 1994, the various brokers with which the Funds had entered into repo transactions issued a veritable blizzard of margin calls on the Funds, beginning with a $30 million margin call from Bear Stearns. Merrill and DLJ were two of eleven broker-dealers to make margin calls on the Funds at this time. All told, the margin demands amounted to more than $131 million. In response to the margin calls, the Funds transferred approximately $49 million in cash or unencumbered collateral to the various brokers, leaving a shortfall of almost $82 million. By March 30, 1994, the Funds' short-term obligations exceeded their cash and unencumbered securities by approximately $60.4 million. Indeed, two days earlier, Askin had asked the Investors for an additional $120 million in capital to use, in part, to pay rapidly-mounting margin calls. As the Funds were unable to meet the margin calls, the brokers liquidated the Funds' portfolios. The Funds collapsed and filed for bankruptcy under Chapter 11 on April 7, 1994. The Investors allegedly lost approximately $230 million in investments.

### The Investor Actions

Between 1991 and 1993, the Funds' portfolios were managed by Askin and John Contino ("Contino"). In 1993, Contino left ACM and was succeeded by Richard John ("John").

Askin and, subsequently, ACM, actively marketed interest in the Funds through written materials as well as in-person through presentations by Askin and ACM's Director of Marketing, Geoffrey Bradshaw–Mack ("Mack").

Although the alleged misrepresentations constitute different aspects of one multifaceted fraud, for ease of discussion they can be separated into two categories, namely, the "valuations fraud" and the "operations fraud." The valuations fraud pertains to representations concerning the process by which the Funds' securities were valued, and, specifically, whether valuations were based on broker marks, as well as representations regarding the performance of the Funds' securities. The operations fraud pertains to representations regarding the use of computer modeling to manage the Funds' investments.

---

**8.** Convexity is described *infra* p. 484 in connection with the consideration of expert testimony. The more negative convexity there is, the more accelerated will be a security's decline in value as interest rates rise.

ACM's marketing materials represented that the Granite Funds would achieve annual returns of 15% or more "by investing in a market-neutral, risk-balanced portfolio of high return, high credit quality CMO derivative securities." These materials further represented that, while higher returns are "typically" associated with higher risk, the Granite Funds were different because, due to their "risk-balanced strategy, higher returns can be achieved with the same, or lower, levels of risk." Thus, "stable rates of return with low risk" were promised.

Market neutrality was to be achieved by acquiring balanced holdings of "bullish" and "bearish" bonds. Thus, by purchasing offsetting positions in predictable securities, the Funds would enjoy the high returns associated with rate-sensitive CMOs while hedging against the risk attendant upon interest rate fluctuations. ACM represented through a graph that the Granite Funds would earn over 10% per year even if interest rates shifted over a 600 basis point range.

ACM further represented that, in order to manage the Granite Funds' portfolios, ACM had "developed its own proprietary analytics system that is used daily." ACM described an elaborate "structured five-step process" whereby, for "each CMO bond under consideration":

> Granite subjects the bonds to extensive financial analysis. Granite imposes a variety of economic scenarios on each security to identify how it would perform should there be changes in interest rates or prepayments. The results of this analysis are used to generate cash flow models for each CMO. Granite assigns probabilities to the possible outcomes for the CMOs under a variety of possible interest rate, prepayment, volatility and spread scenarios. With this information, Granite ascribes total return profiles to each CMO bond.

ACM further described how it made use of its "analytic models" to determine how each bond would combine with others to "form a hedged, lower-risk portfolio," and to "continually" monitor the portfolio and maintain its balance. ACM criticized other money managers for their lack of internal "sophisticated analytics capabilities" and their need to rely on third parties for analysis.

Each Investor executed a subscription agreement, or Private Placement Memorandum ("PPM"), with respect to his investment. The PPMs made similar, but less specific, representations as to the Granite Funds' investment strategy and analytic tools.

The PPMs described the "investment objective" of the Granite Funds as "earn[ing] a consistently high rate of return ... that is relatively stable over time ... by using market-neutral mortgage investing." The strategy was designed to produce these stable results "whether interest rates are rising, falling or remaining essentially unchanged." The investment advisor would use "carefully constructed and researched" "computer models to project the investment performance of different Mortgage–Backed Securities under different interest-rate scenarios and [to] search for securities with appropriately offsetting return profiles," and to "actively" manage the portfolios.

Askin sent investors monthly letters discussing the Funds' performance (the "Performance Letters"). In January 1992, Askin reported that he had corrected "a 'bearish' tilt" in the portfolios established by his predecessor, New Amsterdam. According to Askin, this "effective implementation of [the Funds'] portfolio strategy"— or "=balancing of the hedges"—resulted in "outstanding performance." The following month, Askin wrote that analysis from his "proprietary pricing models" led to another adjustment in hedging positions and the maintenance of the "market-neutral portfolio." In March of that year Askin announced that the "risk-balanced strategy produced an attractive total rate of return." Similar representations were made

during the ensuing two years. Askin pointed out on more than one occasion that there was much volatility in the interest rate markets, such that recognized (and bullish) fixed income indices suffered occasional monthly losses. According to Askin, his "analytics technology" enabled the Funds to maintain their market-neutral posture and, thus, achieve stable, positive returns virtually every month.

Mack and Askin testified that on numerous occasions they represented to the Investors through in-person presentations that ACM valued and would continue to value the Funds' portfolios and calculated returns based on "marks" provided by the brokers. Many Investors have testified to receiving such representations.

As mentioned previously, CMOs are not traded on a public exchange. Therefore, when an institution that owns CMOs wishes to determine the value of its CMO position, it marks that position to market. A mark is an estimate of the price at which a security will sell.

The Funds' auditors, Price Waterhouse, issued annual audited financial statements in which it was stated that "100% of the [Funds'] investments were valued on the basis of a price quotation provided by principal market makers." The market makers for CMOs are broker-dealers. The Price Waterhouse statements also listed the use of such price quotations for valuing the Funds' securities as the first of the Funds' "significant accounting policies." Finally, the Price Waterhouse statements provided that "other assets ... for which market quotations are not readily available are valued at their fair value as determined in good faith." Askin ratified the

1992 audited financials as "accurate and complete." Potential investors routinely received from ACM the audited financial statements for the year prior to the contemplated investment, and then received subsequent audited statements.

The Performance Letters also referenced the use of broker marks. Askin's very first letter noted that poor performance in recent months resulted from "unfavorable dealer marks." Another letter referenced Askin's belief that there was "a disparity between the economic worth of many of our security holdings and the marks placed on them by some of the dealers." Similar representations were made in other letters.

The PPMs stated that securities traded "over-the-counter" would be valued based on the "closing bid" price, while other unidentified securities would be valued based on the "estimated fair value ... as determined in good faith by the General Partner," in the case of Granite Partners, or "the fair market value ... as determined by the Directors in consultation with the Board of Advisors,"[9] in the case of Granite Corp.[10] The General Partner for Granite Partners was Dashtar Corporation, a company wholly owned by Askin. Askin was one of two Directors of Granite Corp. Granite Partners also had a Limited Partnership Agreement ("LPA") which provided for "good faith" valuations.

The PPMs made certain risk disclosures. The first page warned that "[t]he shares offered herein involve a high degree of risk. No one should invest who cannot afford to lose his entire investment." Like all prospectuses, the PPMs

---

9. The Board of Advisors was established in 1992 and was comprised of John Polk ("Polk"), an Investor, Joe Orlando ("Orlando"), a representative of the Whitehead Family, which family controlled many of the largest Investors, and Howard Wohl ("Wohl"), the general partner of Investors Oakwood Associates and Rosewood Associates.

10. The parties disagree as to whether the CMOs acquired by the Funds were governed

by PPMs "closing bid" provision, and the Investors concede that the PPMs were somewhat unclear as to the details of the valuation process. However, the Investors maintain that ultimately this is immaterial because, even if only "good faith" estimations of "fair value" were required, the representations made elsewhere that broker marks determined value filled in any missing details.

included a "Risk Factors" section, which section repeated that there was a risk of complete loss of the investment, stated that "any investment in securities" entails "substantial risks," and noted as risk factors prevailing interest rates, the investment advisor's ability to predict changes in those rates and in the real estate market, and the use of leverage by the advisor. Part of the investment strategy was described as using a "high rate" of leverage. The PPMs also cautioned, "there can be no assurance that risks will actually be reduced to the extent predicted by the [computer] models." Finally, the PPMs disclosed that "the effect of fluctuations in interest rates on the value of Mortgage–Backed Securities, particularly including Residuals, is often complicated due to the prepayment characteristics of these instruments."

The PPMs disclosed that the Granite Funds were designed to exploit mispricing opportunities growing out of the difficulties undergone by thrifts that had purchased CMOs in the 1980's.

When Askin and Contino arrived in 1991, the Funds were using a computer program called Wall Street Analytics. This program has some "option adjusted spread" (OAS) capability.[11] OAS was developed as a technique for capturing the complexities of mortgage-backed securities better than had previous analytical tools, in particular, the dynamic factors of interest-rate changes and prepayment speeds. The extent to which OAS analysis was used at that time by institutions and individuals analyzing such securities is disputed.

Askin and Contino wanted some of the features of the program to be proprietary to them, and worked with Andrew Chasen ("Chasen"), a third-party consultant to develop a product. Ultimately, Chasen licensed his "Amalgamated Bivariate" program (the "Amalgamator") to ACM.

Whether or not this product was proprietary to ACM is disputed.

Askin has testified that the output from the Amalgamator was used to evaluate the sensitivity of individual securities and whole portfolios to changes in market conditions, to measure investment worth, and to assess the "tilt" of a portfolio and compliance with market neutrality. John, however, found the Chasen product too cumbersome to be usable and ineffective to monitor market neutrality. Chasen believed his product provided only "basic analytics," not a CMO "model." John Richardson ("Richardson"), an expert for the Investors, opined that the Amalgamator was incapable of running analyses which Richardson maintains are needed to run a market-neutral portfolio, including OAS, effective duration, and effective convexity, for each bond and the entire portfolio. Lawrence Wiener ("Wiener"), however, also an expert for the Investors, concluded that the Amalgamator was capable of computing present values of securities in different interest scenarios, and of constructing different prepayment scenarios—a description consonant with the PPMs' claims.

Late in 1993, ACM updated Chasen's system with the Derivative Solutions system. Weiner opined that, in combination, the Chasen and Derivatives Solution systems are a powerful analytic tool that can perform sophisticated analysis on both an individual security and portfolio-level basis. However, many of the Funds' bonds were never input into the Derivatives Solution system.

Askin communicated with the dealers on a monthly basis regarding valuation of the CMOs owned by Funds. Typically, this process involved ACM sending a "marks sheet" to each dealer with a list of the CMOs which ACM wanted that dealer to mark. Generally, the securities listed

11. A description of OAS follows *infra* p. 482 in connection with the consideration of expert testimony.

were CMOs that the Granite Funds had either purchased from that dealer, or which that dealer was then financing under a repurchase agreement.

The valuation or marking of CMOs is a complex process which was conducted by the brokers' traders. Marking requires the exercise of informed judgment. The brokers marked the Funds' CMOs to market on a monthly basis, devoting considerable time and effort to this process.

Askin believed that dealer marks should be scrutinized and challenged. This belief was reflected in minutes of some of the meetings of the Granite Funds' Investment Committee. The Performance Letters also reflected that Askin was seeking to get the brokers to establish "more consistent" marks or marks that better reflected what Askin believed to be the true value of the Funds' portfolios. In meetings with investors in 1992 and 1993, Askin contrasted his approach with that taken by his predecessor, Estep, which he characterized as unquestioning with respect to the brokers' valuations.

Kidder began trading CMOs with Granite Partners and Granite Corp. in 1990. Kidder was one of at least 16 dealers trading CMOs with the Funds. Over the course of its dealings with Askin, Kidder provided some 600 marks for the Granite Funds.

Beginning in May 1992, Askin placed monthly calls to challenge Kidder's marks and request revised ones from William O'Connor ("O'Connor"), a Kidder salesperson. The first time Kidder agreed to revise a mark for a bond held by Granite Corp. was in May 1992, and the first time it agreed to revise a mark for Granite Partners was in March 1993. Kidder did not provide revised marks to Quartz. In total, Kidder provided ACM with 86 revised marks.

Recorded conversations between O'Connor and Askin reflect O'Connor's readiness to provide Askin with revised marks. In one, O'Connor stated to Askin, "[a]lright sir, I will adjust these." In another, O'Connor stated, "I will remark these and send them over in five minutes." In a third, O'Connor assured Askin, "[m]onth-end marks ... are completely negotiable ... I will work with you, however you want, on month end marks."

On March 3, 1994, O'Connor expressed concern regarding the revisions sought by Askin for reporting February 1994 performance, stating, "If you want it there I'll mark it there but I am going to go on record and say I can sell you that bond cheaper.... [Although] as long as we are not, you know, as I said hemispheres apart, it's not going to be an issue." Ultimately, Kidder did not provide revised marks in March 1994. This was the month the brokers made the margin calls and conducted the liquidations that wiped out the Funds' accounts.

DLJ began trading CMOs with the Funds in late 1991. Beginning in January 1992, and continuing through March 1994, Askin called DLJ salesperson Betsy Comerford ("Comerford") on a monthly basis and requested revised marks. After each call, DLJ supplied ACM with a revised month-end mark sheet reflecting the prices specified by Askin. DLJ never indicated in any way that the revised month-end mark sheets contained something other than DLJ's real month-end marks. DLJ revised approximately 400 marks, or over half of all marks provided to ACM.

Kidder did not provide ACM with revised marks in March 1994. DLJ did. Ultimately, Askin used many of his own, "manager marks" to report performance for February 1994.

O'Connor, arguing with colleagues on March 25, 1994, whether Kidder should "pull the plug" on ACM by making margin calls, warned that they should not do that because "we are in bed with ACM."

The Brokers did not see ACM's marketing materials and were not present at ACM's presentations to Investors. However, both Brokers reviewed the Price Wa-

terhouse statements reporting a policy of using "100%" broker marks, and both Brokers annually confirmed their marks to the Funds' auditors.

O'Connor acknowledged to Askin his understanding that marks for "performance purposes and repo purposes ... are two different things," and discussed with Askin their mutual understanding that when Askin sought revised marks he would not take those marks as "indications of bids or offers [for] real trading." [12] O'Connor complimented Askin for not "believ[ing] everything on the [revised mark] sheet." O'Connor also told Eric Kieter ("Kieter"), a CMO trader at a buy-side firm, that Askin didn't object when Kidder "mark[ed] things to the bone for repo" because "then we'd have performance marks."

In a conversation on March 14, 1994, O'Connor explained to Michael Vranos ("Vranos"), Managing Director and head CMO trader for Kidder, "[t]his is where he [Askin] wants the marks to be. This is where you marked them for month end. This is not for repo purposes. This is performance marks." Vranos replied, "I don't want to be defrauding his investors." On March 21, 1994, O'Connor, Vranos, and David Barrett ("Barrett"), also of Kidder, discussed the issue again. O'Connor commented,

> [T]he beautiful thing about Askin [is that] he doesn't sit there and make us use the performance marks as his repo marks. From a credit perspective we're covered.

To which Vranos replied:

> Right. Just from a liability standpoint we're not because we are defrauding investors. But, other than that, it's no big deal. Remember, Dave, you're an officer so your ass is going to be on the line.

Kidder's largest revision occurred when it agreed to "schmear" a downward correction in valuation for a particular CMO, the "Pru–Home" bond, over November and December 1993, where the value of that bond had been dramatically, and erroneously, overstated in October 1993. If Kidder had reported the Pru–Home bond's actual value in November 1993, the Funds' would have reported a loss in net asset value ("NAV") for that month rather than, as was reported, a gain.

O'Connor cannot recall any customers other than Askin who regularly asked for marks to be changed.

In Comerford's view, DLJ's initial marks were "correct," "market" prices, whereas the revised prices sought by Askin were not. Other DLJ personnel shared that view. Comerford did not believe Askin could price CMOs better than DLJ, and never saw any evidence supporting Askin's prices. Nonetheless, each month, DLJ provided ACM with another version of the most recent month-end mark sheet, reflecting the precise prices that Askin had requested.

Most of the time Askin sought upward revisions, but at times he also sought—and obtained—downward ones. O'Connor reported that Askin told him "I still got a lot of unrealized gains—why do you think I call you back every month and make you write down some prices.... I got a shit load of rainy day money if I need it."

Comerford testified that she provided revised marks to Askin so that calculations could be made of the yield of the Funds' bonds "as if" they had the value proposed by Askin. The revised mark sheets, however, provided Askin's prices without yields. Comerford's assistant believed the month-end sheets for Askin contained "pricing," not yield calculations. When DLJ delivered the revised mark sheet to ACM it sometimes included a cover note stating that "month end prices" were enclosed or placed the words "with price

---

**12.** "Repo purposes" would be for purposes of the repo transactions, in which the broker was acting as a creditor of the Funds and the value of the securities in the repo accounts determined whether sufficient collateral was being maintained.

changes" or "original" on the document. Comerford has also testified that "I know now I shouldn't have done it this way," and "I screwed up."

Comerford testified that DLJ provided month-end marks "for every single customer," knowing that "all marks are used to make some kind of reporting on the progress of the fund." In addition, ACM entered into a contract with DLJ in which DLJ agreed to provide "accurate" marks each month. The contract stated that the marks were "critical" to ACM's "ability to report [the Funds'] performance [to investors] as soon after the end of each month as possible," that "poor portfolio performance" would "cost [ACM's] customers," and warned that DLJ's failure to honor the contract would cause ACM "to reduce significantly the amount of business" it gave to DLJ.

ACM personnel knew that Askin challenged broker marks, but were aware of neither the scope of the marks revisions obtained by Askin nor the readiness with which the brokers supplied those revisions. Ronald Augustin ("Augustin"), of ACM, knew that at times Askin obtained revised marks but perceived these as corrections of substantive "mistakes." Mack was "flabbergasted" by the "massive changes" involved, after hearing a taped conversation between Askin and O'Connor. John considered the process revealed by tapes of Askin's conversations with O'Connor to be inconsistent with his understanding of the process. John felt "morally compromised" in March 1994 when he learned of Askin's use of "manager marks" to report performance for February 1994, because John had believed the Funds used "broker-dealers' marks ... for our performance". Indeed, John and other senior ACM staff threatened to resign in March 1994 when they learned of Askin's intention to use his own prices.

Beginning with Askin's arrival, the reported returns for both Granite Partners and Granite Corp. improved significantly. An expert for the Investors, Jed Kaplan

("Kaplan"), concluded that the Brokers' revised marks did not represent fair market value. Kaplan further concluded that, if Askin had used DLJ's and Kidder's initial marks rather than the revised ones, between January 1992 and February 1994, there would have been fifteen months with negative changes in NAV for Granite Corp. and sixteen months with negative changes in NAV for Granite Partners. ACM reported no losing months for this period. An expert for the Brokers, Lee Errickson ("Errickson"), quarrels with these numbers, although Errickson's report also concludes that there would have been losing months reported.

Kidder's revisions, standing alone, would have turned a losing month into a winning month on only one occasion, November 1993, when it agreed to "schmear" the Pru–Home bond correction between two months. In addition, of themselves, Kidder's revisions would have had little or no impact on the reported volatility, duration, "Sharpe Ratio" (a performance/risk measure), leverage, or targeted annual returns.

The reported monthly returns were between positive NAV 1.1% and 2.8% for Granite Corp., and between positive 1% and 3% for Granite Partners.

Price Waterhouse, in conducting its audits, took certain steps to determine whether the marks provided by the Brokers were corroborated by actual sales, and concluded that the valuations of the CMOs at year-end were "reasonable." Andrew Carron ("Carron"), an expert for the Brokers, concluded that Kidder's revised marks were "valid indicators of market value." The Bankruptcy Trustee concluded that Kidder's initial marks and revised marks were "[G]enerally ... consistent," with a difference of 3% or less in most cases.

Comerford had read the statement of Granite's investment objective, contained in its marketing materials, as "[a] stable high absolute level of return of 15 percent

per year across a broad range of interest rate scenarios." Donald Peskin ("Peskin"), also of DLJ, understood that Askin "was [running a market-neutral fund]; he had marketed his fund as a market-neutral fund." Peskin could not be sure, but assumed this understanding came from Comerford. Deborah Reynolds ("Reynolds"), a DLJ trader, knew the Funds were "supposed to be . . . zero duration."

DLJ performed six analyses of the Funds' portfolios between January 1992 and September 1993, each of which showed the Funds to be bullish. There is a dispute as to whether DLJ was provided with complete information regarding the portfolios' composition before doing these analyses. DLJ executives were aware the Funds' persistent lack of neutrality. John Friel ("Friel"), head of DLJ's finance desk, concluded that the portfolios were "sensitive" to interest rate increases. Leon Pollack ("Pollack"), head of DLJ's fixed income department, testified that "anyone who had [the Funds'] position[s] would be in trouble [when] rates were going up." Reynolds testified that DLJ's view was that the Funds "had a fair amount of duration."

When Askin told O'Connor about the new Quartz Fund, he told O'Connor, "[t]he main difference in Quartz relative to the Granite is it's not constrained to being market neutral." Exchanges among Kidder personnel and between Kidder and Askin personnel indicate Kidder's awareness that the Granite Funds were persistently bullish, and that this was contrary to the way they were supposed to be structured. O'Connor stated to other Kidder personnel, "[t]his guy's made 35% or more for his investors in the last two straight and he didn't do that by being . . . duration neutral. . . . [M]y only danger is . . . my biggest guy blowing himself up." Vra-

nos laughed when he said the Granite Funds are "structured as [ ] zero duration." O'Connor stated to John, of ACM, "You and I both know that the portfolios are not market neutral."

ACM was one of Kidder's biggest customers, and was DLJ's single largest mortgage-backed securities customer. The Brokers recommended and sold vast quantities of "inverse IO"[13] to ACM. In the third and fourth quarters of 1993, for example, Kidder sold over $120 million in inverse IO and over $300 million in other bullish securities to ACM.[14] As O'Connor put it, "I try to shove inverse IOs down [Askin's] throat." Wiener concluded that all of these securities were bullish. During the same period, DLJ sold approximately $115 million in inverse IOs, approximately the same amount in other securities which Wiener concluded were bullish, and one $3.5 million straight IO that was bearish. The vast majority of all the securities sold by the Brokers to ACM was bullish.

The Brokers represented the inverse IOs as bearish at a time when they were bullish. Jeffrey Lewis ("Lewis"), DLJ's head derivatives trader, characterized inverse IOs are "bullish when you want [them] to be bearish and bearish when you want [them] to be bullish." Comerford testified that inverse IOs are not a substitute for straight IOs, and that it required "a lot of expertise" to understand what ACM purchased. Vranos testified that Askin was buying "high risk" securities from Kidder. Vranos did not think inverse IOs were bearish in February 1994, during which time Kidder was selling inverse IOs to ACM and representing them as bearish. O'Connor feared the Funds would "blow up" due to their bullish tilt.

---

**13.** "IO" stands for "interest only" and pertains to the payments from the payor of the underlying mortgage obligation.

**14.** Inverse IOs, like the other Fund securities, are very complex, and the effect of interest

rate movements on their value depends on many factors. They may be bearish under some circumstances, and bullish under others.

ACM made it possible for the Brokers to sell their entire CMO offerings by purchasing "deal-driver" tranches of exotic securities created by the brokers themselves. In each of these deals, the Brokers sold hundreds of millions of dollars worth of CMOs. The Brokers perceived Askin as one of the few buyers in the market for these deal-driving tranches. Vranos testified that Askin was a buyer of deal-drivers, and O'Connor stated, "You can count the number of inverse IO buyers on three fingers." Richard Whiting ("Whiting"), of DLJ, testified that Askin was a "very significant" DLJ client due to his "unique" requests and willingness to buy deal-driving "tranches . . . new issue CMO securities."

The commissions received by O'Connor and Comerford were related in part to the riskiness of the security, with riskier securities generating higher commissions. O'Connor described how he received increased commissions on the "nuclear waste" sold to Askin. Comerford also testified to the relationship between her commission rate and the nature of the securities.

The Brokers provided very favorable financing for ACM's CMO purchases. DLJ routinely loaned ACM 95% of the purchase price for CMOs in their reverse repo transactions, creating a 19–to–1 debt/equity ratio. Kidder provided ACM with a special type of credit facility. O'Connor described this arrangement to Askin, stating, "[W]e have actually set up a different credit facility for handling you where Vranos signs a sheet that says . . . I absorb any losses here brought about by . . . an Askin account blowing up and us not maintaining a haircut." Vranos testified to the "special account facility pool" set up to do "asset-based lending" and that ACM was a "large fund that fell under the special account facility . . . policy."

Although the Funds' CMO holdings were complex and volatile, DLJ was able to sell many of the Funds' securities within a two-day period following the DLJ liqui-

dation. Moreover, experts for the Funds, in the Funds Action, have opined that the prices obtained by DLJ, as well as by Merrill in its liquidation auction, were lower than what could have been obtained.

The brokers were aware of the claims made regarding computer modeling in the PPMs, but did not see the marketing materials and were not present at ACM's in-person presentations. O'Connor stated to Vranos, "Askin has no model," and joked that the "model" consisted of "wett[ing] his finger and put[ting] it in the air." On another occasion, ACM's John joked to O'Connor, "I am matching up wits with Vranos on my HP."

DLJ's Comerford believed that DLJ had an obligation to "know [its] customer." DLJ knew that several customers had advanced analytical capabilities. DLJ knew that ACM was buying complex securities that could be understood only with sophisticated modeling. DLJ personnel did not see evidence that ACM had such modeling. However, DLJ personnel, unlike Kidder, did not actually express a view that ACM had inadequate modeling capabilities, or "no model" at all.

The Investors include wealthy individuals, money management firms, hedge funds or "funds of funds" (established to institute in other hedge funds), pension plans, and insurance companies. Unless otherwise permitted by the Granite Funds, Investors in those funds were required to invest a minimum of $1,000,000. The PPMs which each Investor signed, stated, "[t]he undersigned has the necessary knowledge and experience in financial and business matters to enable him to evaluate the merits and risks of this investment." The PPMs also included a disclaimer that "no representations or warranties have been made to [the Investor]," and "in entering into this transaction [the Investor is] not relying upon any information other than that contained in the Offering Memorandum [i.e., the PPM] and the results of [the Investor's] own independent investiga-

tion." The PPM also confirmed that there was an opportunity for the Investor to ask questions of ACM, and receive responses, as part of her investigation.

Potential and actual investors were given the opportunity to obtain information about the Funds and how they were run. The Investors were free to examine ACM's offices and its computer models, or to interview its personnel, including Askin. They were invited to observe the computer modeling on ACM's screens and were provided with printouts generated by the Amalgamator. They were provided with the Performance Letters and had access to lists of the Funds' holdings. The Price Waterhouse statements also set forth each security owned by the Funds, broken down by type. These statements were given to prospective as well as current investors. Mack testified that an investor request "to see something or speak to someone" was never denied. ACM also provided responses to due diligence questions by those Investors who inquired. One such Investor, Commonwealth/Providian, concluded that ACM had "sophisticated and comprehensive computer capabilities."

The Price Waterhouse statements broke the Funds' securities into broad categories, such as "interest only tranches," "principal only tranches," "other tranches," and "residual interests." These categories corresponded with categories used in ACM materials, in which ACM represented that interest-only CMOs and residuals were bearish, thus balancing (or hedging) the bullish principal-only tranches. In the annual audited statements, the reported market value of the bullish categories roughly approximated the reported market value of the bearish ones. Some of the tranches reported as "interest only" in the audited financials were in fact inverse IOs, which are not bearish. The Price Waterhouse statements did list the individual securities themselves, so that an Investor could have obtained a prospectus for that security. In addition, some Investors requested, and received, "Current Holdings Reports"

which identified securities in more detail, e.g., as "Interest Only Inverse Floater" or "Super P/O." DLJ obtained statements containing this level of detail in order to perform its portfolio analyses for ACM.

Investors testified that they read the Performance Letters and Price Waterhouse statements as reflecting that ACM's market-neutral, low-volatility approach was working. Each of the Investors has stated in a sworn declaration that he would not have invested, or retained his investment, if he had known of Askin's practice of obtaining revised marks from the brokers.

DLJ's Comerford testified that the Funds' reported returns in 1992 would have led her to conclude that the portfolios were neutral. However, an expert for Kidder, David Ross ("Ross"), opined that one cannot draw conclusions about duration or market sensitivity from the reported returns. Ross compared the Funds' reported returns to the performance of benchmarks and concluded that the Funds' returns were more volatile than Treasuries and were correlated with interest rate movements. Matthew Richardson ("Richardson"), an expert for the Investors, performed a similar comparison and concluded that the Funds did not achieve market neutrality. Richardson's use of regression analysis has been criticized by a DLJ expert, Raj Mehra ("Mehra"), as inadequate for making the measurements required to reach his conclusion. Wiener analyzed the securities listed in the statements provided to DLJ for purposes of the DLJ portfolio analyses. Wiener analyzed the effective duration and effective convexity of each bond within the portfolios and concluded that the Funds were never market-neutral.

Some Investors made their investments before Askin's arrival and, thus, did not have contact with Askin, ACM, or the ACM marketing materials before making their investments: Employee Retirement Income Plan of Minnesota Mining and Manufacturing Company ("3M"), The

David I. Chemerow 1992 Trust (the "Chemerow Trust"), Robert Johnston ("Robert Johnston"), and Richard Johnston ("Richard Johnston") as Trustee for the Demeter Trust (the "Demeter Trust").[15] These Investors contend that assurances made by Askin upon his arrival, or other ACM representations, induced them to maintain their investments. These Investors did receive the PPMs.

Some Investors made their initial investment before Askin's arrival, but made other investments during Askin's tenure: Lionel Sterling ("Sterling") and Antaeus Enterprises, Inc. ("Antaeus").

Investor Roma Malkani ("Malkani") invested after Askin's arrival but did not have contact with Askin or anyone else at ACM before investing.

A number of Investors did not know and did not ask how the Funds' portfolios were valued at the time they made their investments: L.H. Rich Companies ("L.H.Rich"), Primavera Familienstiftung ("Primavera"), International Asset Management Limited ("IAM"), ABF Capital Management ("ABF"), CoriFrance, Hedged Investment Partners ("HIP"), Global Hedge Fund ("Global"), Malkani, 3M, Diversified Income Strategies, Excelsior Investment Fund and Excelsior Qualified L.P. (collectively, "Excelsior"), Oblingter, W Finance Arbitrage ("W France"), the Regency Fund, Montpellier Resources Limited, Robert Johnston, Sofa Partners, the Demeter Trust, Gilla (B.V.I.) Limited ("Gilla"), and Nemrod Leverage Holdings Limited ("Nemrod").

Although all the Investors claim to have reviewed and relied upon the Price Waterhouse statements, fewer than half of the sixty Investors were able to produce copies of those statements, and only thirteen testified to having seen the "100%" broker marks language, with only seven having seen the language before making their investments.

Some Investors perceived, based on the PPMs or other information provided by Askin, that Askin had some discretion in reporting the value of the Funds' securities: Glenwood Balancing Fund, L.P. Glenwood Trust Company as Custodian for Walker Art Center, Glenwood Trust Co. Group Trust II, Glenwood Partners, L.P., Samta, Inc. ("Samta"), Bambou, Inc. ("Bambou"), Loukoum, Inc. ("Loukoum"), FIDR Investors 1996 Trust, HNM First Investors 1996 Trust, HNM Second Investors 1996 Trust, SDI, Inc., Commonwealth Life Insurance Company, Providian Life & Health Insurance Company ("Commonwealth/Providian"), Neutral Strategies, L.P., Pine Equities, L.P., and the Chemerow Trust.

Some Investors knew that Askin talked to the brokers about revising marks: Sterling, Commonwealth/Providian, Oakwood Associates, Rosewood Associates, and the Chemerow Trust.

A number of Investors had little understanding of ACM's computer modeling capabilities and never asked for a demonstration or documentation: Levitt Family Trust, Spirit Debt Limited, Spirit Neutral Limited, 3M, Neutral Strategies, L.P., Zimmerman Family Trust I, Zimmerman Income Partners, IAM, Bambou, Loukoum, Samta, Hubert Looser, L.H. Rich, Primavera, ABF, CoriFrance, HIP, Conservation Securities Limited Partnership, Trans–Resources, Inc., Excelsior, Gilla, Nemrod, Robert Johnston, William Monaghan, Oblingter, and W Finance.

One Investor, William Cook ("Cook"), took note of Askin's comments that he asked the brokers to reconsider their marks. Cook tested the accuracy of the valuations by comparing the reported marks and subsequent sale prices of the bonds. Cook, an investment strategist for

---

15. Not all such Investors are listed here. Moreover, although the Court has reviewed the evidence as a whole. the facts pertaining to each Investor will not be recited here.

Space and time considerations require this approach. Rather, only those Investors as to whom significant evidentiary problems have been identified are discussed here.

a large insurance company, was specifically familiar with CMOs. Cook believed that, while Askin sought revisions, he ultimately accepted the broker's price if he was unable to convince them of their error.

### Facts Relevant to the Statute of Limitations

On March 10, 1994, Askin reported a two percent loss to the Investors for all three Funds. On March 25, 1994, ACM restated the February 1994 loss, acknowledging that the correct figure was approximately twenty percent.

On March 24, 1995, Primavera filed a putative class action complaint in the United States District Court for the Northern District of California. This suit asserted federal claims and was brought "on behalf of a class consisting of all persons and entities who purchased, directly or beneficially, securities issued by any of the Granite Funds ... from January 26, 1993 through the date the Granite Funds went bankrupt."

In April 1995, the Funds' Chapter 11 trustee filed a preliminary report with the bankruptcy court regarding his investigation of the Funds' demise. This report indicated the possible involvement of the Brokers in Askin's fraudulent scheme.

On September 20, 1995, the *Primavera* complaint was amended to add the Brokers as defendants, and on October 18, 1995, the *Primavera* Action was transferred to the Southern District of New York. On March 1998, class certification in the *Primavera* Action and the later-filed *Montpellier Action* was denied.

Providian Life & Health Insurance Company ("Providian") is an insurance company with its principal place of business in Pennsylvania. Providian is a plaintiff in *ABF Action*, filed on March 27, 1996.

Sterling is a Connecticut resident. Sterling is a plaintiff in the *Johnston Action*, filed on June 9, 1997.

The Demeter Trust maintains its principal place of business in Connecticut. The Demeter Trust is a plaintiff in the *Johnston Action*, filed on June 9, 1997.

Cook is a Connecticut resident. Cook is a plaintiff in the *AIG Action*, filed on October 21, 1998.

Arbor Place, L.P. ("Arbor"), maintains its principal place of business in Massachusetts. Arbor is a plaintiff in the *Montpellier Action*, pursuant to the amended complaint filed on June 2, 1997.

Global Hedge Fund ("Global") is domiciled in Jersey, Channel Islands. Global is a plaintiff in the *Montpellier Action*, pursuant to the amended complaint filed on June 2, 1997.

Malkani is a Maryland resident. Malkani is a plaintiff in the *Montpellier Action*, pursuant to the amended complaint filed on June 2, 1997.

### The Funds Action

#### The Repurchase Transactions

DLJ and each of the Funds executed a standard industry agreement referred to as the PSA ("Public Securities Association") Agreement (the "PSA Agreement") with respect to their repo transactions.[16] Merrill and Quartz executed the PSA Agreement, but Merrill and Granite Partners and Granite Corp., respectively, did not.

The PSA Agreement provides with respect to the Funds' obligation as to margin maintenance, and the brokers' right to demand additional collateral:

> If at any time the aggregate Market Value of all Purchased Securities subject to all Transactions in which a particular party hereto is acting as Buyer [the broker] is less than the aggregate Buyer's Margin Amount for all such Trans-

---

16. The Funds have alleged in the Second Amended Complaint that DLJ entered into and breached other contracts with the Funds which are not the subject of the instant motions.

actions (a "Margin Deficit"), then Buyer may by notice to Seller [the Fund] require Seller in such Transactions, at Seller's option, to transfer to Buyer cash or additional Securities reasonably acceptable to Buyer ("Additional Purchased Securities") so that the cash and aggregate Market Value of the Purchased Securities, including any such Additional Purchased Securities, will thereupon equal or exceed such aggregate Buyer's Margin Amount (decreased by the amount of any Margin Deficit as of such date arising from any Transactions in which such Buyer is acting as Seller.

PSA Agreement ¶ 4(a).

The "Buyer's Margin Amount," i.e., the amount of collateral which the Fund was required to maintain in a repo account so as not to have a margin deficit, is "the amount obtained by application of a percentage ... agreed to by Buyer and Seller prior to entering into the transaction, to the Repurchase Price for such Transaction." PSA Agreement ¶ 2(c).

The PSA Agreement provides that the Fund may obtain the return of collateral that is in excess of the required margin amount:

> If at any time the aggregate Market Value of all Purchased Securities subject to all Transactions in which a particular party hereto is acting as Seller [the Fund] exceeds the aggregate Seller's Margin Amount for all such Transactions at such time (a "Margin Excess"), then Seller may by notice to Buyer [the broker] require Buyer in such Transactions, at Buyer's option, to transfer cash or Purchased Securities to Seller, so that the aggregate Market Value of the Purchased Securities, after deduction of any such cash or any Purchased Securi-

ties so transferred, will thereupon not exceed such aggregate Seller's Margin Amount [ ].

PSA Agreement § 4(b).[17]

The PSA Agreement defines "market value, with respect to any Securities as of any date," as,

> the price for such Securities on such date obtained from a generally recognized source agreed to by the parties or the most recent closing bid quotation from such a source, plus accrued income to the extent not included therein ... as of such date (unless contrary to market practice for such Securities).

PSA Agreement ¶ (2)(h).

If a margin call remains unsatisfied one business day after notice was given, the buyer, i.e., the broker, has the right to liquidate the repo positions of the seller, i.e. the Fund, in default. See PSA Agreement ¶ 11. In order to accomplish this liquidation the broker has two options, referred to hereinafter as "Option A" and "Option B":

> (A) immediately sell, in a recognized market at such prices as the nondefaulting party may reasonably deem satisfactory, any or all Purchased Securities subject to such Transactions and apply the proceeds thereof to the aggregate unpaid Repurchase Prices and any other amounts owing by the defaulting party hereunder ["Option A"] or (B) in its sole discretion elect, in lieu of selling all or a portion of such Purchased Securities, to give the defaulting party credit for such Purchased Securities in an amount equal to the price therefor on such date, obtained from a generally recognized source or the most recent closing bid quotation from such a source, against the aggregate unpaid Repurchase Prices

17. This section refers to the "Seller's Margin Amount." The PSA Agreement permitted the seller's margin amount and the buyer's margin amount to be the same, see PSA Agreement ¶ 2(h) and (q), and there is no dispute that the parties so agreed in this case. This is

why the effect of this paragraph is to permit the Fund to obtain a refund, as it were, of collateral that is in excess of its margin maintenance requirement (the buyer's margin amount).

and any other amounts owing by the defaulting party hereunder ["Option B"].

PSA Agreement ¶ 11(d)(i).

In the case of the DLJ repo transactions, the margin maintenance requirement was set in relation to the haircut percentage. According to the report of Funds' expert John Y. Campbell ("Campbell"), this requirement was equal to the (repo amount) * (100% + haircut percentage).[18] For example, one of the securities held in Granite Corp.'s repo account with DLJ was FHLMC 1415 S. The repo or loan amount for this security was $1,951,000. The haircut was 10%. The margin amount required to avoid a margin deficit was $2,146,100, which is 110% of the repo amount. The haircut amounts for the securities held by DLJ ranged from 5% to 25%. This margin maintenance obligation was not the same as the repurchase obligation due on the buy-back date. As explained earlier, the repurchase obligation was equal to the repo amount plus the market rate of interest.

The PSA Agreement provides expressly that the parties "intend that all Transactions hereunder be sales and purchases and not loans." PSA Agreement ¶ 6.

As mentioned earlier, Merrill entered into a PSA Agreement with Quartz but not with Granite Corp. or Granite Partners. Merrill and each of the Funds—Granite Corp., Granite Partners, and Quartz—entered into a "reverse repurchase confirmation" agreement (a "Repo Trade Confirmation") for each repo transaction.

The Repo Trade Confirmations all have identical terms. With respect to the level of collateral required to be maintained in the repurchase accounts, the confirmations provide:

> If on a business day the market value of the securities for a transaction is less than the agreed upon percentage of the outstanding purchase price, the purchaser may demand a mark to market. . . .
> Margin percentage shall at all times be equal to 102% of the repurchase principal plus accrued repurchase interest to date unless otherwise agreed.

Repo Trade Confirmation at 2.

The confirmations also contain certain provisions concerning adequate assurance of performance:

> If any time prior to the repurchase date, reasonable ground for insecurity shall arise with respect to performance by a party hereto, the other party may demand from such party that adequate assurance of due performance by such party be provided.
> A party is in default if . . . it fails to provide adequate assurance of due performance upon demand by the other party. If either party is in default, the other party may without notice . . . sell the securities. . . .

Repo Trade Confirmation at 2.

Under the Repo Trade Confirmations, the Funds were to repurchase the repoed securities from Merrill by April 25, 1994.

Unlike the PSA Agreement, the Repo Trade Confirmations do not provide expressly that the transactions are intended to be sales and purchases rather than loans.

Michael Aneiro ("Aneiro"), Augustin, John, Contino ("Contino"), Stephen J. Dendinger ("Dendinger"), and Askin, all of whom were employees of either Merrill or the Funds, testified that they were not aware of and did not view there to be any differences between the Merrill/Granite

---

**18.** This formula appears to be different from Merrill's explanation, discussed *infra*, of how margin requirement would be calculated in relation to the haircut percentage. Neither the Funds nor DLJ have explained exactly how the margin maintenance requirements were set for the DLJ repo accounts. The Court has been forced to derive the method from Campbell's report, and the relevant exhibits submitted by DLJ are illegible. In any event, DLJ and the Funds do not dispute the required margin maintenance amounts. Instead, their dispute centers around whether DLJ undervalued the Funds' securities for determining whether the margin maintenance requirement had been met.

transactions, in which no PSA Agreement was executed, and the Merrill/Quartz transactions, in which both a PSA Agreement and Repo Trade Confirmations were executed—or between the Merrill/Granite transactions and the transactions between the Funds and the other broker-dealers, in which only PSA Agreements were executed.

Some of these same witnesses also testified that they understood the repo transactions as loan arrangements, with the securities serving as collateral for those loans. Merrill's internal policy manual describes repos as "collateralized loan[s]," and the internal documents used by Merrill to monitor the repo account levels refer to the "loan amount" of the repos. Merrill's financial statements refer to repos as "collateralized financing transactions."

Merrill set the haircut amounts for its repo transactions at amounts ranging from 15 to 20 percent. According to Merrill, the margin maintenance requirements ranged, accordingly, between 118 and 125% of the repo, *i.e.* the loan, amount. For example, if a security is valued at $100,000, and the broker took a 20 percent haircut, resulting in a repo payment to the Fund of $80,000, then the margin percentage was 125% of the $80,000 purchase price, *i.e.*, $100,000.[19] George C. Ellison ("Ellison"), a vice president and mortgage sales specialist at Merrill, states in an affidavit that when he negotiated repo transactions with the Funds the parties agreed that the applicable haircut percentage determined the margin maintenance percentage for that transaction. Keith Peckholdt ("Peckholdt"), a vice president in Merrill's Repo Operations Department, testified that the haircut percentage was the threshold level which would trigger a margin call. Dendinger states in an affidavit that "when Merrill Lynch and the Funds agreed to a haircut for a repo trans-

action, they also agreed to designate the same percentage as the margin maintenance level for that transaction." However, Dendinger did not speak directly to any representative of the Funds, and the alleged agreement to base the margin requirement on the haircut percentage was oral.

Merrill generated daily reports for the repo accounts which stated the "Margin Percentage" as a comparison of the total value of the account compared to the outstanding repo amount, Peckholdt testified that Merrill's margin calls were dictated by the computer reports. The daily reports stated "no margin call for this customer" when the value of the collateral was greater than 102 percent of the repo amount. Some Merrill employees have testified that Merrill's computer system always defaulted to the 102 percent amount, rather than generating reports that were specific to the types of securities or actual margin requirement for a particular transaction.

Industry practice is that broker-dealers may reserve discretion to make margin calls any time the collateral depreciates in any amount, including by the haircut percentage. However, it is also industry practice that the parties may agree in advance to a "trigger point" for these calls, which trigger point would not necessarily be the haircut percentage.

At Askin's deposition, he was asked about the significance of the haircut percentage. Askin testified that the fact that Merrill lent the Funds less than 98 percent of the value of their securities—that is, took a haircut of 15 to 20 percent—modified the contractual obligations between the parties by requiring "a deeper discount for conversely less borrowing capacity."[20] Askin was also asked specifically whether the haircut percentage modified the rules governing margin calls by Merrill. Askin

---

19. This method, as just mentioned, is different from the one seemingly employed by Campbell.

20. The 98 percent figure corresponds to the 102 percent margin maintenance requirement referenced in the Repo Trade Confirmations.

answered, "I don't know," that he had never discussed that issue without anyone at Merrill one way or the other, and that to his knowledge no one else at ACM had either.

Peckholdt did not recall any occasions when Merrill had made a margin call on other customers when the daily reports, which defaulted to calculate margin requirements based on a 102 percent threshold, stated "no margin call for this customer," or, specifically, when the value of the customer's collateral was above the 102 percent threshold.

In-house counsel for Merrill, Michael McGovern ("McGovern") testified as Merrill's corporate designee in a Rule 30(b)(6) deposition. The Rule 30(b)(6) notice sought a deposition of a witness who could testify regarding "[t]he margin calls made by Merrill on the Funds in March of 1994, including the following subjects: a) the decision to issue margin calls . . . b) determination of the amount of the margin calls [ ]." McGovern testified that he was unaware of any conversation in which the parties agreed to apply a margin requirement percentage other than the one referenced in the Repo Trade Confirmations.

### The Margin Calls and Liquidations

#### The DLJ Margin Calls and Liquidation

In the beginning of the week of March 28, 1994, rumors circulated at DLJ that other brokers were making margin calls on the Funds and that the Funds were having difficulty meeting these calls. Pollack, head of DLJ's Fixed Income Department, recalled that DLJ was concerned about these rumors and that they created a "sense of urgency" at DLJ.

DLJ re-priced the Funds' securities on March 28, 1994. As of that date there were no margin deficits in the Funds' accounts according to DLJ's valuations. DLJ re-priced the securities again on Tuesday, March 29. The traders in DLJ's repo department did the re-pricing. There were discussions within DLJ concerning the difficulty, or even impossibility, of determining where the Funds' securities would trade on the market, and DLJ believed it ought to be conservative in its pricing in order to protect the firm's interests.

On March 29, 1994, a margin deficit existed in Granite Partners' repo account with DLJ. There is a dispute as to the amount of this deficit. According to DLJ, the deficit was in the amount of $9,243,077. According to the Funds, the deficit was $5,362,166. The Funds contend that DLJ was required to, but did not, calculate the deficit based on prices obtained from a "generally recognized source agreed to by the parties or the most recent closing bid quotation from such a source," plus accrued income not included therein, as specified in ¶ 2(h) of the PSA Agreement.

DLJ made a margin call on Granite Partners on March 29, 1994 in the amount of $9,243,077 and gave Granite Partners until 11:00am on March 30 to meet the call. Granite Partners did not meet the March 29 margin call. On the morning of March 30, 1994, prior to the deadline for meeting the March 29 call, and after recalculating Granite Partners' margin deficit, DLJ made a new, revised margin call in the amount of $14,534,189. Granite Partners did not meet the revised margin call.

On March 29, 1994, DLJ made a margin call on Granite Corp. in the amount of $2,922,344 and gave Granite Corp. until 11:00am on March 30 to meet the margin call. The Funds contend that if DLJ had properly calculated the margin deficit, in accordance with its obligations under the PSA Agreement, that there would have been no margin deficit on that date. Indeed, the Funds allege that on March 29 there was a $2,250,344 surplus in the Granite Corp. account. Granite Corp. failed to meet the March 29 margin call. On the morning of March 30, 1994, prior to the deadline for meeting the March 29 call, DLJ issued a revised margin call on Granite Corp. in the amount of $12,328,885, which Granite Corp. also failed to meet.

Earlier that same month, on March 2, DLJ had made a margin call which the Funds considered excessive and to which they objected, although without asserting that DLJ was in breach of the PSA Agreement. DLJ reduced its March 2 margin call in response to the Funds' objection.

According to the Brokers' expert Errickson, on March 29, 1994, Granite Partners had approximately $39.3 million in available cash and securities, and on March 30, Quartz had approximately $24.4 million in available cash and securities. Granite Partners and Quartz made payments towards or satisfied certain margin calls by other brokers on March 28, 29 and 30. Under the PSA Agreements, the Funds were obligated to re-purchase all repoed securities from DLJ for approximately $198 million in April 1994.

At around 2:00pm on the afternoon of March 30, 1994, members of DLJ's fixed income management team, together with Friel, head of the finance desk, and Bruce Richards ("Richards"), DLJ's head CMO trader, met with counsel and others to determine how to proceed. At that meeting, DLJ decided to liquidate all repo positions held by Granite Partners and Granite Corp. DLJ elected to liquidate the Funds' securities pursuant to Option B, *i.e.*, by deeming the securities as sold to itself and crediting the Funds' accounts for the value of those securities. DLJ considered this option to be in the best interest of both the Funds and DLJ, as compared with Option A.[21]

After the meeting on the afternoon of March 30, DLJ informed ACM, Granite Corp., and Granite Partners by fax that "in light of [the Funds'] failure to meet the margin call[s] and in view of the fact that there does not seem to be a ready market for the securities in [Corp.'s and Partners' accounts], we intend to take the securities into inventory and hedge our position."

DLJ liquidated the repo position of Granite Partners instantaneously on the afternoon of March 30, 1994, one business day after the initial margin call on that account, and the same business day as the revised margin call on that account. Inasmuch as DLJ liquidated the Granite Partners' account before the deadline on the revised March 30 margin call, *i.e.*, before March 31, Granite Partners was not given an opportunity to meet the revised margin call.[22]

Immediately upon the conclusion of the March 30 meeting, DLJ sold short a large volume of government and agency securities to hedge further erosions in the value of the Funds' securities. Next, bid lists were prepared and sent to other major dealers as a check on the reasonableness of DLJ's traders' prices. In addition, some of the bonds were marketed to DLJ's institutional customers. There were 33 securities in the Funds accounts as of the liquidation. DLJ sold 12 of the securities on March 30. The prices at which DLJ sold these securities were higher than the values credited by DLJ to the Funds' accounts for these securities in the liquidation.

On March 30, 1994, a margin deficit existed in the Quartz repo account. However, the Funds contend that DLJ did not calculate this deficit in accordance with the PSA Agreement, and that DLJ overstated the deficit amount. DLJ made a margin

---

21. The Funds do not dispute this version of events for purposes of opposing DLJ's motion as to Count I. For purposes of the Funds' cross-motion as to Count X, however, the Funds contend that the liquidation did not occur immediately, *i.e.*, on the afternoon of March 30, 1994, and that DLJ liquidated the securities pursuant to Option A, not Option B.

22. DLJ proceeded in an equivalent fashion with respect to Granite Corp. That is, it made a margin call on March 29, 1994, a revised margin call on March 30, 1994, and it liquidated the Granite Corp. repo positions on the afternoon of March 30, 1994. However, DLJ does not seek summary judgment as to Granite Corp. because it concedes there is a genuine dispute as to whether the Granite Corp. account had a margin deficit, given the calculations of the Funds' expert, Campbell.

call on Quartz on March 30 in the amount of $1,903,600, which margin call Quartz failed to meet. According to the Funds, the actual deficit for the Quartz account on March 30 was $512,556.

On March 31, one business day after the initial margin call on Quartz, DLJ sent a fax to ACM and Quartz informing them that because of the failure to meet the margin calls "and in view of the fact that there does not seem to be a ready market for the securities in [Quartz's repo account], we intend to take the securities into inventory and hedge our positions." DLJ then immediately liquidated the repo positions of Quartz by deeming the securities to itself and crediting the value of those securities, as calculated by DLJ, to the Quartz account.[23]

On March 31, DLJ sold 11 more of the Funds' securities, again at higher prices than the values credited by DLJ to the Funds' accounts. On April 4 and 5, 1994, DLJ sold 8 more securities, and on May 18, 1994, and August 4, 1994, DLJ sold the remaining 2 securities out of the total number of 33. These later sales were at prices that were below the amounts credited by DLJ to the Funds during the liquidation.

Also on March 30, 1994, DLJ set up a trading account, designated "T93," from which to conduct transactions related to its liquidation of the Funds' securities. DLJ's traders did not make bookkeeping entries showing the crediting of the securities from the Funds before the close of business in March 30. Instead, these entries were recorded on trade blotters and then into DLJ's trading system on the following day, March 31, "as of March 30." "As of" entry of trades is a common way of recording trades that occurred on the preceding day. By the time these entries were recorded on the late afternoon and evening of March 31, as described above, DLJ had already sold 23 of the Funds' securities to its institutional customers—at prices that

were above the valuations credited to the Funds' accounts.

The Funds voluntarily filed for bankruptcy on April 7, 1994. Some brokers, including DLJ, filed deficiency claims in the bankruptcy proceeding for alleged losses by the brokers in the liquidations. DLJ filed its deficiency claim January 4, 1995. DLJ seeks reimbursement for the difference between the prices it credited to the Funds for the securities during the liquidation and the repurchase amounts owed by the Funds under their respective PSA Agreements.

At the time of the liquidation, the Funds' outstanding repo obligations were approximately $198.7 million. DLJ credited the Funds in the amount of approximately $180.8 million, resulting in a $17.8 million discrepancy. After adjusting this amount by certain pre-liquidation obligations owed by the Funds to DLJ, and DLJ to the Funds, the net deficiency according to DLJ's calculations was approximately $9.9 million.

DLJ did not offset its deficiency claim by the amount of proceeds received on the resales of the 23 securities carried out by March 31, 1994. If DLJ had credited the Funds with these proceeds, and with the credited values for the remaining 8 securities sold at a later point, the total amount credited would have been approximately $189.9 million—as compared with the $180.8 million actually credited by DLJ. After the additional adjustments for pre-liquidation obligations, the net deficiency would have been $754,110—as compared with $9.9 million. Finally, DLJ also realized $2.36 million in hedging profits on the T93 account as a whole by March 31.

### The Merrill Margin Calls And Liquidation

Merrill, like DLJ, was aware of rumors that the Funds were in financial trouble. Merrill trader Scott Soltas ("Soltas") and

---

**23.** Again, the Funds concede this version of events for purposes of opposing DLJ's motion, but contest it for purposes of their cross-motion as to Count X.

the head of Merrill's mortgage trading, Jeffrey Kronthal ("Kronthal"), heard such rumors as early as February 1994. In mid-March, another Merrill trader, Bella Borg ("Borg"), heard rumors that the Funds were having difficulty making margin calls by Kidder, and on March 29 Soltas told Borg that there were rumors Askin was failing to meet margin calls by Bear Stearns and Kidder and "there could be some liquidations."

Between March 28 and 29, 1994, Merrill's valuations of the securities in the Funds' accounts decreased from $43,-536.568 to $37,303,782 for Granite Corp., from $23,726,489 to $19,825,017 for Granite Partners, and from $10,077,446 to $9,157,174 for Quartz. According to the March 29 valuations, Granite Corp. had collateral valued at 104% of the outstanding repo obligation amount and Quartz had collateral valued at 114% of its outstanding repo obligation. At the time, Granite Partners collateral was valued at less than the outstanding obligation, but according to a later correction is now conceded by Merrill to have been slightly above 102% of that amount. According to the calculations of the Funds' expert, Campbell, Merrill did not employ fair market prices in its valuations, and if it had there would have been a margin excess in each account.

On the morning of March 30, 1994, Merrill made margin calls on Granite Corp., Granite Partners, and Quartz in the amounts of $5,750,000, $4,050,000, and $480,000, respectively. These margin calls were based on a collateral requirement of 120% of the outstanding repo amounts for each of the Funds' accounts. None of the Funds met these margin calls.

On March 31, 1994, Merrill liquidated the Funds' repo positions through an auction. Merrill included other broker-dealers in the auction, but not its institutional, retail customers. Dave Scaramucci ("Scaramucci"), a DLJ trader, and Vranos, Managing Director and head CMO trader for Kidder, testified that broker-dealers are in the business of buying securities

and then reselling them at a profit. Three of the other broker-dealers who liquidated Fund securities through auctions included retail customers in those auctions. Vranos testified that in Kidder's auction the institutional customers, who were solicited for bids, "had greater interest and submitted higher bids than the dealers did" in that auction. Records of the Kidder auction confirm that retail customer bids were higher than dealer bids for 13 of the 14 securities in which Kidder received bids from both types of auction participants. Soltas testified that it was unusual for broker-dealers to trade CMOs with each other. However, Soltas also testified that it was not normal to seek bids directly from customers, and Kronthal stated in an affidavit that Merrill decided the best way to maximize proceeds was to solicit bids from the most active dealers, and that the dealers included in the auction were those dealers. Moreover, Askin testified that when he liquidated repo accounts he solicited bids only from broker-dealers because he believed that was the best way to maximize proceeds for the seller of securities.

Both Merrill and DLJ, when they later resold securities acquired in their liquidations, did so to institutional customers rather than other dealers. However, although Merrill garnered a profit of approximately $500,000 on those resales which were conducted immediately following the liquidation, it ultimately sustained a loss of approximately $700,000 with respect to the total number (nine) of resales of securities acquired during the auction.

Merrill allowed its own trading desk to participate in the auction on a blind basis (*i.e.*, without knowing the bids submitted by other auction participants). The total number of brokers participating in the Merrill auction, including Merrill itself, was six. Merrill knew that ACM did most of its trading with four broker-dealers—Kidder, Bear Stearns, DLJ, and Merrill—and Merrill had already received liquidation bid lists from Bear Stearns and DLJ, and was aware that Kidder had out-

standing margin calls. One of the participating brokers, Lehman Brothers ("Lehman"), did not submit any bids. Another broker, Salomon Brothers ("Salomon"), submitted two. However, Merrill obtained at least three bids for each security.

Prior to the auction, one of Merrill's retail customers, TCW, had given Merrill indications of interest in certain securities. Merrill bid on these securities in the auction at prices below what TCW had indicated it was willing to pay—in the hope, according to Soltas, of earning a small profit. Merrill acquired three of these securities, which it then resold to TCW at a mark-up of just under $500,000, or just over 2%, later in the day on March 31. The prices TCW indicated it was willing to pay were higher with respect to four securities than were any of the bids received in the auction as to those bonds.

Merrill gave bidders less than a day to submit bids. However, it extended the bidding period by one half hour when asked for more time by one of the broker-dealers. Earlier in the month, Askin had offered Merrill the opportunity to bid on certain securities but Merrill failed to bid on them, asserting that the time allowed to respond—approximately one day—was insufficient for Merrill to evaluate the securities and formulate bids.

According to an expert retained by DLJ, Leslie Rahl ("Rahl"), there was no standard industry practice for the liquidation of CMOs in 1994. The bankruptcy trustee also made a factual finding to this effect.

The prices obtained in the auction, and credited by Merrill to the Funds, were on average 12 percent lower than what Campbell calculates would have been fair market prices. Of the CMOs obtained by Merrill itself in the auction on March 31, 1994, Merrill resold four on the same day. Three were sold to TCW, all at prices that were lower than Campbell's fair market valuations for these same CMOs. Merrill

also offered six CMOs of the nine CMOs it had acquired in the auction to the Clinton Group, all at lower prices than Campbell's fair market valuations, but the Clinton Group agreed to buy only one—at the Merrill price.

Kronthal testified at his deposition that he "assume[d]" that in attempting to resell the Funds' CMOs that the Merrill traders treated these CMOs like any others, but that it was the traders rather than he who conducted these transactions. Kronthal did not recall any special instructions given to the traders, e.g., to resell these CMOs as quickly as possible. Jeffrey Gundlach ("Gundlach"), whose deposition testimony is cited by Merrill, had no recollection of the process.

Merrill's margin calls represented approximately eight percent of the $131 million demanded by the broker-dealer community.

Merrill did not make a deficiency claim in the Funds' bankruptcy proceeding.

### The DLJ Principal and Interest Payments

The bonds purchased by the Funds make principal and interest distributions on a periodic basis. The PSA Agreement requires than when the dealer holds securities at a time when an income payment is due, it must transfer that payment to the Fund, credit the Fund's account, or reduce the amount due on the loan at the end of the repo period.

Granite Corp. had FHLMC 1209–S on repo with DLJ after August 20, 1992, and DLJ had possession of that security. The bond made principal and interest payments on the 15th day of each month, and in December 1993 the bond paid a total of $243,668.24. Granite Corp.'s portion of the bond was 45.624% of the total face. Therefore, Granite Corp. was entitled to that percentage of the December 1993 payment, i.e., $111,170.[24] However, DLJ held

---

24. The Funds actually contend that Granite Corp. is entitled to a somewhat larger

amount, i.e., the missed payment plus accrued interest since that date.

that amount in a suspense account at the firm and did not credit it to the Funds.

### The Expert Reports

The Funds have submitted reports by three experts in support of their opposition to Merrill's motion for summary judgment, and of their cross-motion against Merrill. These experts are Campbell, Burton G. Malkiel ("Malkiel"), and Atanu Saha ("Saha").

### The Campbell Report

Campbell is offered as an expert in the economic analysis of securities prices and interest rates. More specifically, counsel for the Funds requested that Campbell undertake the following assignments: (1) to assess the fair market prices of the CMOs held in the Funds' accounts at DLJ and Merrill on the margin call and liquidation dates; (2) to calculate the Funds' margin positions on the margin call dates based on the fair market prices of the securities; and (3) to compute the difference between the sums that would have been credited to the Funds using the fair market prices for the liquidated securities and the sums that were actually credited to the Funds by DLJ and Merrill.

Campbell is the Otto Eckstein Professor of Applied Economics at Harvard University. Previously, he was the Class of 1926 Professor of Economics and Public Affairs at Princeton University. He was also the Director of the Program in Asset Pricing at the National Bureau of Economic Research, and has held visiting positions at the London School of Economics, Oxford University, the Bank of England, the Wharton School of the University of Pennsylvania, and the Sloan School of MIT. Campbell graduated from Oxford University and received his Ph.D. from Yale University.

Campbell has published more than fifty articles and books on financial economics and the statistical analysis of financial data. His research includes analyses of stock and bond prices, the relationships between economic risk and the rate of return on assets, and the term structure of interest rates. He has held editorial positions with leading scholarly journals including the American Economic Review, the Review of Economics and Statistics, the Journal of Financial Economics, the Review of Financial Studies, and the Journal of Money, Credit, and Banking. Campbell teaches a course at Harvard that has included a segment on CMOs and their valuation, and he has performed consulting work and advised on a Ph.D. thesis that involved CMO valuation.

In his report Campbell concludes that (1) DLJ and Merrill credited to the Funds lower-than-fair-market prices for the liquidated securities—on average, 14 percent lower in the case of DLJ and 13 percent lower in the case of Merrill; (2) had DLJ used fair market prices, the Funds would have received $27.5 million more than was actually credited by DLJ; (3) had Merrill used fair market prices, the Funds would have received $9.5 million more than was actually credited by Merrill; and (4) based on the fair market prices of the securities, the repo account of Granite Corp. did not have a margin deficit on the margin call dates, and the value of the securities held in each of the Funds' accounts at Merrill exceeded 102 percent of the outstanding repo obligation.

Campbell explains the methodology he employed in order to reach these conclusions as follows.

In order to value the Funds' securities as of the margin call and liquidation dates, Campbell developed a pricing model. He did this because most CMOs, unlike exchange-traded stocks, are infrequently traded and, as a result, do not have readily observable transaction prices.

A key element of Campbell's pricing model is OAS (option-adjusted spread) analysis, which Campbell characterizes as the most accurate method for CMO valuation. OAS measures the expected return on a CMO relative to the return on U.S. Treasury securities, taking into account

the prepayment options embedded in the CMO. Models for computing OAS simulate the performance of the CMO under many different interest rate (and, hence, prepayment rate) scenarios. Each interest rate scenario yields a different set of simulated cash flows for a CMO. An OAS model then solves for the "yield spread differential," or OAS, that must be added across each point of the Treasury yield curve so that the average present value of the simulated cash flows equals the current market price of the CMO. In other words, given the current market price for a CMO, an OAS model can solve for its OAS. Conversely, given an OAS for a CMO, an OAS model can solve for that CMO's price.

Campbell employed two methodologies to value the Funds' securities. The first involved relative value analysis and is referred to as Method 1. This approach is based on the premise that CMOs with similar risk-return characteristics and interest rate sensitivity should have similar OASs and should be affected by changes in the interest rate environment in a similar fashion. Additionally, any changes in liquidity in the market should affect the OASs of similar securities in a similar fashion. Therefore, according to Campbell, the OAS of a security that is comparable to a security held by the Funds can be used to infer the OAS of the Fund security on the valuation dates, i.e., the margin call and liquidation dates. In turn, the OAS inferred for a particular Fund security on the valuation dates can be used to compute the fair market price of that security on those dates.

However, for some Fund securities, Campbell could not find a comparable security. In those cases, he adopted a modified approach, referred to as Method 2. Using the DLJ or Merrill repo mark of the Fund security, i.e., the price that DLJ or Merrill assigned to the security for purposes of monitoring its own exposure on its repo loans, Campbell computed the security's OAS on March 28, 1994, a date prior to the margin calls or liquidations. He

adjusted this OAS to reflect the changes in the interest rate environment and liquidity between March 28 and the valuation dates, using the median changes in OAS of CMOs in the broad group of CMOs in which the Fund security belongs. Campbell then used the adjusted OAS of the Fund security on the valuation dates to compute the fair market price of the Fund security on each of those dates.

Of the thirteen Fund securities liquidated by Merrill that Campbell priced, eight were valued using Method 1 and five were valued using Method 2.

Campbell contends that his analysis accounts for the effect of possible changes in liquidity in the CMO market during the margin call and liquidation period. In the case of Method 1, because he computed the fair market price of the Fund security using the OAS of a comparable security, price-effects of changes in liquidity in the market would be reflected in the OAS of the comparable security and, therefore, in the pricing of the Fund security under Campbell's model. In the case of Method 2, Campbell accounted for changes in liquidity by adjusting the OAS of the Fund security between the original OAS computation date and the valuation dates using changes in OASs for a similar category of CMOs.

Campbell used actual transaction prices when available for assigning prices to the comparables—which prices were then used to compute OASs for those securities. When actual transaction prices were not available, Campbell relied on inventory and exposure report marks obtained from DLJ, Merrill, and Bear Stearns. Campbell admitted at his deposition that he could not know if the marks were "completely fresh," and that in a market where CMO prices were falling the use of stale marks would have the effect of inflating model-generated prices. However, the marks Campbell used had been changed from the preceding business day and Bear Stearns traders have testified that they

marked the CMOs in their portfolios on a daily basis.

With respect to Method 1, Campbell employed the following methodology in order to identify comparable securities. First, he identified four characteristics which he deemed to be key in determining comparability: CMO type, credit risk, interest rate risk, and prepayment risk. Then he analyzed the Funds' securities and a database of approximately 1,500 potentially comparable securities in terms of these characteristics. More specifically, in order to select a comparable security to be used for each Fund security, Campbell employed an algorithm that sifted the securities in the database through four screens based on the risk-return characteristics of the securities. In Stage 1, the potential comparables were limited to agency securities of the same general type as the Fund security but that had not been owned by the Funds or another Askin-managed account.[25] In Stage 2, the potential comparables were screened based on similarity of maturity date, weighted average coupon, weighted average life, and interest rate cap. In Stage 3, points were given to various characteristics of the potential comparables and those potential comparables were then ranked based on their total score.

The top four securities that passed a minimum threshold were considered at Stage 4, where the Derivative Solutions program was used to compute OAS, effective duration (a measurement of price sensitivity to changes in interest rates), and effective convexity (a measurement of the sensitivity of duration to changes in interest rates) for those securities for which trade or mark data were available for the three-week period surrounding the margin calls and liquidations. The final selection process took into account, among other things, the closeness of the effective duration of the potential comparable to that of the Fund security and whether a trade price rather than a mark was available for the potential comparable.

Campbell concedes that some of his comparable securities are "more comparable than others."

Once a comparable was selected for the Fund security, Campbell computed the OAS for that comparable on the margin call and liquidation dates. Where the price or mark used to compute the OAS for the comparable was not from the margin call or liquidation date, Campbell adjusted the OAS between the price or mark date and the valuation dates based on the change in OAS experienced during that time period by CMOs in the same category. This procedure accounted for intervening changes in liquidity, interest rate, and other market factors. Once he had computed the OAS of the comparable security on the margin call and liquidation dates, Campbell applied the OAS to the Fund security to compute the fair market price of the Fund security on each of those dates.

Before using his model to price the Funds' CMOs, Campbell compared OASs calculated with his model of several non-Fund CMOs to the OASs reported by Bloomberg for those CMOs. Bloomberg is a recognized pricing service. Campbell concluded that 98 percent of the variation in the Bloomberg OASs was explained by his model-computed OASs, indicating to him that his model performed well in pricing CMOs. This comparison pertained to Campbell's ability to accurately calculate a CMO price from a given OAS.

Campbell employed two techniques to evaluate whether his model-computed prices were "meaningful and accurate." First, he determined that the average changes in the Funds' portfolio values, using his model-computed prices, were generally consistent with the average daily

25. This was done to avoid including securities that, because they were owned by other accounts managed by Askin, might be subject to the same issues concerning propriety of pricing as the securities owned by the Funds.

change in the Lehman Brothers Bond Price Index (the "Lehman Index") for long-term treasury securities. (The Lehman Index is reflective of the interest rate environment.) Campbell testified that the comparison with the Lehman Index was not so much a "test" of his results as it was "a rough cross-check of reasonableness." His intention was to capture "sensitivity"—which he characterizes as a measure of how much the value of CMOs might be expected to move when the values of long-term Treasury securities move. Campbell did not expect a particular degree or direction of sensitivity, but he did expect it to be stable over time.

Second, Campbell examined the weighted average OASs of the Funds' portfolios during the margin call and liquidation period, using his model-computed prices. Based on OAS data obtained from Merrill's Mortgage Market Monitor (the "Market Monitor"), Campbell expected that the OASs of CMOs would not show a drastic change during the last week of 1994. Campbell testified that he would not expect a one-to-one correspondence between his average weighted OASs and the Market Monitor, but that the Market Monitor "gives a general indication in the CMO market as a whole." Campbell's analysis revealed that the average OASs calculated using his data were consistent with the Market Monitor data. Campbell considers that this suggests that his model-computed prices are meaningful and accurate.

Campbell avers that his methodology was "conservative," i.e., one tending to lead to lower calculated fair market prices, in two respects. First, to the extent he used broker-dealer marks as part of his analysis, these marks were at or close to the bid side of the bid-offer spread,[26] and thus reflect a built-in discount for uncertainty in valuation. Second, Method 2 used as a starting point the DLJ and Merrill exposure report marks of March 28, which Campbell avers were sharply lower than those that would have been expected given the trend of interest rates and the Lehman Index. Campbell's opinion is that a pricing analysis based on these marks would likely result in a computed price that is lower than the true fair market price.

According to Campbell, both comparable-security-based valuation analysis and OAS analysis are generally accepted in the securities industry and in academia. With respect to the use of these techniques within the industry, Campbell relied on testimony from certain witnesses in this case. For example, Lewis, the head CMO trader at DLJ, testified that in order to price CMOs in connection with contemplated trades, "[y]ou can look for comparable securities that you've seen trade in the market place.... You could also run an option adjusted spread [ ]." Jeffrey Reich, a trader at Bear Stearns, testified that Bear Stearns' pricing method involves solving for the OAS of one CMO based on that CMO's price, and then applying that OAS to another CMO and obtaining the second CMO's price:

Q: Did you ever start with an OAS and then solve for price?

Reich: Yes.

Q: How would you determine what OAS to start with?

Reich: Well, if you sold a PO to the customer at 70, you would solve for OAS. And if the OAS was 240, then you would take the 240, plug it into the model to solve for price on another PO.

OAS analysis was also used by Kidder Peabody and the Clinton Group, a significant participant in the CMO market, as well as by Merrill's and DLJ's valuation experts.

Professor Anthony B. Sanders ("Sanders"), a Merrill expert, employed OAS

---

**26.** Campbell relied on testimony by certain DLJ, Merrill, and Bear Stearns employees in reaching this conclusion.

methodology but adapted it by computing a range of values for some but not all of the Funds' securities, and employing an assumption that any price corresponding to an OAS within 25 percent of his "derived OAS" was reasonable. At his deposition, Sanders did not identify anyone else who had applied this particular technique, or professional literature that discussed it.

Repo marks are used in the industry for purposes of crediting repo account holders with the value of their securities. For example, Pollack testified that DLJ credited the Funds in the liquidation with the repo mark amounts used in March 30 margin calls. The PSA Agreement gives the broker the option of crediting a defaulting buyer's repo account for securities "in an amount equal to the price therefor" on liquidation date. Reich testified that repo marks used to report on Bear Stearns' net capital position at the end of each day. Reich also testified that brokers adjusted their pricing of CMOs based on changes in interest rates.

After submitting his original report, Campbell submitted a revised report in which the fair market values ascribed to certain securities were changed. Campbell's estimations increased for Merrill securities, but decreased for DLJ securities. Campbell also corrected an error with respect to one Merrill security, for which he originally used a March 25 repo mark (pursuant to Option 2) but should have used marks from March 30 and 31. As a result of this correction, the Funds' damage claim in relation to that security was reduced slightly.

### The Malkiel Report

Malkiel is offered as an expert in finance, including the use of derivative instruments. More specifically, counsel for the Funds asked Malkiel to examine whether DLJ and Merrill (1) complied with their obligations under applicable PSA Agreements; (2) adhered to the covenant of good faith and fair dealing inherent in these Agreements or otherwise applicable to their conduct; (3) conducted the liquidations in a commercially reasonable manner; and (4) credit fair market prices to the Funds for the liquidated securities.

Malkiel has taught economics at Princeton University for nearly thirty years, has twice chaired Princeton's Economics Department, is currently the Chemical Bank Chairman's Professor of Economics at Princeton, and has served as Dean of the Yale University School of Management and as a member of the President's Council of Economic Advisers. He has published widely in the field of finance, the valuation of stocks and bonds, the use of derivative instruments, and the operation of the United States financial markets. Malkiel also has extensive experience in the investment community. He serves on the Board of Directors, and chairs the Investment Committee, of the Prudential Insurance Company of America, is a director of the Vanguard Group of Investment Companies, is a member of the Investment Committee of the Pew Charitable Trust, and is the Chairman of the (Derivatives) New Product Committee of the American Stock Exchange. Earlier in his career, he worked on Wall Street as a stock and bond trader and investment banker.

Malkiel summarized his conclusions as follows:

> The liquidations of the Funds' securities by DLJ and ML were improper and conducted in violation of the intent and spirit of the applicable PSA Agreements, the covenant of good faith and fair dealing, and standards of commercial reasonableness. DLJ and ML did not meet their obligations to secure the best prices for the liquidated securities and improperly put their own interests before those of their customers the Funds.

Malkiel concluded that DLJ and Merrill had an obligation to solicit bids from their institutional customers; that the Funds would have benefitted from such solicitation; that Merrill sought bids from broker-dealers who responded only with "accom-

modation bids"; that DLJ's and Merrill's resale profits indicated they had failed to obtain the best prices for the Funds, although the resale prices were not necessarily indicative of the fair market prices of the securities; that DLJ chose to resell the securities at below-market prices because that "was, from DLJ's self-interested perspective, quite rational"; and that Merrill "could have looked for additional, more competitive purchasers, [but] it had little incentive to do so when it could immediately resell to TCW [Trust Company of the West], satisfy a customer, and make the profits noted above, while avoiding the risks and effort involved in a more sustained sales effort."

In his report Malkiel cites to evidence developed during discovery, including testimony and trading records, as support for his conclusions. The Funds also aver that Malkiel drew on his considerable experience in the financial community and his academic research and training concerning market behavior.

### The Saha Report

Saha is offered as an expert in applied economics and econometrics. More specifically, counsel for the Funds asked Saha to compute damages by computing the differences between sums that would have been credited to the Funds using the "highest intermediate price" for the liquidated securities and the sums actually credited to the Funds by DLJ and Merrill.

Saha is a Principal of Analysis Group/Economics, an economic and financial consulting firm. He previously was a member of the graduate faculty at Texas A & M University, teaching Ph.D.-level courses in applied economics and econometrics.

Saha concluded that had DLJ credited the Funds with the "highest intermediate price" of the securities during the period of the liquidations and immediately thereafter, the Funds would have received $35.4 million more than was actually credited by DLJ, and; had Merrill credited the Funds

with the "highest intermediate price" of the securities during the period of liquidation and immediately thereafter, the Funds would have received $10.2 million more than was actually credited by Merrill.

Saha states that he based his conclusion on a review of the fair market prices calculated by Campbell as well as prices obtained from certain contemporaneous sources, namely, prices obtained by DLJ and Merrill in their resales of the liquidated securities on March 30, March 31, and April 4, 1994, prices from DLJ's March 30 exposure report, prices from a March 31 resale by Bear Stearns of a Fund security held at both Bear Stearns and DLJ, an April 6 sale by Bear Stearns of a security held at both Bear Stearns and Merrill, and certain liquidation prices credited to the Funds by DLJ and Merrill.

### DISCUSSION

### Standard for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure provides that a motion for summary judgment may be granted when "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The Second Circuit has repeatedly noted that "as a general rule, all ambiguities and inferences to be drawn from the underlying facts should be resolved in favor of the party opposing the motion, and all doubts as to the existence of a genuine issue for trial should be resolved against the moving party." *Brady v. Town of Colchester,* 863 F.2d 205, 210 (2d Cir.1988) (*citing Celotex Corp. v. Catrett,* 477 U.S. 317, 330 n. 2, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (Brennan, J., dissenting)); *see Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 (2d Cir.1995); *Burrell v. City Univ.,* 894 F.Supp. 750, 757 (S.D.N.Y.1995). If, when viewing the evidence produced in the light most favorable to the nonmovant, there is no genuine issue of material fact, then the entry of summary judgment is appropriate. *See Burrell,* 894 F.Supp. at 758 (*citing Binder*

*v. Long Island Lighting Co.*, 933 F.2d 187, 191 (2d Cir.1991)).

Materiality is defined by the governing substantive law. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "[T]he mere existence of factual issues— where those issues are not material to the claims before the court—will not suffice to defeat a motion for summary judgment." *Quarles v. General Motors Corp.*, 758 F.2d 839, 840 (2d Cir.1985).

For a dispute to be genuine, there must be more than "metaphysical doubt." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted).

■ A claim for aiding and abetting fraud must be proven by clear and convincing evidence. *See Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91, 98 (2d Cir.1997). Accordingly, in order to survive summary judgment, the Investors must have adduced sufficient evidence to meet this standard at trial. *See Anderson*, 477 U.S. at 255, 106 S.Ct. 2505; *Woo v. Times Enters., Inc.*, No. 98 Civ. 9171, 2000 WL 297114 (S.D.N.Y. Mar.22, 2000).

### *The Investor Actions*

### I. *The DLJ and Kidder Motions for Summary Judgment Against all the Investors*

■ In order to prevail at trial, the Investors will have to prove (1) the existence of the primary fraud, (2) the aider and abettor's knowledge of the fraud, and (3) substantial assistance by the aider and abettor. *Schlaifer Nance*, 119 F.3d at 98 (discussing clear and convincing standard

in fraud action); *Tribune v. Purcigliotti*, 869 F.Supp. 1076, 1100 (S.D.N.Y.1994), *aff'd*, 66 F.3d 12 (2d Cir.1995) (setting forth elements).

The Brokers contend that the Investors cannot meet their burden as to any of the elements of aiding and abetting, and cannot establish loss causation and determinable damages. Furthermore, the brokers urge that at most the evidence supports a claim of corporate mismanagement, rather than fraud, and that the Investors lack standing to bring such a claim.

### A. *The Primary Fraud*

■ In order to establish the existence of the primary fraud, the Investors must show (1) that Askin or ACM made material, false representations, (2) with the intent to defraud, and (3) that the Investors justifiably relied upon those representations, (4) causing damage to the Investors. *See, e.g., The Pits, Ltd. v. American Express Bank Int'l*, 911 F.Supp. 710, 717–19 (S.D.N.Y.1996); *Morin v. Trupin*, 711 F.Supp. 97, 103 (S.D.N.Y.1989) (citation omitted); *Freschi v. Grand Coal Venture*, 551 F.Supp. 1220, 1230 (S.D.N.Y.1982). Evincing the absence of restraint that typifies the litigants in this case, the Brokers challenge each and every element of the primary fraud.

### 1. *The Making Of Material Misrepresentations*

The Investors contend that they were induced to purchase and/or retain their interests in the Funds based on misrepresentations by Askin that the Funds would be (and were) valued using independent broker marks, maintained in a strict market neutral posture, and managed through the use of sophisticated, proprietary computer models. They also assert reliance on representations that the Funds were making money every month, with little volatility, under Askin's leadership.

(a) *The Valuation Aspect of the Fraud Claim is Consistent With the Complaint*

■ The complaint alleges that the Brokers and ACM negotiated inflated marks for the Funds' bonds, which marks were then passed on to the Investors through ACM's performance reports. *See ABF I*, 957 F.Supp. at 1328–29 (discussing marks-related allegations). At the present stage, however, the focus of the Investors' theory is that they were misled as to the valuation "process," and that the brokers revised marks both upward and downward, enabling ACM not only to inflate returns but to "smooth" them.

Kidder maintains that this theory is "totally inconsistent" with the complaint, and that the valuation aspect of the Investors' fraud claim should now be disregarded because Kidder has been substantially prejudiced by the introduction of this "newly styled" claim.

Although the Investors' theory at the pleading stage centered on the allegation that Askin reported inflated values, the issue of the marks revision process was part and parcel of that theory. *See ABF I*, 957 F.Supp. at 1328–29 (discussing allegation of "process by which the Brokers and ACM would negotiate inflated marks and pass them on to investors"). Discovery has now revealed evidence that Askin sometimes obtained upward revisions, and sometimes obtained downward ones.

The allegation of "smoothed" returns is not totally inconsistent with the complaint but, rather, reflects the fuller picture as it has been developed through discovery. Indeed, the Investors still allege that on numerous occasions, with the help of the Brokers' revised marks, ACM overstated performance. In addition, the theory that ACM committed fraud by representing that it used broker marks to value the Funds' securities, and then did not do so, thus misrepresenting the valuation "process," is consistent with this Court's previous holding that ACM had "an affirmative duty ... to disclose the falsity of the statements that initially induced the Plaintiffs' investments." *Id.* at 1329.[27] Finally, Kidder's allegation of prejudice is unsubstantiated.[28] Therefore, the valuation aspect of the Investors' claim will not be disregarded as "newly styled."

(b) *Whether Askin Made Fraudulent Misrepresentations*

■ The Brokers aver that the Askin's representations regarding various subjects were true and, thus, cannot support a fraud claim.[29] These subjects include the

27. This said, it is noted that the Investors overstate this holding. According to the Investors, *ABF I* held that ACM had an affirmative duty to reveal the marks revision process. Thus, the Investors appear to contend that ACM was obligated to disclose this process even if it did not represent that it used broker marks to report performance. What this Court actually held was that to the extent ACM made misrepresentations to induce a plaintiff's investment—which, certainly, could include misrepresentations regarding the valuation process—then a later failure to disclose the truth was itself a misrepresentation. *See ABF I*, 957 F.Supp. at 1329.

28. The issue of prejudice has not been fully briefed, and Kidder reserves its rights to raise that issue upon any subsequent application by the Investors to amend the current pleading. To the extent that the summary judgment motions are denied, the parties will be required to prepare a pretrial order, the purpose of which is "to make specific the legal theories on which each party is proceeding and to crystallize and formulate the issues to be tried," *Olivieri v. Ward*, No. 85 Civ. 3269, 1986 WL 11451, at *1 (S.D.N.Y. Oct. 7, 1986), and which "shall control the subsequent course of the action unless modified by a subsequent order," Fed.R.Civ.P. 16(e). If amendment of the pleadings is sought through the pretrial order, then the Court will consider any objections, including claims of prejudice. *See Kermanshachi v. Republic Nat'l Bank of New York*, No. 87 Civ. 2599, 1991 WL 177282, at *1 (S.D.N.Y. Sept. 3, 1991) (granting defendant's request in pretrial order to amend answer to conform to evidence during discovery, including to both eliminate and add affirmative defenses, and discussing prejudice factor).

29. It is not entirely clear as to which element of the primary fraud this argument is directed, that is, whether there were material mis-

types of securities and whether there was a bona fide market for those securities, Askin's qualifications, leverage, computer modeling, the valuation process, and market neutrality. However, only the last three topics will be addressed here, as they are the only ones central to the Investors' claim.[30]

### (i) *Representations as to Computer Modeling*

The Brokers contend that the Investors have "abandoned" their claims regarding computer modeling because they concede that ACM did license a software product, *i.e.*, Chasen's Amalgamator. The complaint alleges that "[c]ontrary to ACM's representations, ACM had no proprietary, computerized tools with which to model CMOs." Thus, the Investors can no longer claim that ACM had "no" computer tools whatsoever.

However, while the additional discovery in this action has revealed the existence of the Chasen product, this standing alone does not mean that the Investors have—or must—abandon this aspect of their claim. Rather, the issue is whether the computer capabilities ACM did have were consistent with the representations made.

ACM represented through its marketing materials and the Performance Letters that it had sophisticated, proprietary analytic tools—sometimes described as an elaborate "five-step" process—enable it to maintain market-neutral portfolios through computer modeling. The PPM representations were more cautious, referring to

"carefully constructed and researched" models that could project performance under different interest rate scenarios and select securities with "offsetting return profiles," and warning that "there can be no assurance that risks will actually be reduced to the extent predicted."

There is conflicting evidence as to whether the Chasen product was a "model" capable of conducting the analyses claimed. Chasen's testimony that his program provided only "basic analytics," as well as Richardson's expert opinion, supports the view that the Amalgamator fell far short of the representations made in the marketing materials and Performance Letters.[31] The skeptical comments and jokes by Kidder and ACM personnel further undermine all of these representations. Moreover, John, the other portfolio manager at ACM after Contino's departure, found the Chasen product ineffective and too cumbersome to use. Indeed, all told, this evidence is inconsistent with even the PPMs' relatively cautious representations of "carefully constructed and crafted" models enabling Askin to conduct "active" portfolio management. However, Askin testified that the product could do all that was claimed for it both in the PPMs and elsewhere. Moreover, one the Investor's own experts, Wiener, concluded that the Chasen product could carry out analyses which were consonant with the PPM representations.

ACM updated Chasen's system late in 1993, and Wiener opined that, in combination, the Chasen product and this later

---

representations, or scienter. Irrespective, however, the result is the same.

**30.** The Investors do contend that Askin lied about the types of securities and existence of a bona fide market, Askin's qualifications, and the Funds' use of leverage. However, in order to defeat the Brokers' motion they need not establish a genuine dispute of material fact as to each and every claimed misrepresentation, so long as there is sufficient evidence as to other misrepresentations to sustain their claim.

**31.** The Brokers criticize Richardson's report, and the Investors' argument, as focusing on the Amalgamator's inability to conduct OAS analysis or calculate effective duration and convexity. The Brokers point out that Askin never made such specific representations. The point, however, is that Askin represented that he had a system that enabled him to run market-neutral portfolios. Evidence that in order to do so he would have had to be able to conduct OAS analysis, or calculate effective duration and convexity, goes to whether the Chasen product was on a par with the claims made.

"Derivative Solutions" system are a powerful analytic tool. However, the representations regarding computer modeling began before late 1993, and many of the bonds in the Funds' portfolios were never even input into the Derivatives Solution system.

Thus, there is a genuine dispute of fact as to whether the representations regarding computer analytics were fraudulent.

**(ii) _Representations As To The Valuation Process_**

The Brokers contend that the PPMs and Granite Partners LPA are contracts which governed the Granite Funds, and therefore, that the only relevant representations concerning valuation were the ones made in those documents. These documents did not promise the use of dealer marks but, rather, permitted Askin to estimate values in "good faith," at least for securities not traded-over-the-counter. Since these representations allowed for the exercise of discretion on Askin's part, the Brokers aver that they were consistent with his actual conduct.

Furthermore, the Brokers maintain, since the valuation process was governed by these documents the only available cause of action is for breach of contract. Such a claim would be baseless, they aver, because all the Investors have alleged is that ACM never intended to carry out its promise, and such an allegation will not sustain an action for fraud.

The Investors concede that the LPA was a contract—albeit, applicable only to Granite Partners—but object that the PPMs were not contracts. A PPM is not necessarily, but may be, a contract, depending on its terms and the circumstances. _See Ogden Martin Sys. of Tulsa, Inc. v. Tri-Continental Leasing Corp.,_ 734 F.Supp. 1057, 1068 (S.D.N.Y.1990) (PPM was not contract because terms indicated intent not to be bound until future date and execution of formal contract). Assuming _arguendo_ that the PPMs were contracts,

however, the Brokers' argument is nonetheless misplaced.

■ Under New York law, a cause of action for common law fraud can arise out of a contractual relationship where the "fraudulent misrepresentation [is] collateral or extraneous to the contract." _Bridgestone/Firestone, Inc. v. Recovery Credit Serv., Inc.,_ 98 F.3d 13, 20 (2d Cir.1996). It is also "elementary" that a false representation that induces one to enter into a contract supports a fraud claim. _Stewart v. Jackson & Nash,_ 976 F.2d 86, 88–89 (2d Cir.1992) (citing cases); _see Waltree Ltd. v. Ing Furman Selz LLC,_ 97 F.Supp.2d 464, 470 (S.D.N.Y.2000) (allegation of fraudulent inducement to invest through material misrepresentations was not breach of contract claim disguised as tort).

■ Moreover, although "a mere conclusory allegation that the defendant did not intend to carry out a promise is insufficient to state a fraud claim," such a claim is viable where there are specific facts supporting "an inference that [the defendant] never intended to carry out its alleged promise." _Dornberger v. Metropolitan Life Ins. Co.,_ 961 F.Supp. 506, 542 (S.D.N.Y.1997) (citing cases); _see Brown v. Lockwood,_ 76 A.D.2d 721, 732, 432 N.Y.S.2d 186 (1980) ("Where a party represents that he intends to act when in actuality he has no such intention, he has made a misrepresentation as to his state of mind and has thus misrepresented a then existing fact.") (citation omitted); _Deerfield Communications Corp. v. Chesebrough–Ponds, Inc.,_ 68 N.Y.2d 954, 956, 510 N.Y.S.2d 88, 502 N.E.2d 1003 (1986). The collateral misrepresentation doctrine applies under these circumstances because there is a "representation of present fact, not of future intent . . . collateral to, but which was the inducement for the contract." _Deerfield Communications,_ 68 N.Y.2d at 956, 510 N.Y.S.2d 88, 502 N.E.2d 1003 (citations and internal quotation

marks omitted).[32]

The PPMs and LPA were not the only place ACM made representations regarding the valuation process. Representations regarding the past, present, and/or intended future use of brokers marks were made through the marketing materials, the Performance Letters, the Price Waterhouse statements, and in-person presentations.[33] Thus, assuming *arguendo* that the CMOs were governed by the "good faith" provision, *i.e.,* the provision for securities not traded-over-the-counter, that representation was supplemented by other, specific representations regarding the use of broker marks.

There is evidence that Askin, from the very beginning of his tenure, routinely substituted his own marks for those of the dealers (with their cooperation). This is specific evidence supporting an inference that ACM misrepresented both historical fact, *i.e.,* that it had used broker marks, and present fact, *i.e.,* that it intended to continue doing so. *See Dornberger,* 961 F.Supp. at 542 (specific evidence of conduct contrary to promise "from the very beginning" supported inference that defendant falsely represented intent to carry out promise).

Therefore, the Investors are not confined to a contract claim with respect to the valuation aspect of the alleged fraud. Moreover, there is a genuine dispute of fact as to whether the representations regarding valuation were fraudulent.

**32.** The cases cited by Kidder are inapposite, because they concern cases where the plaintiff sued under a commercial contract and in addition made a merely conclusory allegation that a party to a contract did not intend to perform an express contractual promise. *See, e.g., Four Finger Art Factory, Inc. v. Dinicola,* No. 99 Civ. 1259, 2000 WL 145466, at *4 (S.D.N.Y. Feb. 9, 2000).

**33.** The Brokers have correctly pointed out that, because this is not a class action, each of the Investors must establish the primary fraud based on evidence particular to that Investor.

### (iii) *Representations As To Market Neutrality* [34]

The Brokers do not contend that the Granite Funds' portfolios were market-neutral. Rather, they maintain that the only thing ACM promised was to attempt to achieve market neutrality. The Brokers point to various cautionary statements contained within the PPMs, such as, "the Fund intends to engage in market-neutral mortgage investing.... There can be no assurance that the Fund will achieve its objective."

"[B]ad forecasting alone is not actionable." *ABF I,* 957 F.Supp. at 1323 (citation omitted). However, the Brokers' argument assumes that in proving their case the Investors may not look to statements other than those made in the PPMs. This premise, as explained below, is incorrect. *See* Part I.A.2(b), *infra.* The representations made through the marketing materials, Performance Letters, and in-person presentations portrayed market-neutrality as a reality, not merely an objective. There is a genuine dispute as to whether such statements were fraudulent.

The Brokers also contend that, assuming the Granite Funds were represented as market-neutral, the Investors could not rely on those representations because they could easily have seen that they were not true. This argument is addressed to whether the Investors' reliance was justifiable, and is addressed below. *See* Part I.A.2(d), *infra.*

Thus, it cannot be presumed that ACM actually made these representations through each means to each Investor. However, where the Brokers' arguments apply to the Investors as a whole, as here, the evidence will be analyzed as if applicable to all Investors.

**34.** Quartz, unlike the Granite Funds, was not represented to be market-neutral. Therefore, any discussion in this opinion of misrepresentations in that regard pertains to the Granite Funds only.

### (c) *Materiality*

■ The Brokers contend that the returns reported to the Investors were not misleading with respect to the volatility or market sensitivity of the Funds because those returns were not "smoothed." It is not clear whether this point is addressed to the materiality of the representation, or the justifiability of the Investors' reliance. The latter point is addressed below. *See* Part I.A.2(d), *infra.* As for materiality, the Brokers' argument falters in several respects.

First, the Investors stress that the most important aspect of the valuation fraud was the fact that Askin reported returns based on marks he obtained by requesting revisions from the Brokers, rather than based on the marks initially provided by the Brokers—after, it should be noted, having devoted specialized staff and technological resources to this complex task. Second, although the Investors have refined their theory to include the "smoothing" of returns, they have not abandoned their claim that Askin inflated performance. Indeed, an expert for the Investors concluded that ACM reported gains for the Granite Funds in many months when it should have reported losses. This satisfies materiality. *See Getty Family Trust*, No. 93 Civ. 3162, 1998 WL 148425, at *6 (S.D.N.Y. March 27, 1998); *In re Kidder Peabody Secs. Lit.*, No. 94 Civ. 3954, 1995 WL 590624, at *5 (S.D.N.Y. Oct. 4, 1995).[35] In addition, numerous Investors have testified that the stability of the reported returns was important both to their decision to invest in the Funds and to retain those investments, since they believed these returns demonstrated the success of Askin's market-neutral approach.

Finally, the Brokers point out that the reported returns were not perfectly "smooth," even with the revised broker marks, and contend, further, that the effect of those marks was immaterial. However, a fluctuation of within a couple of percentage points, especially over a period when interest rates were volatile, is close enough for there to be a material issue of fact as to whether the returns were represented as smooth. Comerford testified that the Funds' reported returns in 1992 would have led her to conclude that the portfolios were neutral. Moreover, the reported results would have not only have fluctuated more widely if Askin had not sought revised marks, but would have included losing months instead of continuous winning ones. Thus, there is a genuine dispute of fact as to materiality.[36]

### 2. *Justifiable Reliance*

■ The Brokers contend that none of the Investors can establish justifiable reliance. Some of the Brokers' arguments go to all Investors, while others go to particular plaintiffs.

### (a) *The Investors May Bring a Claim Based On Inducement to Make and/or Retain Their Investments*

■ Although the complaint alleged that all Investors were fraudulently induced by ACM both to make and retain their investments in the Funds, the evidence developed through discovery reveals that some Investors may not, or could not, have been induced to make their initial investments by the alleged misrepresentations. The most obvious example is the small group of Investors who invested before Askin arrived in September 1991.

---

**35.** DLJ has submitted expert evidence that the Investors have overstated the number of months for which this is true. It is the jury that must resolve whether, given this dispute of fact, the reported returns could be considered to have materially misrepresented market neutrality or the extent of positive returns.

**36.** Kidder points out that, if its revisions were taken standing alone, the effect on reported performance would have been quite small as compared with the effect of both its and DLJ's revisions together. This issue is discussed below in the context of whether Kidder rendered substantial assistance. *See* Part I.D.2., *infra.*

■ The Brokers contend that the only claim such Investors may bring is for "fraudulent maintenance," rather than "fraudulent inducement." The Brokers further contend that a fraudulent maintenance claim is really a claim for corporate mismanagement and, therefore, is a derivative claim as to which the Investors lack standing.[37]

The distinction between fraudulent maintenance and fraudulent inducement was discussed preliminarily in *ABF I*. This Court assumed *arguendo* that such a distinction was valid on the facts of this case and held that, while certain of the Investors' allegations might go to a corporate mismanagement claim—such as the purchase of unmodelable securities—other allegations—such as representations about the ability to model those securities—did go to a fraud claim. *See* 957 F.Supp. at 1329. It was not necessary at that time, however, to deal with the issue of whether some Investors might not have been recipients of the alleged fraudulent misrepresentations at the time they invested.

Typically, common law investment fraud cases involve plaintiffs who claim to have been induced both to make and retain their investment. *See Marbury*, 629 F.2d at 708–09 (discussing cases). This is not particularly surprising, but it does make discernment of the correct rule more difficult. However, the reasoning of these cases does not warrant the sharp distinction drawn by the Brokers. In *Marbury*, the Second Circuit, in determining whether or not damages could be obtained for the period during which a plaintiff was induced to retain his investment, discussed interchangeably cases where the plaintiffs were induced both to make and retain their investments, and cases where the plaintiffs were induced only to retain them. *See* 629 F.2d at 708–09 (*citing inter alia David v. Belmont*, 291 Mass. 450, 454, 197 N.E. 83, 85 (1935) (retention of securities) and *Continental Ins. Co. v. Mercadante*, 222 A.D. 181, 183, 186, 225 N.Y.S. 488 (N.Y.App.Div.1927) (retention of securities)). The Second Circuit also noted "to the same effect" a New York case which did not involve investment fraud but which held that " '[f]raud which induces non-action where action would otherwise have been taken is as culpable as fraud which induces action which would otherwise have been withheld' " *Marbury*, 629 F.2d at 709 (*quoting Stern Bros. v. New York Edison Co.*, 251 A.D. 379, 381, 296 N.Y.S. 857 (N.Y.App.Div.1937)).

Another district court within this circuit has concluded that "it is sufficient that the misrepresentation induce[d] plaintiff to purchase *or* retain his investment." *Alvin S. Schwartz, M.D., P.A. v. O'Grady*, No. 86 Civ. 4243, 1990 WL 156274, at *14 (S.D.N.Y. Oct. 12, 1990) (emphasis added); *see also Freschi*, 551 F.Supp. at 1230 (common law fraud claim exists where "ongoing concealment" causes the retention of a investment).[38] The New York State Appellate Division has also recognized that a common law fraud may be "based on inducement to retain" an investment. *Kaufmann v. Delafield*, 224 A.D. 29, 229 N.Y.S. 545, 546–47 (N.Y.App.Div.1928).

The cases cited by the Brokers, *Crocker v. FDIC*, 826 F.2d 347 (5th Cir.1987), and *BRS Assocs.*, 246 B.R. 755 (S.D.N.Y.2000), do not warrant a different result. *Crocker* was decided under Mississippi law. *See* 826 F.2d at 349–50. *BRS Assocs.* held that the plaintiffs did not have standing to assert a claim for mismanagement of a corporation because they failed to show a

---

**37.** A claim for corporate mismanagement is derivative because, where a corporation is mismanaged and therefore suffers an injury, with a resulting diminution in the value of the stock, the claim belongs to the corporation rather than the shareholders. *See BRS Assocs. v. Dansker*, 246 B.R. 755, 771 (S.D.N.Y. 2000).

**38.** Although the *Freschi* plaintiffs did allege inducement both to purchase and to retain their investment, this holding was relied on elements of fraud under New York law—none of which pertain to the inducement/maintenance distinction. *See* 551 F.Supp. at 1230.

connection between that claim and any misrepresentations. *See* 246 B.R. at 772. Thus, this claim was merely for breach of fiduciary duty, not fraud. *See id.*

■ Finally, it is well-established that, in determining whether a claim is derivative or direct, it is the nature of the alleged wrong that matters, not the designation the parties impose upon the claim. *See ABF I,* 957 F.Supp. at 1329 (citing cases). In this case, the "fraudulent maintenance" evidence pertains to fraudulent misrepresentations, not merely mismanagement of the Funds. Therefore, the Investors may assert a fraud claim based on the theory that they were induced to make and/or retain their investments.[39]

#### (b) *The Legal Standard for Justifiable Reliance*

New York law requires that a plaintiff alleging common law fraud establish "justifiable" reliance on a material misrepresentation. *See Gordon & Co. v. Ross,* 84 F.3d 542, 546 (2d Cir.1996). Under this standard, a plaintiff is entitled to rely on the representations made to him unless "under the circumstances, the facts should be apparent to one of [the plaintiff's] knowledge and intelligence from a cursory glance," or "he has discovered something which should serve as a warning that he is being deceived, [in which case] he is required to make an investigation of his own." *Twenty First Century L.P.I. v. LaBianca,* 19 F.Supp.2d 35, 40 (E.D.N.Y.1998) (internal quotation marks omitted) (*quoting Field v. Mans,* 516 U.S. 59, 71–72, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995) (internal citations omitted)); *see Corva v. United Services Automobile Assoc.,* 108 A.D.2d 631, 633, 485 N.Y.S.2d 264 (1985) (reliance not justifiable if "any ... normal person would

recognize at once [the representation] as preposterous") (internal quotation marks and citation omitted). The justifiable reliance test is "clearly less burdensome" than the reasonable reliance test applicable to federal securities fraud claims. *Gordon & Co.,* 84 F.3d at 546.

■ Application of the justifiable reliance rule to sophisticated investors, however, results in a greater obligation to make an independent investigation than the obligation applicable to ordinary persons. "[S]ophisticated businessmen [have] a duty to exercise ordinary diligence and conduct an independent appraisal of the risk they [are] assuming." *Abrahami v. UPC Construction Co., Inc.,* 224 A.D.2d 231, 234, 638 N.Y.S.2d 11 (N.Y.App.Div. 1996) (citations omitted). Thus, "[w]here sophisticated investors engaged in major transactions enjoy access to critical information but fail to take advantage of that access, New York courts are particularly disinclined to entertain claims of justifiable reliance." *Lazard Freres & Co. v. Protective Life Ins. Co.,* 108 F.3d 1531, 1541 (2d Cir.1997) (internal citation and quotation marks omitted). However, even sophisticated investors may justifiably rely on facts that are "peculiarly within the other party's knowledge." *Id.* at 1542 (discussing cases).

#### (c) *Reliance on Representations Outside of the PPMs Was Not Unjustifiable as a Matter of Law*

■ The Brokers contend that the PPMs disclosed the risks associated with investment in the Funds, and that it was unjustifiable for the Investors to rely on other representations regarding "low risk" that contradicted those disclosures. This

---

**39.** Kidder also contends that a fraudulent inducement claim may not be brought in connection with equity, as compared with debt, securities. Kidder relies on dicta in a New York Appellate Division case in which the court indicated its willingness to recognize a fraudulent inducement claim for holders of debt securities based on the relationship between such persons and the corporation whose debt securities they hold. *See Continental Ins.,* 222 A.D. at 182, 225 N.Y.S. at 489. This Court has not relied on *Continental Ins.* in reaching the conclusion drawn here. Also, *Freschi,* 551 F.Supp. 1220, involved equity securities.

contention is similar to one raised at an earlier stage by ACM. *See ABF I,* 957 F.Supp. at 1323–34 (rejecting contention that PPM risk disclosures rendered reliance by Investors on other representations unjustifiable under "bespeaks caution" doctrine).

Under New York law, reliance on statements that are contradicted by a writing is not justifiable. *See Hunt, IRA v. Alliance North American Gov't Income Trust, Inc.,* 159 F.3d 723, 729 (2d Cir.1998) (reliance unreasonable where "prospectuses warned investors of exactly the risk [they] claimed were not disclosed") (internal citation and quotation marks omitted); *Republic Nat'l Bank v. Hales,* 75 F.Supp.2d 300, 315 (S.D.N.Y.1999) (borrower could not reasonably rely on alleged oral misrepresentations by bank where express provisions of written contract contradicted those misrepresentations). This rule applies to written as well as oral statements contradicted by a writing. *See Hunt,* 159 F.3d at 729 (plaintiffs could not have been misled by written "advertisements when read in conjunction with the prospectuses and related offering materials"). However, cautionary language in a prospectus does not bar a fraud claim where is does not "precisely address the substance of the specific statement or omission that is challenged." *In re Prudential Secs. Inc. Ltd. Partnerships Lit.,* 930 F.Supp. 68, 72 (S.D.N.Y. 1996). Nor does "cautionary language … protect material misrepresentations or omissions when Defendants knew they were false when made." *Id.*[40]

The PPMs did caution that not only was success not assured, but there was "substantial" and "a high degree" of risk involved, such that those who could not "afford to lose [their] entire investment" should not participate. The PPMs also specifically warned of CMOs' lack of liquidity.

The Brokers have a point when they contrast these statements with the aggressively optimistic statements regarding risk made in ACM's marketing materials. However, the Investors' fraud claim is not based solely, or even primarily, on assurances that their investments would be "low risk." Rather, their claim turns on specific misrepresentations regarding ACM's methods for selecting and valuing securities, the actual performance of the Funds, the use of proprietary, quantitative analytical models, and market neutrality. Moreover, the representations of low risk in other materials were linked with misrepresentations not contradicted by the PPMs— such as the promise that the Granite Funds achieved "stable rate[s] of return with low risk" due to ACM's market-neutral strategy and computer modeling. The PPM risk disclosures did not contradict these more specific, alleged misrepresentations of past and present historical fact.

Therefore, the PPM risk disclosures do not immunize against a primary fraud claim based on representations made outside of the PPMs. *See In re First Amer. Ctr. Secs. Litig.,* 807 F.Supp. 326, 333 (S.D.N.Y.1992) (citation omitted); *see Hunt,* 159 F.3d at 728–29 (sustaining fraud claim by hedge fund investors where prospectuses promised fund would attempt to use hedging but in fact fund could not do so).

The Brokers also aver that the Investors waived any right to rely on any representations outside of the PPMs because of the disclaimer in each PPM that "no representations or warranties" had been made, and the Investor was "not relying upon any information other than that contained in the Offering Memorandum [*i.e.,* the PPM] and the results of [the Investor's] own independent investigation."

---

**40.** These cases concern reasonable, rather than justifiable, reliance. However, both the Investors and the Brokers have cited to reasonable reliance case law, including these de-

cisions, with respect to the issue of whether the PPM provisions rendered the Investors' reliance unjustifiable.

■ A fraud plaintiff is bound by a specific disclaimer of reliance on prior statements. *See Belin v. Weissler*, No. 97 Civ. 8787, 1998 WL 391114, at *7 (S.D.N.Y. July 14, 1998) (investor could not claim reliance on representations outside partnership agreement where according to subscription agreement he "relied solely ... on the information contained in the Partnership Agreement" and "[n]o representations or warranties, other than as set forth in the Partnership Agreement, have been made").

■ However, the PPMs acknowledged that each Investor would rely not only on the PPM but also on "the results of [the Investor's] own independent investigation." The PPMs further confirmed that, as part of an Investor's independent investigation, there was the opportunity to ask questions of ACM and receive responses—responses which would include, by implication, representations outside of those contained in the PPM. The PPMs, then, actually contemplated the making of representations outside of those contained in the PPMs, and the Investor's reliance upon those representations. This does not mean that an Investor was necessarily entitled to take whatever was told to her at face value. That would be neither "independent" nor an "investigation." It simply means that reliance on non-PPM representations is not unjustifiable per se.

Moreover, "in order to be considered sufficiently specific to bar a defense of fraudulent inducement ... a guarantee must contain explicit disclaimers of the particular representations that form the basis of the fraud-in-the-inducement claim." *Manufacturers Hanover Trust Co. v. Yanakas*, 7 F.3d 310, 316 (2d Cir. 1993). The PPM disclaimer did not address the particular representations forming the basis for the Investors' fraud claim. Therefore, the Investors are not precluded from establishing justifiable reliance based on this disclaimer.

### (d) *Sophisticated Investors*

■ The Brokers contend that the Investors, wealthy individuals and institutions who invested, barring some exceptions, a minimum of $1,000,000, did not justifiably rely on any misrepresentations under the standard applicable to sophisticated investors. Specifically, the Brokers maintain that all of the Investors could have found out about the valuation process by asking ACM personnel about it and paying attention to Askin's comments about challenging dealer marks; tested the accuracy of Askin's valuations; investigated the adequacy of ACM's computer analytics by asking about them and requesting documentation; and verified whether the Granite Funds were market neutral by comparing reported returns with interest rate movements, or analyzing the characteristics of the securities listed in the Price Waterhouse statements.[41]

The Investors respond that they were not sophisticated in the relevant sense, *i.e.,* with respect to CMOs, some of the world's most complex and esoteric securities, and thus could justifiably rely on the representations made to them unless actually faced with the facts that refuted those representations.

Certainly, however wealthy or knowledgeable an investor may be about financial matters in a broad sense, whether or not an investor has experience in the specific sector is relevant. *See · Lazard Freres*, 108 F.3d at 1543 ("As a substantial and sophisticated player in the bank debt market, [plaintiff investment bank] was under a further duty to protect itself from misrepresentation."). However, the Investors overstate their case when they contend that they can be considered sophisticated only if they were knowledgeable with

---

41. The Brokers also contend that the Investors could have uncovered the truth about other alleged misrepresentations, including representations about the degree of risk involved, the use of leverage, and Askin's qualifications. However, as these issues are not central to the Investors' claim, they need not be addressed herein.

respect to CMOs. *See Giannacopoulos v. Credit Suisse*, 37 F.Supp.2d 626, 632 (S.D.N.Y.1999) (plaintiff financier had duty to make "independent inquiry into the available information, especially where ... [he was] a sophisticated businessman"); *Stuart Silver Assocs., Inc. v. Baco Dev. Corp.*, 245 A.D.2d 96, 100, 665 N.Y.S.2d 415 (N.Y.App.Div.1997) (advertising agency president and sole shareholder of corporation, who had previously participated in real estate ventures, "were not too inexperienced to know ... to request" background information on "state of the Harlem real estate market by consulting ... legal and financial advisors").

Moreover, the Investors represented, when they signed the PPMs, that they "had the necessary knowledge and experience in financial and business matters to enable [them] to evaluate the merits and risks of this investment," *i.e.*, investment in hedge funds that invested in mortgage-backed securities, including CMOs. Finally, as wealthy individuals and institutions, the Investors had the resources to secure assistance in evaluating their investments. Thus, under New York law, the Investors were sophisticated investors. Of course, to say this does not end the justifiable reliance inquiry.

The Investors object, however, that even the most diligent of investors could not have discovered the fraud. The Brokers contend that this is mere speculation, and point out that "mere conjecture or speculation" does not support denial of a motion for summary judgment. *Quarles*, 758 F.2d at 840. However, the Investors' argument goes to whether the necessary information was "peculiarly within the other party's knowledge," and whether these so-

phisticated investors had access to that knowledge. *Lazard Freres*, 108 F.3d at 1542.

Even a sophisticated investor could not have been expected to have discovered the valuation aspect of the fraud. The limited disclosures Askin made about his efforts to challenge broker marks, for example in the Performance Letters or Investment Advisory Committee meeting, fell far short of revealing the true nature of the process. Indeed, these statements could have justifiably been interpreted as meaning that Askin accepted, and used, broker marks even when he disagreed with them. Similarly, they could have been interpreted as meaning that, on occasion, Askin challenged inaccurate marks based on mistakes made by the Brokers, and was sometimes successful in convincing the Brokers of their error. His statements did not reveal the large number of revisions obtained, the ease with which he obtained them, and the fact that on numerous occasions the revisions enabled him to transform losing months into winning ones.[42]

Moreover, ACM's own personnel believed that broker marks used to report performance to Investors, and that any revisions made at Askin's urging were relatively infrequent and involved challenges to mistakes identified by Askin, or, at the most, negotiation over where within the bid-offer range to mark a bond. Senior ACM personnel, including Mack and John, threatened to resign in March 1994 when they learned of Askin's intention to use manager marks to report performance for February 1994.[43] John recalled that he felt "morally compromised" by Askin's plan because it was contrary to his understanding that broker marks were used to

---

**42.** Here, as elsewhere, the Brokers contend that, regardless of the process, the revised marks were accurate representations of market value. This argument is misplaced, since the failure to disclose the process—assuming representations were made to the contrary—is material. Moreover, there is a genuine dispute as to whether the marks could be considered accurate. *See* Part I.D., *infra*.

**43.** In February, the Funds had suffered a precipitous decline in value, and some of the Brokers were unwilling to revise their marks as Askin requested. Thus the "manager marks" idea.

report performance. Moreover, Mack and John were dismayed when they reviewed transcripts of Askin's conversations with O'Connor, and considered the number of revisions and the readiness with which they were provided to be inconsistent with how they had reported performance. All of this is evidence that even senior ACM personnel did not understand what Askin was doing, at least before February 1994. Thus, while the Brokers point out that the Investors had access to ACM personnel and the right to ask for information, this would hardly have helped.[44]

Finally, the Price Waterhouse statements confirmed that the Funds utilized 100% broker marks, and the Brokers confirmed their marks to Price Waterhouse on an annual basis. Thus, it is unrealistic to suggest that the Investors could have discovered the truth from the auditing firm, Price Waterhouse.

Thus, there is a genuine issue of material fact as to whether the facts of the valuation process were accessible to a sophisticated investor, or, in other words, whether the Investors justifiably relied on representations regarding the use of broker marks.

With respect to market neutrality, the Brokers urge that certain "simple" analyses of the reported returns would have revealed that the Funds' performance was not absolutely market-neutral, and were in fact correlated to interest rates. The Brokers aver that the Investors were sophisticated enough either to conduct these anal-

yses themselves or to know to hire others to conduct them.[45] Specifically, the Brokers maintain that the Investors, like their expert Richardson did, could have made a "simple comparison" between the performance of the Funds with that of Treasuries, and determined that the Funds' performance was correlated with interest rate movements. Alternatively, according to the Brokers, all the Investors had to do was "simply ... tak[e] the securities reported in the Funds annual financial statements and characteriz[e] them as bullish or bearish." According to the Brokers, this is what the Investors' expert, Wiener, did in concluding the Funds were never market-neutral.

The Brokers insist that the Investors, because they were sophisticated, were obliged to do more than take these reports at face value.

The Brokers' point might be well-taken, since these sophisticated Investors could not justifiably take claims of market-neutrality at face value based on the reported returns. *See, Granite Partners, L.P. v. Bear Stearns & Co.*, 58 F.Supp.2d 228, 260 (S.D.N.Y.1999) ("No reasonable investor could rely solely on month-end valuations or portfolio analyses made after the purchase without conducting some independent due diligence."). However, even the parties' experts disagree as to what is revealed by these ostensibly simple analyses. For example, DLJ's experts, Mehra, contends that Richardson's methodology—which Kidder calls "simple"—is fatally

44. DLJ points out that at least one Investor, Cook, took note of Askin's comment that he asked the Brokers to reconsider their marks, and tested the accuracy of the valuations be comparing the reported marks and subsequent sale prices of the bonds. Cook, it is noted, was not only an investment strategist for a large insurance company, but was specifically familiar with CMOs. Thus, contrary to DLJ's contention, reliance by the other Investors is not necessarily unjustifiable because they did not undertake such an analysis. Moreover, even in Cook's case, he still believed that, while Askin sought revisions, ultimately Askin accepted the Broker's price if he was unable to convince them of their er-

ror. The readiness with which the revisions were provided does not reflect such a reasoned process.

45. Kidder also urges that the effect of its revised marks must be evaluated separately from the effect of DLJ's and that, once that is done, any effect is so minimal as to be immaterial. The representations made to the Investors, however, were not disaggregated in this fashion. Kidder's point is however relevant to the issue of substantial assistance, and is discussed further herein. *See* Part I.D.2, *infra.*

flawed. As for Wiener's report, the Brokers drastically overstate the simplicity of Wiener's technique, which required among other things the calculation of each security's duration and convexity. Although the Investors did have an obligation to make some independent appraisal, it cannot be said that they relied unjustifiably where the parties' experts, offered as leading scholars in their field, disagree—or where the technique is so complex and specialized that a jury could find it justifiable for the investor not to have employed it.

However, the Investors had more information available to them than the reported returns. The Price Waterhouse statements also listed each security individually. Moreover, Investors who asked were given access to the very detailed Current Holdings Reports. Based on these materials, the Brokers contend, the Investors could have analyzed the composition of the portfolios and discovered that they were not market-neutral.

The Investors protest that this is an unreasonably high standard, and that they cannot be expected to be capable of such analyses simply by virtue of the fact that they are wealthy individuals, or even institutions with generalized experience in investing. In this regard, the Investors seem to take the position that, as sophisticated investors, they would have no obligation to obtain the advice necessary to help them understand their investments. This position is untenable. *See, e.g., Granite Partners,* 58 F.Supp.2d at 260; *Stuart Silver Assocs.,* 245 A.D.2d at 99–100, 665 N.Y.S.2d 415 (reliance not justifiable because plaintiffs could have obtained needed information "by consulting the legal and financial advisors").

There is also the fact, however, that the Price Waterhouse statements listed the securities in a misleading way, *i.e.,* broken down into broad categories which, when reviewed in light of other ACM statements regarding the "bearish" or "bullish" nature of various types of CMOs, reflected balanced portfolios. Thus, these statements, like the Performance Letters, not only supported the view that ACM's purported market-neutral strategy was working, but could justifiably be interpreted as misleading in this regard. The Investors could have obtained the more detailed, and more accurate, Current Holdings Reports, or could have requested prospectuses on a security-specific basis. They could then have hired experts to analyze the portfolios. Under other circumstances, their failure to take such steps might render their reliance unjustifiable as a matter of law. However, given the complexity of the issues and the extent to which the Performance Letters and Price Waterhouse statements were misleading, this conclusion is not warranted.

Finally, with respect to ACM's claims of sophisticated computer modeling, the Brokers point out that the Investors were free to examine ACM's offices and ask questions of its personnel regarding ACM's computer capabilities, observe the Amalgamator runs on ACM's computer screens, and review output from that program. The Brokers do not suggest how such inquiries would have revealed that ACM could not and did not perform the analyses represented, asserting conclusorily that all the Investors needed to do was hire a computer consultant to "check under the hood." It is notable that ACM's response to some Investors' due diligence inquiries regarding computer analytics confirmed, rather than undercut, the representations regarding computer modeling. Nor would it be reasonable to assume that the Investors would have learned that John rarely used the Amalgamator because of its lack of utility, or that it was not proprietary to ACM.

Therefore, while it is certainly relevant that the Investors were sophisticated, and this increases their burden at trial, it cannot be said as a matter of law that on this basis they can not show justifiable reliance.

### (e) *The Evidence as to Each Investor's Justifiable Reliance*

This is not a class action and, therefore, in order to prevail at trial, each Investor must establish justifiable reliance based on evidence specific to that Investor.[46] DLJ has pointed to a number of evidentiary deficiencies on an Investor-specific basis which DLJ maintains require summary judgment against those Investors.

According to DLJ, a number of Investors cannot prove that they were induced to make their investments by the alleged misrepresentations. DLJ avers that (1) some Investors made their investments before Askin's arrival in September 1991 and, thus, necessarily could not have been induced be misrepresentations as to either the valuation or operations aspect of the fraud; (2) one Investor, Malkani, had no contact with Askin or anyone else at ACM before making her investment decision; and (3) some Investors did not know and did not ask how the Funds' portfolios were valued at the time they made their investments, and thus did not know anything about the valuation process.

DLJ also maintains that some Investors' reliance on representations regarding the use of broker marks was unjustifiable, because these Investors knew that Askin had discretion in this regard, or that he talked to the Brokers about revising marks.

Finally, DLJ contends that a number of Investors showed virtually no interest in ACM's computer capabilities. DLJ is not entirely clear as to what aspect of the Investors' case this contention pertains. Based on a review of the evidence regarding these Investors, it could go to the issue of whether misrepresentations were received, to materiality, or to justifiability, depending on the Investor.

A review of the evidence supports DLJ's contention that some Investors were not fraudulently induced to make their investments. Of course, this is necessarily the case with 3M, The Chemerow Trust, Robert Johnston, and the Demeter Trust, since those Investors made their investments before September 1991.[47] In addition, a review of the evidence pertaining to Malkani's case reveals that in making her investment decision she relied not on representations by ACM but, rather, on representations by Twenty First Century.

However, DLJ's argument fails because it is premised on the theory that each Investor must have been fraudulently induced to make his initial investment. As previously explained, the Investors may bring claims based on fraudulent inducement to retain their investments. In making its plaintiff-specific objections, DLJ has not argued that these Investors were induced neither to make nor to retain their investments, and has not pointed to flaws in the evidence with respect to the reten-

---

**46.** Although all of the litigants have submitted Rule 56.1 statements that are specific to each Investor, only DLJ has briefed the issue of justifiable reliance on a plaintiff-specific basis. However, DLJ did not do this until its reply brief. In its opening brief DLJ expressed the view that reliance could not be established as to any plaintiff and generously invited the Court to identify the deficiencies in each plaintiff's case by combing through the nine volumes comprising DLJ's Rule 56.1 statement. Given the manner in which DLJ structured its briefing, the Investors cannot be faulted too greatly for their failure to brief this issue in more detail. However, the Investors were put on notice that DLJ's motion was specific to each plaintiff. With respect to those Investors for whom DLJ did identify specific evidentiary problems, the Court has painfully reviewed the evidence submitted by all parties in determining whether summary judgment is warranted.

**47.** Robert Johnston and the Demeter Trust rely on representations that Askin would continue the strategy of his predecessor, Estep, but point to no specific representations by Askin in this regard.

DLJ also contends that Sterling falls into this category, but he also made investments after Askin's arrival. Moreover, Sterling recalled very specific representations made by Askin upon his arrival as to how he planned to continue Estep's strategy—representations that go to Sterling's claim here.

tion of investments issue.[48]

■ Similarly, the evidence reveals that, just as DLJ contends, some Investors did not know and did not ask how the Funds' portfolios were valued at the time they made their investments, and had no understanding at that time that broker marks were to be used. Every Investor has submitted a declaration stating that the Investor relied on representations regarding broker marks, and would not have made or retained his investment if he had known the truth. However, in a number of cases these statements are contradicted by those same Investors' deposition testimony.[49] A genuine issue of fact cannot be created by declarations that contradict earlier, sworn deposition testimony. Again, however, this in itself does not warrant dismissal of these Investors' claims because it does not necessarily mean they were not fraudulently induced to maintain their investments.[50]

There is another problem with DLJ's argument, which is that DLJ has not addressed whether summary judgment is warranted if an Investor did not rely on misrepresentations regarding the valuations process, but did rely on misrepresentations regarding the operations fraud.

As for those Investors who knew that Askin had some discretion in reporting performance or even that he did challenge broker marks, a review of the evidence as to these Investors does not reveal that they knew or should known of the extent to which the reality contradicted his representations regarding broker marks.

Finally, with respect to representations regarding computer analytics, DLJ rightly points out serious flaws in the evidence of reliance on these representations. Some Investors showed next to no interest in this issue. In such cases, allegations that the Investors actually received misrepresentations—or that those misrepresentations were material—cannot be sustained.[51] In other cases, the evidence shows that the Investors' understanding was based on assumptions, or knowledge regarding the industry generally, rather than specific misrepresentations by Askin.[52]

DLJ has not confined its argument in this regard to representations made prior to the Investors' making their decisions to invest. Rather, DLJ argues that these Investors could not have been materially misled by misrepresentations regarding computer analytics, period. This point is well-taken. The difficulty, however, is that these Investors may have relied on other misrepresentations, such as those regarding the valuations process and whether the Funds were market-neutral. DLJ has not argued that under those circumstances these Investors' claims must fail.

### B. A Finding Of Loss Causation is Not Precluded Due to Factors Extraneous to the Alleged Primary Fraud

■ The Brokers contend that the Investors cannot establish loss causation because their losses are attributable not to the alleged primary fraud but, rather, to extraneous factors, namely, a market

---

48. None of this is to excuse the Investors' sweeping treatment of the evidence, such as where they aver that all Investors were fraudulently induced to make their initial investments even though that cannot be the case.

49. L.H. Rich, Oblingter, and Primavera are just some examples.

50. The issue of the Price Waterhouse statements comes out much the same way. Contrary to the Funds' blanket assertion that all Investors saw and relied on the "100%" bro-

ker marks statements, the evidence reveals that very few Investors actually recalled any statements regarding valuation in the Price Waterhouse materials, including that one. Nonetheless, this of itself does not vitiate these Investors' claims.

51. Primavera and Excelsior are examples, as their representatives showed little interest in, and had no understanding of, what computer modeling was to be used for.

52. 3M is an example of one of these Investors.

downturn resulting from sharp and unexpected interest rate increases in the first quarter of 1994, the effect of leverage and excessive negative convexity in the Funds' portfolios, and the actions of other brokers in liquidating the Funds' portfolios.[53] Put another way, the Brokers maintain that the Investors must prove that the Funds would not have been damaged by these external events.[54]

In *AUSA Life Ins. Co. v. Ernst and Young*, 206 F.3d 202 (2d Cir.2000), the Second Circuit analyzed the issue of causation in the context of both federal securities fraud and common law fraud claims.[55] The court explained that in this context causation has two elements, transaction causation and loss causation. *See AUSA*, 206 F.3d at 209. Loss causation is equivalent to the traditional "proximate cause" concept, and pertains to whether the fraudulent conduct caused the economic harm. *See id.* Transaction causation is analogous to reliance, and pertains to whether the fraudulent conduct caused the plaintiff to engage in the transaction in question. *See id.*

The plaintiffs in *AUSA*—investors—asserted federal and common law fraud claims against the auditors of the company in which they had invested. *See* 206 F.3d at 204. The district court found after a bench trial that the auditors had misrepresented the company's financial condition, and that the plaintiffs had relied on those misrepresentations in making and retaining their investments, but that loss causation was not established because the demise of the company was caused not by the misstated financials but rather by the company's disastrous acquisition of another company. *See id.* at 210.

The Second Circuit reversed and remanded for further factual findings as to loss causation, holding that loss causation is established when "the damage complained of [was] one of the foreseeable consequences" of the fraud. *AUSA*, 206 F.3d at 216 (internal quotations marks and citation omitted). The court emphasized that the issue of foreseeability is crucial to the loss causation inquiry, as it is with proximate cause, *see id.* at 217, elaborated that "foreseeability finding turns on fairness, policy, and ... 'a rough sense of justice,'" *id.*, and concluded that it would not be unjust to hold liable a party who misrepresented the financial condition of a company, thus inducing investors to refrain from selling their securities, *see id.* at 217, 218–20. The court observed that the issue of external causal factors, including, specifically, a market crash, is relevant to the loss causation analysis, but stressed that it "did not intend to bar a plaintiff from successfully pleading proximate cause when the claim follows a market collapse." *Id.* at 215.

The *AUSA* court relied heavily on the discussion in *Marbury* of cases concluding that causation may be found where a broker's or seller's assurances induced continued retention of an investment "which ultimately plummeted in value, regardless of the cause of the final plunge in price." *AUSA*, 206 F.3d at 212. The court observed that the cases discussed in *Marbury* were "equally applicable" in the *AUSA* investors' case. *Id.* The court further relied on New York law as stated in *Continental Ins.*, which framed the proximate cause question as whether "'the fraud actually accomplished the result it was intended' to achieve." *AUSA*, 206 F.3d. at 212–13 (*quoting Continental Ins.*, 225 N.Y.S. at 494). Understood this way,

---

**53.** Kidder, but not DLJ, stresses the liquidations argument because it has settled with the Funds in the Funds action.

**54.** Although the substantial assistance element of aiding and abetting has a causation aspect to it, this "loss causation" argument pertains to whether there is a sufficient causal

link between the Investors' losses and the primary fraud.

**55.** Although *AUSA* involved securities fraud, the court noted the usefulness of the common law in analyzing "loss causation and related concepts". *AUSA*, 206 F.3d at 217 n. 5.

there was loss causation in *AUSA* because the auditors accomplished what they sought to achieve with their fraudulent financial statements, *i.e.*, they induced the investors to retain their investments. *See AUSA*, 206 F.3d at 213.

The Brokers insist that the Investors conflate loss causation and transaction causation, and aver that, even if the Investors were induced by ACM's misrepresentations to make and retain their investments, the most this evidence shows is transaction causation. In addition to the *AUSA* court's distinction between these two concepts, the Brokers primarily rely on *Citibank NA v. K–H Corp.*, 968 F.2d 1489 (2d Cir.1992), and *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763 (2d Cir. 1994).

The district court in *AUSA* also relied on *Citibank*, 968 F.2d 1489, and *First Nationwide*, 27 F.3d 763, for its conclusion that loss causation was not established due to intervening causal factors. *See AUSA*, 206 F.3d at 213. The court of appeals, however, distinguished those cases on the grounds that loss causation was not properly pleaded in the complaints. *See id.* at 213–215. That problem is not present here.

Indeed, in *First Nationwide*, as revealed by the *AUSA* court's explanation, the intervening factor of a real estate market collapse did not of itself bar the claim for lack of loss causation. *See* 206 F.3d at 213. The *AUSA* court explained that the relevant considerations in the loss causation analysis include " 'the magnitude of the misrepresentations, the amount of time between the ... transaction and the loss, and the certainty with which the loss can be attributed to the defendant's conduct." 206 F.3d at 214 (*quoting First Nationwide*, 27 F.3d at

770). The court then explained that, in *First Nationwide*, the external factor of the real estate crash combined with the significant period of time between the alleged misrepresentations and the loss "supported the conclusion that the alleged misrepresentations were not a substantial cause of [the plaintiff's] injury." *Id.* (*citing First Nationwide*, 27 F.3d at 770). Finally, as mentioned previously, the court stated explicitly that a market crash is not an absolute bar to loss causation. *See id.*

This Court has previously relied on *Marbury* for the conclusion that "where the alleged misrepresentations could be found to have induced both the purchase and the retention of the investment, proximate cause has been established" despite intervening business factors, including a recession in the relevant business. *Kaufman v. Chase Manhattan Bank, N.A.*, 581 F.Supp. 350, 354 (S.D.N.Y.1984) (*citing Marbury*, 629 F.2d at 709); *see also Schwartz*, 1990 WL 156274, at *12 (genuine issue of fact as to loss causation where foreseeable plaintiffs would be induced to retain investments in reliance on allegedly false monthly statements).[56] Although the *AUSA* court articulated the distinction between loss and transaction causation somewhat more forcefully than did *Marbury*, given the AUSA's court's approval of *Marbury* specifically with respect to the issue of loss causation, the conclusion reached in *Kaufman* still holds. *See AUSA*, 206 F.3d at 211–12.[57]

Bearing in mind that the foreseeability inquiry, which is central to a finding of proximate cause, "turns on fairness, policy, and ... a rough sense of justice," the evidence is sufficient to establish a genuine dispute of fact as to loss causation. *AUSA*, 206 F.3d at 217 (internal citation

---

**56.** In both *Kaufman* and *Schwartz*, the defendants argued that loss causation could not be established because the misrepresentations affected the plaintiffs' retention of the investments rather than the investments' value. *See Kaufman*, 581 F.Supp. at 354; *Schwartz*, 1990 WL 156274, at *13.

**57.** *Marbury* did recognize the distinction, but observed that under the circumstances "the claim [was] that the misrepresentation was the agency both of transaction causation and loss causation." 629 F.2d at 708.

and quotation marks omitted). There is a genuine issue of material fact as to whether it could reasonably have been foreseen that the Investors would have been induced to make and/or retain their investments, which investments were then lost when the Funds were destroyed by the effect of rising interest rates on the heavily bullish portfolios and the margin calls by the brokers.[58] Indeed, based on the composition of the Funds' portfolios, it was reasonably foreseeable not only that the Investors would retain their investments but also that they could lose their investments or, as O'Connor put it, that Askin might "blow[ ] ... up." It is not necessary that the drastic increase in interest rates in early 1994 itself have been foreseeable.[59]

Therefore, the brokers are not entitled to summary judgment on the theory that the Investors cannot establish loss causation.[60]

## C. *The Damages Sought are not Impermissibly Speculative*

The Investors seek damages calculated as the difference between their initial investments and the value of the investments after discovery of the fraud, plus pre-judgment interest. At the time the alleged fraud was revealed the Funds had collapsed, rendering the securities worthless. Thus, the Investors seek to recover the entirety of their initial investments. Kidder contends that the damages sought are speculative, and that the Investors are entitled to claim only the difference between the actual value of their investments at the time of acquisition and the purchase price. As the Investors have not offered evidence establishing the value of their investments at the time of acquisition, Kidder contends the Investors will not be able to establish damages with reasonable certainty at trial and, therefore, that Kidder is entitled to summary judgment.

■ Under New York law, a fraud plaintiff may recover only "out-of-pocket" losses, or specific damages resulting from the alleged fraud. *See Enzo Biochem, Inc. v. Johnson & Johnson*, No. 87 Civ. 6125, 1992 WL 309613, at *12 (S.D.N.Y. Oct. 15, 1992) (citing cases). "Ordinarily the actual pecuniary loss sustained as a direct result of fraud which induces purchase of a chattel is the difference between the amount paid and the value of the article received." *Hotaling v. A.B. Leach & Co.*, 247 N.Y. 84, 159 N.E. 870, 871 (1928).

■ However, the Investors point out that in cases such as *Hotaling* and *Continental Ins.*, investors who were fraudulently induced to buy and retain securities were permitted to recover the difference between the amount invested and the value of their securities once the fraud was

---

**58.** The Brokers also contend that excessive leverage and negative convexity were at fault. However, there is evidence that these circumstances were actually contrary to Askin's representations of the Funds' status. Therefore, these were not extrinsic factors in the same sense as the market collapse. The liquidations are somewhere in the middle—extrinsic, insofar as the market collapse was a factor—and not extrinsic, insofar as the Funds were, contrary to Askin's representations, not market neutral, not managed through computer modeling, highly leveraged, and negatively convex.

**59.** This conclusion is not meant to elide the distinction between loss and transaction causation. It is noted that, after approving *Marbury*'s analysis, the *AUSA* court characterized the foreseeability inquiry in that case as to whether it was foreseeable that the misrepresentations would enable the company to make the acquisition that led to its downfall, a characterization which falls more easily under the loss causation rubric than may the instant case. *See* 206 F.3d at 217.

**60.** Kidder and the Investors have made letter submissions regarding the district court's decision on remand in *AUSA*. After making further factual findings, the district court reaffirmed its conclusion that loss causation was not proven. *See AUSA Life Ins. Co. v. Ernst & Young*, 119 F.Supp.2d 394 (S.D.N.Y.2000) (decision on remand). Both sides urge that the decision on remand supports their positions. However, this Court is not making factual findings as to loss causation but, rather, is concluding that a reasonable jury could do so. Therefore, the decision on remand is of limited utility.

revealed. *See Hotaling,* 159 N.E. at 873; *Continental Ins.,* 222 A.D. at 185–87, 225 N.Y.S. at 493–94. Indeed, in *Hotaling,* because the investments had become worthless due to subsequent events that led to the collapse of the issuer, the plaintiffs recovered the entire amount of their investment. 159 N.E. at 873.

Kidder contends that this rule is an exception to the out-of-pocket damages rule which only applies in cases involving debt securities, i.e., bonds, as compared with equity securities, and cases where the plaintiff can prove that the fraudulent misrepresentation and not some other extrinsic factor was the direct cause of the damages. Kidder's theory that there is an extrinsic cause exception is not well-developed and appears to be little more than another stab at the loss causation argument, previously discussed herein. As for the debt security exception, Kidder's premise is that, for these instruments, but not for equity securities, misrepresentations about the solvency of an obligor are directly linked to the loss when the obligor later defaults on the notes and, thus, damages for the full value of the instrument are not speculative.

While Kidder is correct that several of the New York cases cited by the Investors involve bonds, the reasoning of these cases does not support Kidder's theory that recovery was based on a debt security exception to the general damages rule applicable to fraud cases. The key, rather, was that the fraudulent misrepresentations induced the retention of the investments, so that the losses sustained as a result of a decline in the investments' value flowed from the fraud even though the decline in value stemmed from market events. *See Hotaling,* 159 N.E. at 872–73 (where investors induced to make and retain bonds by defendant's representations, and bonds became worthless due to issuer's collapse, investors entitled to recover difference between amount invested and value of invest-

ment "in light of subsequent events"); *Continental Ins.,* 222 A.D. at (investor entitled to recover damages occasioned by fraudulently induced inaction). In addition, in *Kaufmann,* 224 A.D. 29, 229 N.Y.S. 545, also cited by the Investors, the plaintiff was entitled to recover the difference between the amount paid for the investment and its value after the fraud was revealed because "[t]he claim was based on an inducement to retain." *Id.* at 30, 229 N.Y.S. 545. Thus, the critical issue is not the type of security but, rather, that "the effect of the representations of the defendant did not cease with plaintiff's purchase." *Hotaling,* 159 N.E. at 873.

This reading of New York law is supported by the decision in *Marbury.* In *Marbury,* the plaintiffs alleged federal securities fraud on the theory that they had been fraudulently induced to make and retain their investment in equity securities. *See id.* at 708. The *Marbury* court discussed and approved of the damages analysis in *Hotaling,* 247 N.Y. 84, 159 N.E. 870, *Continental Ins.,* 222 A.D. 181, 225 N.Y.S. 488, and similar cases, *see* 629 F.2d at 707–10, and relied on them in concluding that, where "the misrepresentation was such as to induce both [the plaintiffs'] purchases and their holding of the securities, their holding and its duration determined the extent of their losses." *Marbury,* 629 F.2d at 708.

Finally, Kidder belatedly raises the argument in its reply brief that the Investors must apportion their claimed losses between actionable and non-actionable causes, *i.e.,* between the fraud, on the one hand, and the market collapse, excessively bullish composition of the Funds' portfolios, and wrongful liquidations, on the other.[61] However, the damage apportionment cases cited by Kidder are inapposite here. These cases did not involve claims that the misrepresentations had induced the plaintiffs to make and retain their investments but, rather, that the misrepresentations

---

**61.** The fact that Kidder raised this argument for the first time in its reply brief is itself

sufficient grounds for rejecting the argument.

overstated the value of the investment or caused the decline in value. *See In re Executive Telecard, Ltd. Sec. Litig.,* 979 F.Supp. 1021, 1026 (S.D.N.Y.1997) (plaintiff must distinguish between fraud and non-fraud related influences on stock price); *In re Saxon Sec. Litig.,* Nos. 82 Civ. 3103, 83 Civ. 3760, 1985 WL 48177, at *9 (S.D.N.Y. Oct. 30, 1985) (plaintiff must prove how much of decline in value after revelation of fraud "attributable to disclosure and by extension, the fraud"). There was no apportionment requirement in *Marbury,* where the claim was that the fraudulent misrepresentation's induced the purchase and retention of the Investors' securities. *See* 629 F.2d at 707.[62]

Therefore, the damages sought are not impermissibly speculative. These damages are recoverable based on an application of the out-of-pocket damages rule to the circumstances of this case. The Investors are not seeking to apply an inapposite "exception" to this rule.[63]

### D. There are Genuine Issues of Material Fact with Respect to Whether the Brokers Aided and Abetted the Primary Fraud

█ The Brokers may be held liable for aiding and abetting the primary fraud

if they knew of the fraud and rendered substantial assistance to its achievement. *See Tribune Co. v. Purcigliotti,* 869 F.Supp. 1076, 1100 (S.D.N.Y.1994), *aff'd sub nom. Tribune Co. v. Abiola,* 66 F.3d 12 (2d Cir.1995); *Federal Deposit Ins. Corp. v. FSI Futures, Inc.,* No. 88 Civ. 0906, 1991 WL 224302, at *6 (S.D.N.Y. Oct. 16, 1991).

### 1. Knowledge or Scienter

█ In order to establish the scienter or knowledge element at trial, the Investors will have to prove, by clear and convincing evidence, sufficient facts to support a "strong inference" of fraudulent intent. *Beck v. Manufacturers Hanover Trust Co.,* 820 F.2d 46, 50 (2d Cir.1987). Such an inference may be established by (1) showing a motive for participating in a fraudulent scheme and a clear opportunity to do so, or (2) identifying circumstances indicative of conscious behavior. *Id.; Dreieck Finanz AG v. Sun,* No. 89 Civ. 4347, 1990 WL 11537, at *12 (S.D.N.Y. Feb. 9, 1990).[64]

As discussed in *ABF I,* when considering an aiding and abetting claim, a stricter standard may often apply to an aider and abettor than to the primary perpetrator

---

**62.** These cases concern federal securities fraud rather than common law fraud. However, both Kidder and the Investors discuss the damages rules in these two areas of the law interchangeably. In addition, the case law supports the conclusion that the same rules apply with respect to speculative damages, as with respect to loss causation.

**63.** Although Kidder challenges the claim for pre-judgment interest as part of its argument on speculative damages, Kidder does not raise a separate argument regarding the interest issue. There, the Investors are not precluded from claiming pre-judgment interest.

**64.** Both DLJ and the Investors confuse the standard applicable to this element. DLJ insists that the Investors must prove both "actual knowledge" and "scienter." However, "knowledge" and "scienter" are one and the same element within the context of an aiding and abetting fraud claim. *See, e.g., Dreieck,* 1990 WL 11537, at *12 (discussing "knowledge or scienter" element); *see also Black's*

*Law Dictionary* 1347 (7th ed.1999) (defining scienter as "[a] degree of knowledge that makes a person legally responsible for the consequences of his ... act or omission," or "[a] mental state consisting in an intent to deceive, manipulate, or defraud."). The Investors, for their part, urge that the scienter element can be satisfied by establishing "reckless disregard" for the truth. The cases cited by the Investors, however, arose in the context of an aider and abettor that owed a fiduciary duty to the fraud victim. *See, e.g., Rolf v. Blyth, Eastman Dillon & Co.,* 570 F.2d 38, 44 (2d Cir.1978) ("[A]t least where ... the alleged aider and abettor owes a fiduciary duty to the defrauded party, recklessness satisfies the scienter requirement."). While the law in this circuit has not always been the clearest as to this issue, the Investors' unequivocal statement that recklessness suffices is not tenable, and that standard will not be applied here. *See In re Leslie Fay Cos., Inc. Sec. Litig.,* 835 F.Supp. 167, 172 (S.D.N.Y. 1993) (observing that scienter requirement "is

since the " 'scienter requirement scales upward when activity is more remote.' " 957 F.Supp. at 1331 and n. 5 (*quoting Edwards & Hanly v. Wells Fargo Sec. Clearance Corp.*, 602 F.2d 478, 484 (2d Cir.1979)); *see National Westminster Bank USA v. Weksel*, 511 N.Y.S.2d 626, 630 (N.Y.App.Div. 1987) (aiding and abetting liability for fraud requires "high degree of scienter"). Kidder urges that this higher standard applies here. However, *ABF I* also held that "the scienter requirement need not be more exacting than that applied to the primary fraud" in a case involving a "symbiotic fraudulent scheme," as compared with a "remote" relationship. *See* 957 F.Supp. at 1331 n. 5. As further explained below, while the evidence revealed through discovery may be somewhat less damning than the allegations in the complaint, it is sufficient to support an inference of a symbiotic scheme. Thus, the Investors are not held to a higher standard of scienter.

There is evidence from which a jury could find that the Brokers knew that Askin represented to Investors that he used broker marks to report performance and that at Askin's prodding the Brokers readily revised their marks, on a monthly or near-monthly basis, for ultimate dissemination to the Investors. This evidence includes testimony by DLJ's Comerford, conversations between Kidder's O'Connor and various other individuals, including Askin, evidence that the Brokers reviewed

the Price Waterhouse statements and confirmed their marks as accurate, and the contract between DLJ and ACM which revealed the importance of DLJ's marks for ACM's reporting purposes.[65] In addition, there is evidence that the Brokers considered marking CMOs to be a complex, highly specialized task "more art than science," as Kidder puts it—and yet readily revised marks to reflect Askin's numbers at his request.

There is also evidence that the Brokers did not consider the revised marks to be accurate reflections of market prices, as evinced by conversations between Kidder's O'Connor and Askin, and by Comerford's testimony. Finally, at least with respect to Kidder, some persons at the brokerage firms were themselves concerned about the propriety of revising marks, as when Vranos commented that the problem with distinguishing between performance marks and repo marks was "we are defrauding investors." [66] This is an indication of conscious behavior and, thus, scienter.

There is also evidence that the Brokers knew that the Granite Funds were represented as market-neutral, and that this representation was not accurate. DLJ personnel have testified to their awareness of Askin's claim to market-neutrality, while DLJ's half-dozen portfolio analyses between 1992 and 1996 revealed the Funds

---

indeed a murky area of law in this circuit"); *see also Breard v. Sachnoff & Weaver, Ltd.*, 941 F.2d 142, 144 (2d Cir.1991) (stating without qualification that recklessness sufficient to show scienter); *but cf. Ross v. Bolton*, 904 F.2d 819, 823 (2d Cir.1990) ("[A]ssuming ... recklessness has been adequately pleaded—absent a fiduciary duty ... there is no aiding and abetting liability .... [plaintiffs] need to show ... actual intent.").

**65.** Kidder contends that the Investors repeatedly rely on evidence applicable only to DLJ to ascribe misconduct to Kidder. The Court, however, Court has not done so. Here, as elsewhere, the Court has taken pains to correct for the parties' lamentable tendencies to overstate or distort the evidence.

**66.** Kidder insists that the Investors have quoted Vranos's comments about "defrauding investors," made on two separate occasions—March 3 and 21—out of context, and that the only permissible inference is that Vranos did not want to defraud investors. However, at least with respect to the March 3 comment, it would also be reasonable to interpret Vranos' comment otherwise. Kidder also points out that in March 1994 it did not supply the revised prices requested by Askin for February 1994. The fact that Kidder decided not to go along with the repricing in the very same month that Brokers saw the Funds' value go through the floor, and the Brokers decided to make massive margin calls, could be interpreted simply as evidence that at that juncture it was not in the Brokers' interest to continue facilitating the fraud.

to be persistently tilted towards interest rate sensitive securities. Although DLJ contends that it did not obtain complete information on the Funds' holdings, and therefore could not have known of the lack of neutrality, this claim is somewhat implausible and, at the most, goes to create a genuine issue of fact as to DLJ's awareness. As for Kidder, Askin commented to O'Connor on the market-neutrality "constraint" on the Granite Funds, and indicated his desire to smooth returns with his "shitload of rainy day money" comment. Moreover, Kidder, like DLJ, participated in revising marks both upward and downward, and O'Connor discussed with colleagues their mutual understanding that the Granite Funds were supposed to be market-neutral.[67] Kidder was also aware that the Granite Funds were so persistently non-neutral as to be in danger of, as O'Connor put it, "blowing up."

Of course, as the Brokers point out, overly optimistic forecasting does not give rise to a fraud claim. Thus, if the evidence only showed that ACM expressed to Investors that it sought to achieve market neutrality, and that the Brokers were aware of that investment objective, the Investors' claim would fail both as to the primary fraud and aiding and abetting liability. However, as discussed earlier, there is sufficient evidence of representations going beyond mere forecasting to create a genuine issue of fact as to the primary fraud claim. With respect to aiding and abetting, the evidence does not reveal a great amount of detail as to the Brokers' knowledge regarding ACM's representations of

market neutrality. However, knowing that market neutrality was a "constraint," or that the Funds were marketed as market-neutral with "stable" 15% returns, combined with the Brokers' involvement in revising prices, supports an inference that the Brokers knew that Askin did more than brag of being able to achieve market neutrality. This evidence supports an inference that the Brokers knew Askin made misrepresentations of current and past historical fact in this regard.

In addition, the Brokers' awareness of Askin's lack of computer modeling capabilities—an issue which was interwoven with ACM's claims of market-neutrality—further supports the element of scienter. True, the evidence regarding the Brokers' knowledge of ACM's computer modeling claims is less damning than the Investors would have it.[68] For example, although the Brokers were aware of the PPMs' claims regarding computer modeling, but the record does not reflect knowledge of other ACM claims in this regard, such as those made in the marketing materials. Kidder personnel, however, expressed unequivocally their view that Askin could not model the securities in the Funds' portfolios. Indeed, Kidder's understanding belied even the relatively cautions (when compared to the marketing materials) PPM statements regarding "carefully constructed and research" "models" used to "actively" manage the portfolios and "project performance." DLJ, for its part, was aware that the complex securities involved, and market-neutrality, required advanced analytical capabilities of which DLJ saw no

---

**67.** Of course, an understanding that the Funds were supposed to be market-neutral could simply be an understanding that Askin himself had that as a goal. Viewed in context, however, the skepticism of Kidder personnel regarding the Funds' neutrality could reasonably be interpreted as reflecting their awareness that the Funds were represented quite differently.

**68.** The Investors overstate the evidence at various points. As just one example, they claim that DLJ "had to have known" of Askin's claims of sophisticated computer model-

ing because it knew other customers had such capabilities, that such capabilities were needed, and it had a "know your customer" obligation. The Investors' also seek to ascribe knowledge to Kidder based on the "Know Your Customer" rule. None of this is evidence of what the Brokers knew about Askin's claims, since whether or not they "had to know" something does not establish that they actually knew it. *See Renner v. Chase Manhattan Bank*, No. 98 Civ. 926, 1999 WL 47239, at *12 (S.D.N.Y. Feb. 3, 1999).

evidence. Moreover, the Brokers' knowledge of the marks revision process, and of the lack of analysis behind Askin's requests for revisions, supports an inference that they knew even the relatively cautious PPM claims regarding computer modeling were fictional. This, in turn, supports the claim that the Brokers knew ACM's claims to market-neutrality were fraudulent.

The evidence is stronger in some respects as to one Broker or the other. For example, the evidence that the Brokers knew Askin's claims regarding computer modeling were baseless is far stronger with respect to Kidder. Conversely, the evidence that the Brokers knew his claims to market-neutrality were fraudulent is stronger with respect to DLJ. Considered in its totality, however, the evidence is sufficient to give rise to an inference of conscious behavior by the Brokers with respect to both the valuations fraud and the operations fraud aspects of the Investors' claim. Thus, there is a genuine issue of material fact as to scienter or knowledge.

### 2. *Substantial Assistance*

■ The substantial assistance element has been construed as a causation concept, requiring that the acts of the aider and abettor proximately caused the harm upon which the primary liability is predicated. *See Edwards & Hanly v. Wells Fargo Sec. Clearance Corp.*, 602 F.2d 478, 484 (2d Cir.1979) (substantial assistance is proximate causation concept); *Northwestern Nat'l Ins. Co. v. Alberts*, 769 F.Supp. 498, 511 (S.D.N.Y.1991) ("[A] plaintiff alleging 'substantial assistance' by the aider and abettor must allege that the acts of the aider and abettor proximately caused the harm upon which the primary liability is predicated.").

Kidder, which made smaller revisions to its marks, protests that its revised marks were accurate and, therefore, that as to it the valuations fraud claim must fail.[69] Certainly, there is evidence in support of Kidder's claim. Marking CMOs is a complex task, and there is evidence to suggest that there might be a range of "accurate" marks for any given security at any given time. Kidder also points to the Price Waterhouse analyses, the Trustee's findings, and Carron's expert report, all of which support the view that the revised month-end marks supplied by Kidder represented fair market value. However, there is also evidence to the contrary. Kaplan, an expert for the Investors, opines that Kidder's revised marks did not reflect market value. Some of the recorded conversations between O'Connor and Vranos could reasonably be interpreted as expressing awareness that the revised marks did not accurately reflect such value. The exchange in which O'Connor states "the beautiful thing about Askin [is that] he doesn't sit there and make us use the performance marks as his repo marks. From a credit perspective we're covered," and Vranos replies, "Right. Just from a liability standpoint we're not because we are defrauding investors," is an example.

Moreover, that complexity of the marking process cuts both ways. To the extent that the Brokers rubber-stamped Askin's requests for revisions, after its traders had generated the initial marks through an admittedly complex process, there is support for the proposition that the revised marks were inaccurate. Although Kidder denies that it rubber-stamped Askin's requests, there is sufficient evidence to the contrary to create a material dispute of fact as to this issue. In sum, Kidder is not entitled to summary judgment on the theory that any revised marks it provided to

---

**69.** Kidder raises its "accuracy" argument in the section of its brief dealing with whether it substantially aided and abetted the fraud, rather than in the section dealing with whether there was a primary fraud. This argument, however, would appear to go to both issues since, under Kidder's logic, if the revised marks were accurate, then to the extent ACM based its reported returns on those marks there was no primary fraud.

Askin were accurate and, therefore, not fraudulent.[70]

Kidder also urges that no reasonable jury could find that it rendered substantial assistance because Kidder's revised marks, by themselves, had a minimal impact on the reported valuation of the Funds' portfolios. The Investors' experts have calculated the impact of the revised marks on the Granite Funds' performance—for example, by turning negative months into positive ones—based on the combined effects of DLJ's and Kidder's revisions. Kidder points out that if its revisions are considered standing alone the only time an otherwise negative month would have been reported as positive was in November 1993, because Kidder agreed to "schmear" the Pru–Home bond correction across two months rather than reporting it all in November. Kidder then delineates the impact of its revisions as to the Granite Funds' volatility, duration, "Sharpe Ratio" (a performance/risk measure), leverage, or targeted annual returns, and avers that its revisions had little or no impact on these performance indicators.

The Investors seek to justify their treatment of the evidence with reference to the case law of conspiracy, joint and several liability, and aiding and abetting. However, only the last of these doctrines is relevant, and under that case law the Investors must establish substantial assistance with evidence specific to each Broker. *See, e.g., Bloor v. Carro, Spanbock, Londin, Rodman & Fass,* 754 F.2d 57, 62 (2d Cir.1985) (acts of aider and abetter must have proximately caused harm upon which primary liability predicated); *see also Building Indus. Fund v. Local Union No. 3,* 992 F.Supp. 162, 177 (E.D.N.Y.1996) ("[J]oint and several" is damages allocation rule and is irrelevant for "establishing liability"). Thus, Kidder is not completely off the mark when it criticizes the Funds for "lumping together" evidence against it with evidence against DLJ.

Where Kidder's argument is misplaced, however, is in its attempt to carve out the "valuation" fraud as a completely distinct claim from the "operations" fraud, and, accordingly, to treat the evidence as neatly confined to each of these categories. Substantial assistance can take many forms. Helping to "mak[e] it possible for ACM to claim that the [performance] reports were based on objective valuations" is one. *Primavera,* 173 F.R.D. at 127; *see CPC Int'l, Inc. v. McKesson Corp.,* 70 N.Y.2d 268, 285–86, 519 N.Y.S.2d 804, 514 N.E.2d 116 (N.Y.1987) (broker aided and abetted primary fraud by providing false information used to present "enhanced financial picture to others"). Executing transactions, even ordinary course transactions, can constitute substantial assistance under some circumstances, such as where there is an extraordinary economic motivation to aid in the fraud. *See Armstrong v. McAlpin,* 699 F.2d 79, 91 (2d Cir.1983) (broker's processing of transactions with knowledge of fraudulent nature to generate commissions); *IIT v. Cornfeld,* 619 F.2d 909, 921–22, 926–27 (2d Cir.1980) (performing challenged transaction knowing it violated client's policy, with heightened economic motive to do so); *see also Rolf v. Blyth, Eastman Dillon & Co.,* 570 F.2d at 48 ("[S]ubstantial assistance might include . . . executing transactions or investing proceeds, or perhaps . . . financing transactions."). Participation in financing the fraudulent scheme, particularly where the financing was not routine, is another. *See, e.g., Monsen v. Consolidated Dressed Beef Co.,* 579 F.2d 793, 800–04 (atypical financing transactions); *In re Gas Reclamation, Inc. Sec. Litig.,* 659 F.Supp. 493, 504 (S.D.N.Y.1987) (same). Where there is evidence of various types of activities by an alleged aider and abetter going to this issue, the evidence should be considered together.

In addition to providing revised marks, Kidder recommended and sold to ACM vast quantities of interest rate sensitive

---

**70.** DLJ does not press an "accuracy" argument in support of its motion.

bonds, with knowledge that the Funds were constrained to be market-neutral and yet were persistently tilted towards such high-risk, bullish securities. Indeed, virtually everything Kidder sold to ACM was bullish, including the inverse IOs which it repeatedly urged upon Askin. ACM was one of Kidder's largest and most important CMO customers because of ACM's eagerness to purchase CMOs. Indeed, ACM had a "unique" willingness to buy the esoteric "deal-driving" tranches created by Kidder. Kidder reaped huge profits, selling over $120 million in inverse IOs, $300 million in other bullish securities, and no bearish securities, to ACM during the latter half of 1993. O'Connor had financial incentives to sell such bonds to ACM because he was paid higher commissions for sales of higher risk securities, or "nuclear waste." Kidder's financing terms were not only very favorable, but involved the provision of a special credit facility for ACM, enabling ACM to continue its purchases of Kidder bonds, including Kidder-created tranches. A broker's routine sale of securities is not "substantial assistance," absent a special duty to the Investors which Kidder did not have. *See Thornock v. Kinderhill Corp.*, 749 F.Supp. 513, 517 (S.D.N.Y.1990). However, this is evidence of extraordinary motivations which take these transactions out of the realm of "routine" sales of securities.

Finally, although Kidder provided fewer and less dramatic revisions than did DLJ, once Askin began asking for revisions Kidder readily complied. This helped to make it possible for ACM to claim its reports were based on objective valuations. And, at least for November 1993, when Kidder agreed to "schmear" the Pru–Home correction across two months, Kidder's marks turned a losing month into a winning one.

At the pleading stage, this Court held that substantial assistance had been prop-

erly alleged based on allegations that amounted to a symbiotic fraudulent scheme. *See ABF I*, 957 F.Supp. at 1330. Based upon all of the evidence just described, a reasonable jury could find that Kidder and ACM were involved in such a scheme or, as one Kidder representative frankly stated, that Kidder was "in bed with [ACM]."

DLJ, for its part contends that it did not substantially assist the primary fraud because it did not aid in the preparation or dissemination of the PPMs or marketing materials which contained the alleged misrepresentations. Generally, aiding and abetting liability would require such participation. *See ABF I*, 957 F.Supp. at 1328 (citing cases). However, as with Kidder, there is evidence of DLJ's participation in a symbiotic fraudulent scheme, wherein ACM relied on DLJ to create new CMOs, finance CMO purchases on extraordinarily favorable, highly-leveraged terms, and maintain a market for those CMOs, while DLJ relied on ACM to purchase a large proportion of its CMOs, including DLJ-created "deal-driving" tranches.[71] Comerford also had economic incentives to sell high-risk securities to the Funds, including those that were contrary to the Funds' market-neutrality constraints. Furthermore, although DLJ contends that it merely made "reasonable" adjustments to its marks, the evidence of DLJ's involvement in the marks revision process, and the impact of those revisions on the Granite Funds' reported performance, is quite stark. Thus, while the evidence as to DLJ is weaker in certain respects than it is for Kidder—for example, the record does not reveal whether DLJ's generous financing terms were atypical from those provided for other customers—in other respects it is stronger—as with the scale of the revised marks.

---

**71.** DLJ quarrels with the Investors' characterization of these securities as "virtually unmerchantable" and "toxic," given that DLJ was able to sell most of the Funds' bonds within two days of the liquidation, and the expert evidence offered by the Funds regarding the value of these securities. This evidence, however, while it supports DLJ's contention, is insufficient to eliminate any genuine issue of fact on this front.

Therefore, there is a genuine issue of material fact with respect both Brokers' substantial assistance in the primary fraud.

## II. *Kidder's Motion as to Certain Investors on Statute of Limitations Grounds*

Kidder has moved for summary judgment against certain Investors on the ground that their claims are barred by the applicable statutes of limitations.

### A. *The Applicable Statute Of Limitations*

The aiding and abetting claim asserted against Kidder arises under state law. As such, in determining the statute of limitations applicable to each Investor's claim, this Court must apply New York law. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).

 Under New York law, the statute of limitations for fraud is six years, and a claim accrues when the plaintiff "discovered the fraud, or could with reasonable diligence have discovered it." N.Y. C.P.L.R. 213(8) (McKinney 2000). However, under New York's "borrowing statute," when a plaintiff is not a New York resident the court should apply the shorter of (1) New York's period of limitations or (2) the statute of limitations applicable where the plaintiff resides. N.Y. C.P.L.R. 202 (McKinney 2000). For purposes of the borrowing statute, a cause of action accrues where the injury occurs. *See Gordon & Co. v. Ross*, 63 F.Supp.2d 405, 408 (S.D.N.Y.1999). Where, as here, the injury is purely economic, the place of injury is usually where the plaintiff resides. *See id.*

 The borrowing statute requires that the court apply the foreign jurisdiction's entire body of law concerning the statute of limitations. *Smith Barney, Harris Upham & Co. v. Luckie*, 85 N.Y.2d 193, 207, 623 N.Y.S.2d 800, 647 N.E.2d 1308 (N.Y.1995). Thus, this Court must look to the foreign law to (1) determine when the cause of action accrued and (2) provide the plaintiffs the benefit of any tolling provisions afforded by the laws of the applicable foreign jurisdiction. *Gordon & Co.*, 63 F.Supp.2d at 409.

### B. *Tolling Under American Pipe*

Six of the seven Investors against whom Kidder has moved on statute of limitations grounds rely, entirely or in the alternative, on the tolling rule articulated in *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 554, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974). The Connecticut Investors—Cook, the Demeter Trust, and Sterling—concede that their claims are time-barred unless tolling applies. The other three—Providian, Malkani, and Arbor—offer alternative theories as to why their claims are not time-barred if tolling does not apply. The seventh, Global, does not rely on tolling.

 In *American Pipe*, the Supreme Court held that "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." *American Pipe*, 414 U.S. at 554, 94 S.Ct. 756. "Once the statute of limitations has been tolled, it remains tolled for all members of the putative class until class certification is denied." *Crown, Cork & Seal Co., Inc. v. Parker*, 462 U.S. 345, 354, 103 S.Ct. 2392, 76 L.Ed.2d 628 (1983).

A primary justification for the *American Pipe* rule is that it promotes judicial economy, and, therefore, furthers the goals of the rules governing class actions. The Supreme Court stated,

A contrary rule allowing participation only by those potential members of the class who had earlier filed motions to intervene in the suit would deprive Rule 23 class actions of the efficiency and economy of litigation which is a principal purpose of the procedure. Potential class members would be induced to file

protective motions to intervene or to join in the event that a class was later found unsuitable.

*American Pipe,* 414 U.S. at 553, 94 S.Ct. 756. Meanwhile, defendants are not prejudiced in such situations because they have notice of the claims against them. *Crown, Cork & Seal,* 462 U.S. at 352–53, 103 S.Ct. 2392 (citations and quotation marks omitted).

These Investors contend that the September 20, 1995 amendment of the *Primavera* complaint, adding the Brokers as defendants, tolled the statute of limitations for these Investors as putative members of the *Primavera* class. According to these Investors, each of their states of residence either already has, or would, adopt the *American Pipe* tolling rule, as part of that state's statute of limitations law. Therefore, under the tolling rule, they all filed within the applicable statutory period.

Kidder objects that what the Investors seek is "cross-jurisdictional tolling," because they want this Court to apply a state tolling rule based on the filing of a federal class action. Kidder further objects that all but one of these plaintiffs—Cook being the exception—gave up their right to take advantage of tolling by filing individual actions before class certification was denied on March 19, 1998, in the *Primavera* Action.[72]

▪ Whether the filing of an individual action serves as a waiver of any rights to rely on the *American Pipe* rule has not been decided by the Second Circuit. The parties have not pointed to any other Court of Appeals decision on this issue. A number of district courts, however, have held that a plaintiff who pursues such a course cannot benefit from the tolling rule. *See, e.g., Wahad v. City of New York,* No. 75 Civ. 6203, 1999 WL 608772, at *6 (S.D.N.Y. Aug. 12, 1999); *In re Brand Name Prescription Drugs Antitrust Litig.,*

No. 94 C 897, MDL 997, 1998 WL 474146, at *8 (N.D.Ill. Aug. 6, 1998); *Wachovia Bank and Trust Co., N.A. v. National Student Marketing Corp.,* 461 F.Supp. 999, 1012 (D.D.C.1978), *aff'd,* 650 F.2d 342, 346 n. 7 (D.C.Cir.1980). The rationale for this result was summed up in *Wahad,* where the court observed that the plaintiff, by filing his individual action and not relying on the class action,

> created the very inefficiency that *American Pipe* sought to prevent—he generated more litigation and expense concerning the same issues that were litigated by a class of which he was a member. Accordingly, plaintiff is not entitled to the benefit of a toll under *American Pipe.*

*Wahad,* 1999 WL 608772, at *6. This reasoning is persuasive and is adopted herein.

### C. The Result Under the Statute of Limitations Applicable to Each of These Investors

#### 1. The Connecticut Investors

In Connecticut, the statute of limitations is "three years from the date of the act or omission complained of," Conn. Gen.Stat. § 52–577 (2000) and Connecticut applies a "continuing course of conduct rule," whereby a claim does not accrue until the tortious course of conduct is completed, *Handler v. Remington Arms Co.,* 144 Conn. 316, 130 A.2d 793, 795 (1957).

The Connecticut Investors concede that the latest point the statute of limitations could have begun to run on their claim was March 1994, because that is the latest date upon which the act or omission complained of occurred. Sterling and the Demeter Trust became plaintiffs on June 9, 1997, and Cook became a plaintiff on October 21, 1998. Thus, absent tolling, these plaintiffs concede that their claims are time-barred because they became parties more than three years after March 1994. Connecticut has adopted the *American Pipe* tolling

---

**72.** The Investors may object that they did not have notice of this argument, because it was not raised until Kidder's reply brief. However, this argument is responsive to the tolling theory raised by the Investors.

rule. *See Grimes v. Housing Auth.*, 242 Conn. 236, 698 A.2d 302, 306 (1997).

As just noted, the reasoning of those courts that have declined to apply tolling where a plaintiff files her own action before class certification is decided is persuasive. This conclusion finds even more support as to the Connecticut Investors because the Connecticut Supreme Court, in adopting the *American Pipe* rule, relied on the premise that tolling promotes judicial efficiency. *See Grimes v. Housing Auth.*, 242 Conn. 236, 698 A.2d 302, 306 (1997) (approving tolling rule because "Connecticut's class action procedures ... are designed to increase efficiencies in civil litigation by encouraging multiple plaintiffs to join in one lawsuit.").

■ Both Sterling and the Demeter Trust became plaintiffs before class certification was denied in the *Primavera* Action on March 19, 1998. Therefore, they may not rely on tolling, and their claims are time-barred.

■ Cook, however, did not become a party until after the denial of class certification, and if tolling applied only twenty-five months of the statute of limitations would have run by October 1998, when he became a party. Kidder contends, however, that Cook seeks "cross-jurisdictional tolling," and that the weight of the authority supports the view that Connecticut would not adopt such a rule.

Kidder defines cross-jurisdictional tolling as a rule whereby a court in one jurisdiction tolls the applicable statute of limitations based on the filing of a class action in another jurisdiction. Kidder points to some state cases in which the state courts have held that they would not toll the statute of limitations to permit the filing of a state court suit based on a previously-filed class action suit in another jurisdiction. *See, e.g., Portwood v. Ford Motor Co.*, 183 Ill.2d 459, 233 Ill.Dec. 828, 701 N.E.2d 1102, 1104–05 (1998). The posture of those cases is, of course, somewhat different, as Cook does not seek tolling

based on the *Primavera* Action in order to preserve the timeliness of an action in Connecticut state court. Just so, some of the concerns cited by those courts that have rejected such cross-jurisdictional tolling—including, notably, forum-shopping—are not present. *See Portwood*, 233 Ill. Dec. 828, 701 N.E.2d at 1104–05.

Kidder has also cited to two cases that are more directly on point here, namely, where a federal court was sitting in diversity and the plaintiffs, who had filed suits in federal court, sought tolling based on the previous filing of a federal class action. *See Wade v. Danek Medical, Inc.*, 182 F.3d 281, 284 (4th Cir.1999); *Barela v. Denko K.K.*, No. 93 Civ. 1469, 1996 WL 316544, at *1,*4 (D.N.M. Feb. 28, 1996). In both *Wade* and *Barela*, the federal court concluded that tolling did not apply on the theory that the state court would not apply tolling based on an action filed outside of the state court's own jurisdictional system. *See Wade*, 182 F.3d at 287; *Barela*, 1996 WL 316544, at *4. Both *Wade* and *Barela* determined that the issue had to be governed by whether the state had any interest in applying tolling in this situation, and concluded it did not. *See Wade*, 182 F.3d at 287; *Barela*, 1996 WL 316544, at *4. In addition, the Second Circuit, in dicta, declined to read this type of cross-jurisdictional tolling into at least one state's (Hawaii's) statute of limitations. *See In re Agent Orange Prod. Liability Litig.*, 818 F.2d 210, 213 (2d Cir.1987).

There is, however, another point of view. First, it is not clear what interest a state—and, in this case, Connecticut—has in not having its tolling rule applied in the situation presented here. As just mentioned, there is no issue of forum-shopping. Moreover, absent application of tolling in circumstances such as this, there would be a great incentive for individual members of purported federal classes involving state law causes of action to initiate independent actions in federal and/or state court, since they could not be sure of their ability to pursue those state law claims even in fed-

eral court. This militates against the judicial economy which is one of the goals of federal class action procedure.

Second, even though a federal court sitting in diversity applies the state statute of limitations, there may be counterbalancing federal interests that should be considered where all of the litigation involved is occurring in the federal forum. *See Adams Public School Dist. v. Asbestos Corp., Ltd.,* 7 F.3d 717, 719 (8th Cir.1993) (holding on other grounds that diversity tort action was timely under state law, but stating that prior federal class action would have tolled limitations period even if state had no tolling rule because "we view the federal interest here as sufficiently strong to justify tolling in a diversity case when the state law provides no relief."). Also in this vein, the Second Circuit has assumed the validity of "Justice Rehnquist's categorical statement in his *Chardon [v. Fumero Soto,* 462 U.S. 650, 103 S.Ct. 2611, 77 L.Ed.2d 74 (1983) ] dissent that '[i]f the law of a particular State was that the pendency of a class action did not toll the statute of limitations as to unnamed class members, there seems little question but that the federal rule of *American Pipe* would nonetheless be applicable.' " 818 F.2d at 213 (citation omitted). Kidder contends a straightforward application of *Erie* requires that cross-jurisdictional tolling may only apply where the state supplying the statute of limitations would recognize such tolling. However, the *Erie* analysis is not so simple as Kidder would have it.

These are difficult, barely-charted waters. However, in the absence of any interest on the part of Connecticut in having tolling barred in the circumstances present here, and the interest of both Connecticut and the federal forum in judicial economy, Cook may take advantage of the tolling period engendered by the filing of the *Primavera* Action. Therefore, his claim is not time-barred and will not be dismissed.

### 2. *Malkani*

Malkani is a resident of Maryland. She became a party to these cases on June 2, 1997, which was prior to the denial of class certification in the *Primavera* Action.

Maryland has a three-year statute of limitations for claims of aiding and abetting fraud. *See* Md.Code Ann., Cts. & Jud. Proc. § 5–101. Maryland follows an "inquiry notice rule," which provides that a cause of action accrues when the plaintiff has "knowledge of circumstances which would cause a reasonable person in her position to undertake an investigation which, if pursued with reasonable diligence, would have led to knowledge of the wrong." *Lumsden v. Design Tech. Builders, Inc.,* 358 Md. 435, 749 A.2d 796, 801 (2000) (internal quotation marks and citation omitted).

■ Maryland has not yet decided whether to adopt the *American Pipe* tolling rule. Given the weight of authority, it is reasonable to predict that Maryland would adopt that rule. However, it goes too far to predict that Maryland would afford the benefits of that rule to a plaintiff who files an individual suit during the period in which the putative class action is pending. Therefore, Malkani is not entitled to take advantage of tolling.

■ Malkani contends even without tolling her claim is not barred on the ground that no reasonably diligent inquiry on her part would have revealed facts concerning Kidder's involvement in Askin's scheme. Kidder, *citing Conaway v. Maryland,* 90 Md.App. 234, 600 A.2d 1133, 1142 (1992), objects that Maryland law does not require knowledge of a defendant's identity to trigger the statute of limitations. Since Malkani knew she had been harmed on March 25, 1994, when Askin restated the Funds' February 1994 performance, Kidder maintains that the Maryland statute of limitations began running as of that date.

Kidder is correct that, in Maryland, "Generally ... limitations begin to run when the fact of injury is known, not when the alleged wrongdoers are identified."

*Lumsden,* 749 A.2d at 805 (internal quotation marks and citation omitted). However, the Maryland Special Court of Appeals has recently explained that, in *Conaway,* the reason the statute of limitations was triggered was that the plaintiff knew he had a cause of action for medical malpractice based on treatment at a certain facility, but "merely did not know the name of the physician who had treated him." *Young v. Medlantic Laboratory Partnership,* 125 Md.App. 299, 725 A.2d 572, (1999). In *Young,* by contrast, the plaintiff knew that she had a cause of action for medical malpractice against her doctor, but did not learn until more than three years after her injury that she a medical laboratory had failed to send an important medical report to her doctor—which failure might have played a role in her injury. *Id.* at 576–77. Under these circumstances, the plaintiff was not barred as a matter of law from pursuing her claim against the laboratory, based on the running of the statute of limitations, but was instead given an opportunity to prove at trial whether her failure to discover the laboratory's role at an earlier point was reasonable. *See id.* at 578.

Malkani's situation is akin to the circumstances in *Young,* rather than to those in *Conaway.* Thus, her claim cannot be deemed barred as a matter of law, as she must be given an opportunity to show at trial that she was reasonable in not discovering Kidder's role until the Trustee's report in April 1995.

### 3. *Arbor*

Arbor is a resident of Massachusetts. Arbor became a party to these actions on June 2, 1997, prior to the denial of class certification in the *Primavera* Action.

■ Massachusetts, like Maryland, has not yet decided whether to adopt the *American Pipe* rule. Again, it is reasonable to predict that Massachusetts would adopt this rule, but not that it would extend the benefits of the rule to a plaintiff who does not wait out the tolling period before becoming a party. However, Arbor contends that, even without tolling, its claim is timely under the law of its residence, Massachusetts.

Massachusetts applies a three year statute of limitations to fraud claims. *See* Mass. Gen. Laws ch. 260 § 2A (2000). Massachusetts applies a "discovery rule" to determine when a cause of action accrues. *Bowen v. Eli Lilly & Co.,* 408 Mass. 204, 557 N.E.2d 739, 740 (1990). The state Supreme Court has held that accrual occurs when a plaintiff has "(1) knowledge or sufficient notice that she was harmed and (2) knowledge or sufficient notice of what the cause of harm was." *Id.*

The First Circuit has stated its understanding of the Massachusetts rule as being that the statute does not begin to run until "the plaintiff has enough information to target the defendant as a suspect, although not necessarily to identify the defendant as the culprit." *Cambridge Plating Co., Inc. v. Napco,* 991 F.2d 21, 29–30 (1st Cir.1993). In a later stage of that same case, the district court determined that the plaintiff was not barred by the statute of limitations where it knew it was harmed by a malfunctioning water treatment system, but did not discover the party responsible, and did not sue that party, until more than three years later. *See Cambridge Plating Co., Inc. v. Napco,* 85 F.3d 752, 757 (1st Cir.1996) (discussing district court case).

Arbor concedes that it knew it was harmed as early as March 1994, and that in or shortly after that month it knew of Askin's wrongdoing. However, Arbor contends it did not have "knowledge or sufficient notice of what the cause of the harm was" as to its claim against Kidder before the issuance of the Trustee's report in April 1995. Arbor defines the cause of the harm as Kidder's participation in Askin's fraud.

■ Although Kidder protests that *Cambridge Plating* misread Massachusetts law, the First Circuit is far more familiar

with that law than is this Court. Nor does a reading of that case law demonstrate that the First Circuit was mistaken. Therefore, the reasoning of *Cambridge Plating* will be adopted here. Arbor may seek to prove at trial that it was reasonable in not discovering that Kidder's conduct was a cause of its harm before April 1995.

### 4. *Providian*

Providian became a party to these actions on March 27, 1996, two years and two days after the Funds' losses were revised downward by Askin, and before class certification was denied in the *Primavera* Action.

Kidder contends that Providian is a resident of Pennsylvania and, therefore, that the Pennsylvania statute of limitations applies.

Pennsylvania has a two-year statute of limitations for fraud claims. *See* 42 Pa. Cons.Stat. § 5524. The statute begins to run when "the right to institute and maintain the suit arises." *Beauty Time, Inc. v. Vu Skin Sys.*, Inc., 118 F.3d 140, 143 (3d Cir.1997) (citation and quotation marks omitted). Pennsylvania follows a discovery rule, whereby the statute is tolled until the plaintiff "learns or reasonably should have learned through the exercise of due diligence of the existence of the claim." *Id.* at 148.

Providian raises three alternative theories: (1) that its action is timely under the *American Pipe* tolling rule, (2) that the applicable statute of limitations is provided by Kentucky law and is five years, and (3) that it became a party to these actions less than two years after its claim had accrued.

■ With respect to tolling under the *American Pipe* rule, there is no dispute that Pennsylvania has adopted that rule. The question, however, is whether Pennsylvania would apply tolling to a member of the purported class brings his own suit before the class certification issue is decided.

Providian contends that the critical issue under Pennsylvania law for applying tolling is whether the defendant had notice of the claim and potential claimants. If notice were all that were required, than, logically, it would be immaterial that Providian filed suit before the class certification issue was denied in the *Primavera* Action.

The Pennsylvania courts have, indeed, emphasized the importance of notice in considering whether tolling applies. *See, e.g., Cunningham v. Insurance Co. of North America*, 515 Pa. 486, 530 A.2d 407, 411 (1987) (filing of class action where it was apparent on face of complaint that named plaintiff lacked standing did not provide sufficient notice to trigger tolling); *Municipal Authority of Westmoreland County v. Moffat*, 670 A.2d 747, 749 (Comm. Ct. of Penn.1996) (noting the "emphasis placed on notice by our Pennsylvania Supreme Court" in applying tolling). However, the fact that notice is required does not mean that it is sufficient. The *Cunningham* court also noted that "the rule of tolling in *American Pipe* and its progeny was based upon a need to promote efficiency and economy of litigation." 530 A.2d at 493. As previously mentioned, applying the tolling rule to a plaintiff who does not wait until the class certification issue is decided frustrates that goal. Moreover, the *Cunningham* court also noted that the "potential for abuse of the tolling rule has ... been recognized since the time of its inception." *Id.* at 493. Although the court did not confront the circumstances here, its evident concern about litigant abuse further supports the conclusion that Pennsylvania would not apply tolling in this situation. Therefore, Providian may not take advantage of that rule.

■ With respect to Providian's contention that the applicable law is that of Kentucky, the issue is where Providian felt the economic harm. The complaint alleges Pennsylvania as Providian's principal place

of business, as did Providian's responses to Kidder's interrogatories. However, Providian contends that it felt the economic harm in Kentucky, where its corporate parent is located, and where it conducted its business with regard to the Granite Funds.

The New York Court of Appeals has recently explained that application of the residence test for purposes of the borrowing statute is supposed to be straightforward:

> CPLR 202 is designed to add clarity to the law and to provide the certainty of uniform application to litigants. This goal is better served by a rule requiring the single determination of a plaintiff's residence than by a rule dependent upon a litany of events relevant to the 'center of gravity' of the wrong.

*Global Fin. Corp. v. Triarc Corp.*, 93 N.Y.2d 525, 693 N.Y.S.2d 479, 482, 715 N.E.2d 482 (1999) (citation and internal quotation marks omitted).

Even accepting that the relevant corporate decisions were made in Kentucky, Providian has not explained why the economic harm would be felt there. Moreover, Providian's argument is essentially a grouping of contacts or center of gravity approach which is inconsistent with *Global Financial*. *See also Gordon Co.*, 63 F.Supp.2d at 408; *Appel v. Kidder, Peabody & Co.*, 628 F.Supp. 153, 156 (S.D.N.Y. 1986). Therefore, the applicable law is that of Pennsylvania, not Kentucky.

 Finally, with respect to the contention that Providian's claim is timely even under the two-year Pennsylvania statute of limitations, Providian maintains it could not reasonably have learned of Kidder's complicity in Askin's fraud until well after March 27, 1994. This would make its claim, filed on March 27, 1996, timely. If anything, according to Providian, the fact that when Askin restated the February 1994 performance he disclosed that he had overridden certain broker marks suggested that the brokers were not involved in the wrongdoing.

However, the case law relied upon by Providian for this argument is New York case law applying the New York statute of limitations. Thus, the authorities cited do nothing to illuminate whether Pennsylvania would apply such a rule. Kidder has identified authorities which support the contrary view. The Third Circuit, interpreting Pennsylvania law, has stated that the statute of limitations begins to run no later than when a plaintiff is "put on inquiry notice by 'storm warnings' of possible fraud." *Beauty Time*, 118 F.3d at 148. A Pennsylvania district court, again applying Pennsylvania law, has held that a fraud claim accrues when the plaintiff learns it is the victim of a misrepresentation, even if it does not know who was responsible. *See Leach v. Quality Health Servs., Inc.*, 902 F.Supp. 554, 558 (E.D.Pa.1995). On the other hand, at least one Pennsylvania authority cited by Kidder might support the view that the rule there is similar to the one in Massachusetts, and requires notice of the source of the injury. *See Staiano v. Johns–Manville Corp.*, 304 Pa.Super. 280, 450 A.2d 681, 685 (1982) (citation omitted). However, Providian has provided no authority for the proposition that under Pennsylvania law claims against joint tortfeasors accrue at different times. Therefore, Providian's claim is time-barred under that law and, because Providian cannot rely on any other rule, must be dismissed.

### 5. *Global*

 Global is a resident of Jersey, Channel Islands. Global became a plaintiff in these actions on June 2, 1997.

Global contends that there is no "period of prescription" under Jersey law for a claim of civil fraud and, thus, the (shorter) six-year New York statute of limitations applies. Global bases this contention on *Perrot v. Le Breton*, 11 C.R. 29 (1891). Global's claim would be timely under the six-year New York rule.

There is a Jersey statute which provides that "the period within which actions founded on tort may be brought is ... three years from the date on which the cause of action accrued." Law Reform (Misc.Provisions) (Jersey) Law 1960, art. 2(1). Kidder and Global have each submitted sworn declarations of Jersey advocates regarding the state of Jersey law in this regard.[73]

Advocate Anthony D. Robinson ("Robinson"), in a declaration submitted on behalf of Global, opines that "to the best of [his] knowledge, there is no decision in a Jersey court holding that civil fraud is a tort subject to a three year period of prescription" under the aforementioned statute, and that "to the best of [his] knowledge, the law remains as stated in the case of *Perrot v. Le Breton.*" Robinson also opines that if the Jersey courts were to classify a civil fraud as a type of tort subject to this three-year period, that the running of the period would be suspended where the plaintiff was "ignorant of the existence of a claim as a result of the defendant's fraudulent conduct."

Advocate R. Binnington, in a declaration submitted on behalf of Kidder, states that "Jersey law has developed in the century since the *Perrot* decision, including the adoption in 1960 of the three-year statute of limitations in tort actions," and represents without contradiction that in 1984 Jersey adopted a statute providing that there is no limitations period for fraud actions so long as they are brought against a trustee accused of self-dealing. Under ordinary rules of statutory construction, such a statute would be superfluous if there were no period of prescription for fraud actions in Jersey. *See United States v. Blasius,* 397 F.2d 203, 207 n. 9 (2d Cir.1968). Kidder has also provided a recent case from the Jersey Court of Appeal in which the court considered the effect of Perrot on that statute of limitations for

fraud, and upheld the application of the three-year statute of limitations to such a claim. *See Eves v. Le Main* (Jersey Court of Appeal, January 22, 1999). The Jersey court distinguished Perrot as involving a case where the defendant fraudulently concealed its conduct. *See id.*

Finally, both the *Eves* case and Robinson's declaration support the notion that the running of the limitations period may be suspended where the plaintiff is ignorant of the existence of a claim as a result of the defendant's fraudulent conduct. However, there is no evidence of fraudulent concealment by Kidder that caused Global to be ignorant of its claim after the restating of the Funds' performance on March 25, 1994. Therefore, the three-year statutory period applies beginning on that date, and Global's claim is time-barred.

### III. *Kidder's Motion as to the Quartz Plaintiffs*

Kidder has moved separately against the Quartz Plaintiffs, asserting that they cannot meet their burden to establish either the primary fraud or that Kidder aided and abetted such fraud. With respect to this latter point, Kidder maintains that the Quartz Plaintiffs have not established either its knowledge or substantial assistance in any fraud involving the Quartz Funds.

First, although Kidder concedes that in February 1994 it sold inverse IOs to the Quartz Fund, it points out it had no knowledge that Askin, in a February 1994 letter, had misrepresented those purchases to Investors as bearish. Moreover, the Investors' own experts did not conclude that Kidder's sale of these securities was inappropriate. Second, Kidder did not revise any marks with respect to the (short-lived) Quartz Fund.

The Quartz Investors object that Kidder oversimplifies their case, and aver that

---

**73.** Courts may consider the statements of foreign attorneys on issues affected by foreign law. Fed.R.Civ.P. 44.1.

they relied on various misrepresentations other than the February 1994 letter, including, most importantly, the reported performance of the Granite Funds. If they had known how the Granite Funds had really performed, or the methodology used to calculate those Funds' returns, maintain the Quartz Plaintiffs, they would never have invested in Quartz. They also aver that they relied on misrepresentations regarding computer analytics ostensibly used to manage the Quartz Fund.

■ The Quartz Plaintiffs' contentions find evidentiary support, but they go to the primary fraud rather than to Kidder's aiding and abetting liability. Essentially, the Quartz Plaintiffs maintain that, but for Granite, there would have been no Quartz. The implication is that if Kidder aided and abetted the fraud with respect to the Granite Funds then it must also have aided and abetted the fraud with respect to Quartz. However, the Quartz Plaintiffs have not offered evidence to rebut Kidder's argument that it did not have knowledge of the Quartz fraud. For example, the Quartz Plaintiffs maintain that in making their investments they relied on the Granite Funds' reported performance, and purported valuation methodology. The Quartz Plaintiffs have not pointed to evidence that Kidder had knowledge that Askin made misrepresentations to the Quartz Plaintiffs regarding the Granite Funds—including by providing materials regarding the Granite Funds' performance—in order to induce the Quartz Plaintiffs to invest. Nor have these pointed to evidence of Kidder's substantial assistance with respect to the Quartz Fund, whether by revising marks or otherwise propping up the Quartz Fund. Again, the implication of the Quartz Plaintiffs' position is that Kidder's having rendered substantial assistance to the Granite Funds' fraud necessarily transfers over to the Quartz fraud. There might be circumstances under which this would be a viable theory. However, the Quartz Plaintiffs have failed to explain why that theory is supported here.

Therefore, summary judgment will be granted for Kidder against the Quartz Plaintiffs.

## IV. *Merrill's Motion to Strike the Expert Reports*

Merrill has moved to strike the expert reports submitted by the Funds in connection with the summary judgment motions. The Funds rely heavily on their experts' reports in opposing Merrill's motion, and in support of the Funds' cross-motion, but aver that even if the expert reports are stricken, there is enough other evidence in the record to preclude summary judgment for Merrill on Counts II and VIII.

Merrill contends that Campbell's proposed testimony, as set forth in his report, is neither reliable under *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), nor relevant, and that Campbell is not qualified to render the opinions offered. Merrill contends that Malkiel's report consists of inadmissible legal opinions and conclusory statements, *see Andrews v. Metro North Commuter R.R. Co.*, 882 F.2d 705, 708 (2d Cir.1989), that any factual conclusions reached by Malkiel are unreliable, and that Malkiel is not qualified. Finally, Merrill contends that Saha's report is irrelevant.

### A. *Reliability Under Kumho Tire and Daubert*

The standard for the admissibility of expert testimony at trial is set forth in Federal Rule of Evidence 702:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue a witness qualified as an expert by knowledge, skill, experience, training, or education, may

testify thereto in the form of an opinion or otherwise.

Fed.R.Evid. 702.

■ This standard was the subject of extensive analysis by the Supreme Court in *Daubert*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469, and *Kumho Tire*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238. The Supreme Court has directed that the trial judge is to act as a "gatekeeper" with respect to expert testimony to ensure that such testimony is both relevant and reliable. *Daubert*, 509 U.S. at 589–91, 113 S.Ct. 2786; *see Kumho Tire*, 526 U.S. at 147, 119 S.Ct. 1167 (extending Daubert's "gatekeeping obligation" to expert testimony other than scientific testimony). The determination as to the relevance and reliability of such evidence is committed to the sound discretion of the trial court. *See Daubert*, 509 U.S. at 591, 113 S.Ct. 2786.

■ *Daubert* identified four specific factors which the trial court may consider in determining reliability: (1) whether the theory has been or can be tested, (2) whether the theory has been subject to peer review or been published, (3) when a particular technique is used, that technique's known rate of error, and (4) the extent of acceptance of the theory in the relevant scientific community. 509 U.S. at 593–94, 113 S.Ct. 2786. The *Daubert* test is flexible, however, and this "list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Kumho Tire*, 526 U.S. at 141, 119 S.Ct. 1167. The trial court is to use its discretion to determine what are reasonable criteria of reliability and whether the proposed testimony meets those criteria based on the particularities of the case before it. *Kumho Tire*, 526 U.S. at 158, 119 S.Ct. 1167; *see generally* Federal Judicial Center, *Reference Manual on Scientific Evidence* 21 (2d ed.2000) (observing that in *Kumho Tire* the Supreme Court was "less absorbed . . . in formulating general rules for assessing reliability . . . and more concerned about directing judges to concentrate on 'the particular circumstances of the particular case at issue.' This flexible, nondoctrinaire approach is faithful to the intention of the drafters of the Federal Rules of Evidence [ ].").

■ In assessing reliability, the court must determine whether the expert testimony has "a traceable, analytical basis in objective fact." *Bragdon v. Abbott*, 524 U.S. 624, 653, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998) (*citing General Elec. Co. v. Joiner*, 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997)). "[O]pinion evidence that is connected to existing data only by the *ipse dixit* of the expert" should not be admitted. *Kumho Tire*, 526 U.S. at 157, 119 S.Ct. 1167 (*citing Joiner*, 522 U.S. at 146, 118 S.Ct. 512).

### B. The Campbell Report

Merrill contends that Campbell's report is not relevant and unreliable, and that Campbell is not qualified with respect to the subject about which he proposes to testify.

#### (1) Campbell's Proposed Testimony is Relevant

■ Campbell's proposed testimony regarding fair market prices for the Funds' securities is relevant to Counts I, II, and VIII. With respect to Count I, this testimony is relevant to the calculation of damages under the highest intermediate price rule, which damages as explained below may be sought by the Funds. With respect to Count II, this testimony is relevant to whether the Brokers acted in bad faith in liquidating the Funds' accounts. Finally, with respect to Count VIII, this testimony is relevant to whether the liquidation sale was commercially reasonable, since the proceeds may be considered in making that determination.

#### (2) Campbell is Qualified to Testify on the Subjects in Question

■ Campbell has extensive background and qualifications in the economic

analysis of securities prices and interest rates. He also teaches a course at Harvard that has included a segment on CMOs and their valuation, and has performed consulting work and advised on a Ph.D. thesis that involved CMO valuation. Merrill's claim that Campbell is not qualified suggests that only someone who specializes in CMOs could qualify as an expert on the subjects about which Campbell proposes to testify. The law does not insist on such narrow qualifications. *See McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir.1995); *Hawthorne Partners v. AT&T Technologies, Inc.*, No. 91 C 7167, 1993 WL 311916, at *3 (N.D.Ill. Aug. 11, 1993) (citing cases).

### (3) *Campbell's Proposed Testimony is Sufficiently Reliable to be Admitted at Trial*

■ With respect to reliability, Merrill contends that Campbell's proposed testimony fails to meet any of the criteria set forth in *Daubert* as well as any other criteria that might reasonably apply. Although Merrill has raised numerous arguments in this regard, its main contention is that Campbell erred by failing to take account of "actual trading prices" of the same CMOs for which he has calculated "fair market prices" with his computer model. According to Merrill, Campbell should have both compared his results against those trading prices and used those trading prices as data inputs for his model. Thus, this argument is directed primarily at the first *Daubert* factor, namely, whether the theory has been or can be tested. *Daubert*, 509 U.S. at 593, 113 S.Ct. 2786.

Specifically, Merrill points to the actual prices it obtained in resales on March 31, 1994, of four CMOs obtained by Merrill through its auction, as well as evidence of its inability to sell other CMOs. Merrill sold three CMOs to TCW, all of them at prices that were lower than Campbell's fair market valuations for these same CMOs. Merrill also offered six CMOs to the Clinton Group, all at lower prices than Campbell's fair market valuations, but the Clinton Group agreed to buy only one—at the Merrill price. According to Merrill, its sales to TCW and the Clinton Group were arms-length transactions in which it was necessarily motivated to maximize the price obtained. Therefore, Merrill avers that the reliability of Campbell's model must be tested against these prices, and the fact that Campbell's prices are higher than the actual prices obtained in these transactions requires the conclusion that his methodology is unreliable.

However, one of the issues in this litigation is the legitimacy of the DLJ and Merrill resales, and there is evidence making that question fair ground for litigation. With respect to the TCW sale, before the auction took place TCW had given Merrill indications of interest in the securities which it later bought in the resale. TCW was not included in the auction—Merrill only included selected broker-dealers—and Merrill then submitted bids that were below the prices TCW had indicated it was willing to pay with the specific "hope of earning a small mark-up." Thus, it cannot be said that the TCW prices necessarily represented fair market values and, thus, that Campbell's report is unreliable because his numbers are different. With respect to the Clinton Group sale, although it is certainly relevant that this customer was willing to purchase only one security out of six—at prices that were lower than Campbell's—Campbell's methodology cannot be deemed unreliable based on this single market participant's failure to engage in additional transactions.

Merrill insists that the TCW and Clinton Group sales were conducted in the ordinary course and in the same manner as other securities in its inventory, citing testimony by Kronthal and Gundlach. However, Kronthal only "assume[d]" that the traders treated the Funds' CMOs like any others, since they rather than he conducted the sales, and did not recall whether there were special instructions to the trad-

ers, *e.g.*, to liquidate these CMOs as quickly as possible. As for Gundlach, Merrill fails to identify his role, or even employer, and in any case he has no recollection of the process.

Comparison of Campbell's computer-generated prices for certain CMOs and these actual trading prices of the same CMOs may indeed be one worthwhile way of testing Campbell's model. However, under the circumstances of this case it is not the only appropriate test of that model, nor does the fact that Campbell's methodology resulted in higher prices necessarily mean that his methodology is unreliable. Indeed, to require Campbell to use the resale prices as fair market value benchmarks is tantamount to assuming the conclusion of one of the issues in the case.

Merrill's contention that Campbell's methodology is unreliable because he did not use the resale prices as data inputs for his calculations, similarly, is flawed. Since the Funds question the legitimacy of these prices, and have some evidentiary grounds for doing so, there is a logical basis for Campbell to exclude these data.

Merrill urges that this case is indistinguishable from *Atlantic Richfield Co. v. The Farm Credit Bank of Wichita*, 226 F.3d 1138 (10th Cir.2000). In *Farm Credit Bank*, the Tenth Circuit Court of Appeals upheld the district court's exclusion, on reliability grounds, of an expert's testimony as to the market value of carbon dioxide ("CO2"). *See* 226 F.3d at 1166. The rationale for this ruling was that the expert disregarded (1) prices actually received by ARCO from certain CO2 suppliers in the region in question, namely, West Texas, and (2) prices actually received by CO2 supplies in comparable markets in other regions of the country. *Id.* The Tenth Circuit observed that "[w]hile expert testimony based on hypothesis can (and sometimes must) be used to establish market value, courts tend to prefer evidence derived from actual sales." *Id.* at 1167.

In *Farm Credit Bank*, the evidence supported the district court's discretionary determination that, first, the West Texas market was sufficiently competitive that those transactions ought to have been considered, and, second, the reason articulated by the expert for not considering prices obtained in comparable markets was inadequate. *See* 226 F.3d at 1167–68 (discussing sales in West Texas market and expert's attenuated testimony as to why he considered West Texas unique). In this case, by contrast, there is sufficient evidence to put in doubt whether the transactions with TCW and the Clinton Group took place in a sufficiently competitive environment to require Campbell to measure his results against those transactions.

■ Merrill also points out that in the case of two securities, the actual prices paid for the CMOS by the Funds, which occurred at a time when market conditions were more favorable for CMOs, were lower than Campbell's fair market values as of the liquidation. Of course, Campbell did not use his model to calculate fair market prices for those earlier dates. Nonetheless, Campbell concedes that it is somewhat puzzling that he obtained results for March 31 that were higher than the actual prices obtained at a time when market conditions were more favorable. However, the fact that Campbell's methodology has produced anomalous results in these two cases does not dictate the conclusion that his testimony is inadmissible. "The focus . . . must be solely on principles and methodology, not on the conclusions they generate." *Daubert*, 509 U.S. at 595, 113 S.Ct. 2786; *see Ruiz–Troche v. Pepsi Cola of Puerto Rico Bottling Co.*, 161 F.3d 77, 85 (1st Cir.1998) ("Daubert does not require that a party who proffers expert testimony carry the burden of proving to the judge that the expert's assessment of the situation is correct."). Of course, "conclusions and methodology are not entirely distinct from one another . . . [and] nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit

opinion evidence which is connected to existing data only by the *ipse dixit* of the expert." *Joiner,* 522 U.S. at 146, 118 S.Ct. 512. Campbell's opinion is connected with the price and mark data for the margin call and liquidation period, not merely by his *ipse dixit.*

■ Merrill also contends that Campbell's methodology fails the first *Daubert* factor because he himself has not tested his methodology or offered a way of doing so. *See Daubert,* 509 U.S. at 593, 113 S.Ct. 2786.

Before using his model to price the Funds' CMOs, Campbell compared model-computed OASs of several other CMOs to those reported by Bloomberg, a recognized pricing service. This validation tool is useful with respect to the calculation of price from a given OAS. It doesn't, however, demonstrate the validity of the steps Campbell took in order to generate an OAS, including the identification of comparable securities, use of internal dealer marks as proxies for actual transaction prices, the adjustment of model-generated OASs based on inter-day changes in interest rates, and the borrowing of this adjusted OAS to calculate the price of a given security. However, Campbell also employed other techniques to evaluate the meaningfulness and accuracy of his results.

Campbell describes two ways in which he has attempted to demonstrate that his model-computed prices are meaningful and accurate. The first was that he determined that the average changes in the portfolio values for the Funds' securities, calculated using the model-computed prices, are generally consistent with the average daily change in the Lehman Index. Although not precisely a "test," this was "a rough cross-check of reasonableness." [74] The second was that Campbell examined the weighted average OASs of the Funds' portfolios during the margin call and liquidation period, using the model-computed prices, and discerned that, like the OAS data from the Market Monitor, the OASs as he calculated them did not show a drastic change during the last week of March 1994.[75]

In sum, Campbell did employ techniques to evaluate the reliability of his model and the results he generated, though these techniques were not without their limitations.

The Funds contend that the second *Daubert* factor—peer review and publication—is inapposite because Campbell's methodology is so specifically focused on a particular fact situation that it is likely to be of little interest within academic circles. *See Daubert,* 509 U.S. at 593, 113 S.Ct. 2786 ("Publication ... is not a *sine qua non* of admissibility; it does not necessarily correlate with reliability ... and in some instances well-grounded but innova-

---

74. However, contrary to Merrill's contention, the fact that Campbell could not point to evidence that changes in the values of CMO securities should be expected to *correlate* with changes in the values of long-term Treasury securities does not mean that this test is without value. First, as Campbell explained in his deposition, the concept he employed was "sensitivity" rather than "correlation"—sensitivity being a measure of scale as to how much the value of CMOs might be expected to move when the values of long-term Treasury move. Campbell Tr. at 72. Second, Campbell acknowledged that he had no strong expectations that there would be a particular size—or even direction—of sensitivity, but that what he expected, and what his analysis, was that it would be stable over time. *Id.*

75. Merrill contends that Campbell did not intend this exercise to be a test of the reliability of his results because he stated at his deposition that he is "not using this analysis to assert that there should be a one-to-one relationship." Campbell Tr. at 86–87. However, read in context Campbell's statement reveals that he was intending a test of reliability, only it was a test designed to capture a "general indication in the CMO market as a whole" rather than one-to-one relationships between the OASs from the Merrill Market Monitor and the OASs of the Funds' CMOs. *See id.* at 87.

tive theories will not have been published.... Some propositions, moreover, are too particular, too new, or of too limited interest to be published.").

While the subject of Campbell's report is undoubtedly arcane, it would be difficult to say that it so much more obscure than other matters of interest within academia that questions of peer review and publication would not even apply. Although Campbell's model is indeed tailored to the specific factual situation in this case, there are elements of the model which would appear to have broader application. Moreover, given the importance of CMOs within a particular sector of the financial market, and the difficulties of pricing them, it would seem that the development of a reliable pricing methodology would be of interest beyond the context of this litigation. Nonetheless, while peer review and publication can be a very important consideration, *see Daubert*, 509 U.S. at 593, 113 S.Ct. 2786, like any other factor it is not a prerequisite to admissibility. Finally, Merrill has not pointed to any similar studies of CMOs which have received peer review.

The Funds contend that third *Daubert* factor—the known rate of error of the technique employed—is essentially satisfied because Campbell employed a conservative methodology and erred, if at all, in the direction of undervaluing the securities. The basis for this contention is that in those instances where he used repo marks, he used marks that were at or close to the bid side of the bid-offer spread. Because brokers buy at the bid price and sell at the offer price, the bid side represents more conservative prices. While this argument is plausible, is falls far short of a known rate of error. Nor do the Funds cite sufficient evidence for their somewhat vague contention that "the great bulk" of uncertainty as to Campbell's values necessarily consists of prices above those generated by his model.

The fourth *Daubert* factor, as mentioned previously, is general acceptance of the methodology within the relevant community. *See* 509 U.S. at 595, 113 S.Ct. 2786. OAS analysis as such has been the subject of an extensive amount of peer-reviewed literature in the field. This provides some support for Campbell's report, although to a limited extent because Campbell's model involves a great deal more than OAS analysis. Indeed, OAS analysis only comes into play once other critical steps have been employed, including identifying comparable securities—in method 1—or using repo marks to generate OASs, and adjusting OASs from one date to another—in method 2.

The testimony of Reich and Lewis supports the view, however, that comparable securities-based pricing is accepted within the industry. Although this does not mean that Campbell's precise methodology for identifying comparable CMOs is the same as the method (or methods) employed in the industry for making such an identification, this testimony further supports the conclusion that Campbell's methodology is sufficiently reliable to be admitted.

Special attention must be given to the general acceptance factor as it pertains to Method 2. This method, as described earlier, involves using repo marks to compute a given security's OAS as of a certain date, and then adjusting the OAS to reflect changes in the interest rate environment and liquidity between that date and another date based on median changes in OAS of CMOs in the broad group of CMOs in which the Fund security belongs. There is no widespread acceptance within the industry of using a dealer's mark, rather than a transaction price, as a starting point in determining the fair market value of a CMO. However, there is evidence that repo marks are relied upon in situations involving valuation of CMOs, including for the purpose in a liquidation of crediting the Funds with the value of their securities, and to report on a dealer's net capital position. There is also evidence that broker-dealers adjusted prices of CMOs based on changes in interest rates.

Thus, the issue really comes down to whether Campbell's methodology is unreliable because he has combined analytical tools in a particular way which has not gained general acceptance. The Supreme Court has made clear that where an expert has applied an accepted technique in a particular way it is not enough to simply invoke the acceptance of other uses of that technique.

> [T]he specific issue ... was not the reasonableness in general of a tire expert's use of a visual and tactile inspection to determine whether [a defect] had caused the tire's treat to separate.... Rather, it was the reasonableness of using such an approach, along with [the expert's] particular method of analyzing the data thereby obtained, to draw a conclusion regarding the particular matter to which the expert testimony was directly relevant.

*Kumho Tire*, 526 U.S. at 153–54, 119 S.Ct. 1167.

Campbell's proposed testimony does not run afoul of *Kumho Tire*. The fact that essential principles of his technique do have general acceptance, buttressed by the exercises he has employed for assessing the meaning and accuracy of his results, provides a sufficient level of reliability to warrant admission of his testimony.[76]

The *Kumho Tire* court also warned that the court should be vigilant as to internal inconsistencies within, or any inherent implausibility, of an expert's analysis. *See* 526 U.S. at 154–55, 119 S.Ct. 1167 (reliability doubtful where expert could not determine with any precision number of miles traveled by tire, yet claimed to determine "with some certainty" abuse-related significance of minute differences in wear on tire surfaces, and expert did not apply own technique consistently).

Merrill contends that such Campbell's report is riddled with such problems, but this criticism is overstated. For example, the fact that Campbell reviewed his original report and made certain corrections to it does not show that his methodology was unreliable—revisions are consistent with the scientific method. Nor can his revisions be deemed "results-driven," as Merrill accuses, given that they led to an increase in the fair market value estimations for Merrill securities but a decrease in these estimations for DLJ securities.[77] Campbell's concession that some securities are "more comparable than others," will no doubt be exploited by Merrill on cross-examination, given that Campbell calculates fair market values down to the penny. Campbell Tr. at 213. However, this fact does not so undermine his methodology as to render it unreliable.[78]

Finally, Merrill urges that the unreliability of Campbell's testimony is further demonstrated by application of an addi-

---

**76.** It is also noted that Sanders, a Merrill expert, employed a somewhat novel adaptation of OAS methodology to argue that Merrill's liquidation prices were reasonable. Of course, the burden remains on the Funds to establish the admissibility of their own expert evidence. Nonetheless, this fact does weaken the force of Merrill's argument that Campbell's model is fatally flawed because it involves a novel adaptation of OAS methodology.

**77.** Similarly, the fact that Campbell made an error in valuing one security—which error he corrected in his revised report, resulting in a reduction of the Funds' damage claim—by using a March 25 repo mark rather than marks for March 30 and 31 does not bear on the admissibility of his report as a whole.

**78.** Merrill also criticizes Campbell's use, in applying Method 1 to certain securities, of Bear Stearns marks for another security. Merrill contends that these marks were stale. However, there is evidence that the marks were each changed from the preceding business day. Merrill also contends that it is "ironic" for the Funds to rely on Bear Stearns marks given that the Funds have accused Bear Stearns of misconduct in marking the Funds' securities. However, the marks used by Campbell were marks for non-Askin securities already in Bear Stearns own portfolio, so that there was no incentive for misvaluation.

tional factor identified by the Ninth Circuit in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311 (9th Cir.1995) (*"Daubert II"*), namely, whether an expert's opinion "grow[s] naturally and directly out of research [he] has conducted independent of the litigation, or whether [he] has developed [the] opinions expressly for purposes of testifying." 43 F.3d at 1317.[79] The Funds urge that this factor is inapposite given the highly particularized nature of the inquiry, which the Funds characterize as involving the retrospective valuation of a particular portfolio of CMOs. This argument is no more convincing that the Funds' similar contentions regarding the peer review and publication factor. That is, the Funds characterize Campbell's report too narrowly. Nonetheless, although satisfaction of this additional factor would provide further support for Campbell's testimony, there are sufficient other indicia of reliability to warrant its admission.

### C. *The Malkiel Report*

#### (1) *The Majority of the Malkiel Report Consists of Inadmissible Legal Conclusions*

Expert evidence should not be permitted to "usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." *GST Telecommunications, Inc. v. Irwin*, 192 F.R.D. 109, 110 (S.D.N.Y.2000) (*quoting United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir.1999) (internal quotation marks and other citations omitted)); *see Marx & Co. v. Diners' Club, Inc.*, 550 F.2d 505, 510 (2d Cir.1977). Expert evidence is not inadmissible merely because it "embraces an ultimate issue to be decided by the trier of fact." Fed.R.Evid. 704(a); *see United States v. Duncan*, 42 F.3d 97, 103 (2d Cir.1994). However, an expert opinion must be helpful to the trier of fact and

should not be admitted where it "would merely tell the jury what result to reach." Fed.R.Evid. 704(a) advisory committee's note. As the Second Circuit has explained:

> While Rule 704 has abolished the common law "ultimate issue" rule ... it has not lower[ed] the bars so as to admit all opinions.... This circuit is in accord with other circuits in requiring exclusion of expert testimony that expresses a legal conclusion.... Under Rules 701 and 702, opinions must be helpful to the trier of fact, and Rule 403 provides for exclusion of evidence which wastes time. These provisions afford ample assurances against the admission of opinions which would merely tell the jury what result to reach, somewhat in manner of the oath-helpers of an earlier day.... Even if a jury were not misled into adopting outright a legal conclusion proffered by an expert witness, the testimony would remain objectionable by communicating a legal standard—explicit or implicit—to the jury.... Whereas an expert may be uniquely qualified by experience to assist the trier of fact, he is not qualified to compete with the judge in the function of instructing the jury.

*Hygh v. Jacobs*, 961 F.2d 359, 363 (2d Cir.1992) (internal quotation marks and citations omitted) (alteration in original).

Indeed, Malkiel's assignment was flawed from the outset. Rather than being asked to develop an expert opinion that might happen to embrace certain ultimate issues, he was asked to reach legal conclusions regarding those ultimate issues: whether Merrill and DLJ complied with the PSA Agreements, whether they adhered to the covenant of good faith and fair dealing, and whether they conducted the liquidations in a commercially reasonable manner. The terms employed in defining Malkiel's project are identical to the

---

**79.** This criticism could be levied with equal force at the experts propounded by Merrill and DLJ. However, that does not determine

whether the Funds' expert's testimony is admissible.

legal terms defining elements of the counts in this case. *See United States v. Duncan,* 42 F.3d 97, 101 (2d Cir.1994) (observing that testimony of expert witness who "repeatedly track[s] the exact language of the statutes and regulations which the defendant ha[s] allegedly violated and use[s] judicially defined terms such as 'manipulation,' 'scheme to defraud' and 'fraud' in opining on the defendant's conduct" is properly excluded under Federal Rules of Evidence) (citation omitted). The only aspect of Malkiel's assignment which was less objectionable in this regard concerned the issue of whether fair market prices were credited to the Funds for the liquidated securities. However, as explained below, Malkiel's conclusions on this point are problematic for other reasons.

Given Malkiel's assignment, it is perhaps unsurprising that the Malkiel report is permeated with inadmissible legal opinions and conclusions directed at telling the jury what result to reach. For example, he proposes to testify as to the scope of Merrill's legal obligations under the terms of the PSA Agreements and the implied covenant of good faith and fair dealing, and to his conclusion that Merrill's conduct breached the PSA Agreements, the implied covenant of good faith, and was commercially unreasonable. As support for these opinions, Malkiel relies almost exclusively on his interpretation of deposition testimony by witnesses in this case. In so doing, he does not serve as an expert but, rather, seeks to supplant the role of counsel in making argument at trial, and the role of the jury interpreting the evidence. Malkiel also explains the standards governing the parties' conduct with reference to this Court's discussion of the implied covenant of good faith and fair dealing in *Granite I,* 17 F.Supp.2d at 305–06, and a legal opinion offered in the BMA Amicus Brief. In so doing, Malkiel is seeking to instruct the jury as to the law governing the case. He also makes statements concerning the parties' intent with respect to the PSA Agreement. Here again, he strays outside the scope of proper expert testimony.

The Funds contend that Malkiel's conclusions are admissible because, while they go to ultimate issues in the case, they are purportedly drawn from his extensive experience with and knowledge of customs and practices in the securities industry and his analysis of the evidence obtained in discovery. There is no doubt that Malkiel has extensive qualifications. Moreover, it is proper for an expert to testify as to the customs and standards of an industry, and to opine as to how a party's conduct measured up against such standards. *See Marx & Co.,* 550 F.2d at 509; *Media Sport & Arts s.r.l. v. Kinney Shoe Corp.,* No. 95 Civ. 3901, 1999 WL 946354, at *3 (S.D.N.Y. Oct. 19, 1999). However, Malkiel's report does not reveal how he has made use of his extensive qualifications. He fails to articulate industry customs or standards for consideration by the jury, stating broadly that "[b]rokers and dealers are expected to act with the highest integrity." This is not so much testimony about industry custom or practice as it is Malkiel's thoughts on the state of the law relating to broker-dealers. In addition, Malkiel's characterization of the standard is so vague as to be unhelpful to a jury. Thus, Malkiel has failed to establish a basis for his opinion that Merrill and DLJ failed to comport with industry standards.

Not to put too fine a point on it, Malkiel's report illustrates "how vital it is that judges not be deceived by the assertions of experts who offer credentials rather than analysis." *Minasian v. Standard Chartered Bank, PLC,* 109 F.3d 1212, 1216 (7th Cir.1997) (citations omitted).

**(2) *The Fact Opinions Contained in the Malkiel Report are Merely Conclusory***

To the extent Malkiel's report contains factual conclusions, those conclusions are offered without benefit of citation to research, studies, or other generally accepted support for expert testimony. For ex-

ample, he states that "it was common knowledge that institutional customers were the principal buyers of CMOs, were more likely than broker-dealers to have interest in Askin's securities, and were therefore more likely to submit higher bids than broker-dealers." Whether institutional customers would likely have submitted more competitive bids than the broker-dealers is a proper matter for expert testimony, and would help a jury in determining whether the liquidation was commercially reasonable. However, Malkiel cites no support for his assertion. "[N]othing in either Daubert or the Federal Rules of Evidences requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Kumho Tire*, 526 U.S. at 157, 119 S.Ct. 1167 (citation omitted).

Similarly, when Malkiel states with respect to Merrill's resale of certain securities to TCW that Merrill "had little incentive to [look for other customers] . . . when it could immediately resell to TCW, satisfy a customer, and make the profits noted above," he fails to state any evidentiary basis for his opinion as to Merrill's incentives. There is certainly evidence in the record regarding Merrill's actual conduct with respect to TCW. However, Malkiel does no more than counsel for the Funds will do in argument, *i.e.*, propound a particular interpretation of Merrill's conduct. This is not justification for the admission of expert testimony. Nor is admission warranted based on the Funds' broad contention that Malkiel's conclusions are "fully supported by economic analysis and insights from his experience in the securities industry" sufficient. While it is permissible for Malkiel to base his opinion on his own experience, he must do more than aver conclusorily that his experience led to his opinion. *See Kumho*, 526 U.S. at 150, 119 S.Ct. 1167; *cf., e.g., Berk v. Bates Advertising USA, Inc.*, No. 94 Civ. 9140, 1998 WL 726030, at *3 (S.D.N.Y. Oct. 14, 1998)

(admitting expert's opinion, based on experience, as to plaintiff's available job opportunities where expert explained specifics of experience and how relevant to analyzing plaintiff's circumstances).

The same problem infects Malkiel's conclusion that DLJ failed to credit the Funds with the fair market value of their securities. Malkiel opines that "it is clear that DLJ's valuations were self-serving," but provides no expertise in interpreting DLJ's conduct. Rather, he simply concludes, based on DLJ's remarking of securities between March 29 and 30, that DLJ was acting in a self-serving manner. He then discusses at great length his conclusion that DLJ's liquidation procedures violated "the intent and spirit of the PSA Agreement and the covenant of good faith and fair dealing." Here again, he is simply telling the jury what conclusion to reach.[80] Finally, Malkiel's conclusions as to the CMOs' fair market values are entirely derivative of Campbell's report. There is no reason to admit this portion of Malkiel's discussion.

The remainder of Malkiel's report is permeated with the same sorts of problems as those discussed above. Therefore, it is inadmissible and will be stricken.

### D. *The Saha Report*

Merrill contends that the Saha report is not relevant because it concerns the calculation of damages under the highest intermediate price rule and, according to Merrill, such damages are not available in this case. However, as further discussed *infra*, the Funds may seek highest intermediate price damages in connection with Count I. Therefore, the Saha report will not be stricken.

### V. *The DLJ and Merrill Motions for Summary Judgment as to Count I*

Count I of the Second Amended Complaint is a breach of contract claim against

---

**80.** Although Malkiel references "industry standards" in this discussion, he fails to articulate either what those industry standards might be or the evidence for his opinion in that regard.

the Brokers for making improper margin calls. Specifically, Count I states that the Brokers "breached their contractual obligations to the Funds by acting in bad faith, improperly calculating the margin positions in the Funds' accounts, and improperly basing their margin calls on such calculations and not on 'market' values."

Merrill does not dispute that there is a genuine issue of material fact as to whether it breached its contract with the Funds by making the margin calls. However, Merrill contends that it is entitled to summary judgment because the Funds cannot prove damages. The Funds seek consequential damages, *i.e.*, their bankruptcy-related expenses, and liquidation damages. Merrill contends that liquidation damages are not available in connection with the allegedly wrongful margin calls and that, even if such damages were available that the Funds cannot prove causation. Merrill also contends that the Funds can prove neither causation nor reasonable foreseeability with respect to their alleged consequential damages.

DLJ contends that the Funds cannot meet their burden at trial to prove that DLJ breached the PSA Agreement as to two of the Funds, Granite Partners and Quartz. DLJ also joins as to all of the Funds in the arguments made by Merrill pertaining to consequential damages and the availability, as a matter of law, of liquidation damages in connection with Count I. Finally, DLJ contends that the Funds cannot show causation with respect to liquidation damages although for different reasons than those set forth by Merrill.

### A. *The Applicable Law*

■ In order to prevail on a breach of contract claim under New York law, which is the applicable law, the Funds must plead and prove the following elements: (i) proof of the existence of the contract; (ii) breach by the other party; and (iii) damages suffered as a result of the breach.

*Furia v. Furia*, 116 A.D.2d 694, 695, 498 N.Y.S.2d 12 (N.Y.App.Div.1986).

■ In addition, there is under New York law "[i]mplicit in all contracts ... a covenant of good faith and fair dealing in the course of contract performance." *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 639 N.Y.S.2d 977, 663 N.E.2d 289, 292 (1995). The covenant encompasses "any promises which a reasonable person in the position of the promisee would be justified in understanding were included," and it prohibits either party from acting in a manner "which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Id.* (citations and internal quotations omitted); *see Travellers Int'l, A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1575 (2d Cir.1994).

■ Breach of the covenant gives rise to a cognizable claim, as ("[a] party may be in breach of its implied duty of good faith and fair dealing even if it is not in breach of its express contractual obligations"). *Chase Manhattan Bank, N.A. v. Keystone Distribs., Inc.*, 873 F.Supp. 808, 815 (S.D.N.Y.1994). However, the duty of good faith cannot be used to create independent obligations beyond those agreed upon and stated in the express language of the contract. *See Warner Theatre Assoc. Ltd. P'ship v. Metropolitan Life Ins. Co.*, No. 97 Civ. 4914, 1997 WL 685334, at *6 (S.D.N.Y. Nov. 4, 1997); *CIBC Bank and Trust Co., Ltd. (Cayman) v. Banco Cent. Do Brasil*, 886 F.Supp. 1105, 1118 (S.D.N.Y.1995).

### B. *DLJ's Breach Of Contract*

DLJ contends that Granite Partners and Quartz cannot show that it breached the PSA Agreement because it is undisputed that there were margin deficits in some amount in those Funds' accounts at the time DLJ made the margin calls, and under the PSA Agreement DLJ had the right to make a margin call whenever there was a margin deficit. DLJ acknowl-

edges that there is a factual dispute as to the size of the margin deficits and, more specifically, whether DLJ overstated those deficits. However, DLJ avers that this dispute is immaterial since neither Granite Partners nor Quartz made any attempt to satisfy the margin calls and, moreover, could not have done so due to their financial straits.

■ While Granite Partners and Quartz do not dispute that there were margin deficits in their accounts on March 29, 1994, they contend that the DLJ margin call amounts were so "grossly excessive" as to violate the PSA Agreement. They further contend that the procedures DLJ used to calculate the margin call amounts violated both the terms of the PSA Agreement and the implied covenant of good faith.

DLJ is incorrect that the amount of its margin calls is immaterial on the theory that Granite Partners and Quartz would not have, and could not have, satisfied margin calls of any size. According to the defendant's own expert, Errickson, on March 29, 1994, Granite Partners had approximately $39.3 million in available cash and securities, and on March 30, 1994, Quartz had approximately $24.2 million in available cash and securities. Moreover, Granite Partners and Quartz made payments towards or satisfied certain margin calls by other brokers on March 28, 29, and 30. DLJ made a second, larger margin call on Granite Partners before the deadline on the first margin call had passed. Thus, although there is no genuine dispute that the Funds could not have met all of the brokers' margin calls ensuing between March 28–30, there is evidence that the Funds were acting selectively in applying the resources at their disposal. This is sufficient to raise a genuine issue as to whether Granite Partners and Quartz could have met margin calls

from DLJ in lesser amounts that the ones set by DLJ, including the amounts estimated by the Funds' expert, Campbell.[81]

There is a genuine dispute of material fact as to whether DLJ's margin calls violated the implied covenant of good faith. The Funds have adduced following evidence concerning both the manner in which DLJ calculated the margin deficits and that amount of its margin calls. The head of DLJ's Fixed Income Department, Pollack, recalls that DLJ was aware of and concerned about rumors that other brokers were making margin calls on the Funds and that the Funds were having difficulty meeting those calls. There is evidence of discussions within DLJ concerning the difficulties or perhaps impossibility of determining where the securities would trade on the market, and that DLJ believed it ought to be conservative in its pricing in order to protect the firm's interests. Although there were no margin deficits in the accounts as of March 28, 1994, within the next two days, the period around which the rumors as to the Funds' difficulties were circulating, DLJ quickly repriced the securities—resulting in significant margin deficits. DLJ made a second, larger margin call on Granite Partners before the deadline on the first call had passed. In addition, Campbell, one of the Funds' experts, opines that if DLJ had accurately valued the securities in the repo accounts based on fair market prices then the deficit in the Granite Partners account would have been $5,362,166 on March 29, 1994, rather than $9,243,077, and the deficit in the Quartz account would have been $512,556 on March 30, 1994, rather than $1,903,600.

Campbell's numbers may be susceptible to attack at trial, and the evidence as to DLJ's concerns and motivations is susceptible to interpretations other than the one proffered by the Funds.[82] Nonetheless,

---

**81.** Campbell estimated the Granite Partners deficit as $5,362,166 on March 29, and the Quartz deficit as $1,903,600 on March 30.

**82.** DLJ criticizes the Funds for quoting deposition testimony out of context and even going so far as to misquote such testimony. As far as quoting testimony out of context goes, this

the evidence set forth above is sufficient to give rise to a genuine issue of material fact as to whether DLJ's acted in a manner which had "the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Dalton,* 639 N.Y.S.2d 977, 663 N.E.2d at 292.

DLJ is not entitled to summary judgment on the theory that the manner in which it priced the securities, *i.e.,* pricing them itself, was in accordance with market practice for such securities. The relevant contractual provision states that prices shall be "obtained from a generally recognized source agreed to by the parties or the most recent closing bid quotation from such a source unless contrary to market practice for such securities." PSA Agreement § 2(h). The Funds aver that DLJ was required to, and did not, obtain its prices from a generally recognized source. DLJ contends that it complied with the "market practice" clause, and that the universal practice and custom in the CMO market is that the dealer who holds the CMOs prices them itself for margin purposes. However, DLJ has offered no evidence in support of this contention. Therefore, it has not met its burden on this summary judgment motion.[83]

 There is no genuine dispute of fact, however, with respect to the Funds' contention that DLJ breached the express terms of the PSA Agreement by making margin calls that were substantively too large or, as the Funds put it, "grossly excessive." The PSA Agreement allows the dealer to make a margin call so that the value of the collateral in the repo account "will thereupon equal or exceed" the margin deficit amount. PSA Agreement § 4(a). The Funds were entitled to obtain a refund of any excess margin. *See* PSA Agreement § 4(b). However, this provision was not self-executing. *See id.* (requiring notice to dealer to obtain refund). Moreover, the Funds have failed to articulate a standard as to what degree of excessiveness would constitute a contract violation. Given this failure, and the fact that margin. calls in excess of the margin deficit amounts are expressly contemplated by the PSA Agreement, the Funds' claim that the margin calls violated the PSA Agreement terms simply by virtue of being "grossly excessive" fails as a matter of law.[84]

 Finally, DLJ contends that the Funds are estopped from arguing that DLJ breached a contractual duty by making "excessive" margin calls.[85] DLJ relies on what it characterizes as the prior course of conduct between the parties, and the fact the Funds failed to object to the margin call amounts at the time the calls were made. With respect to the prior course of conduct, DLJ points out that on March 2, 2994, DLJ had made a margin call which the Funds considered excessive and to which they objected, but without asserting that DLJ had breached its contract. In response to the objection DLJ reduced its margin call which the Funds then met. However, evidence that on one prior occasion—just a few weeks before the margin calls at issue here—the Funds objected to a margin call as excessive without calling it a breach of contract is not sufficient to establish a course of conduct upon which DLJ relied to its detriment. Moreover, the Funds' argument concerns

---

attack could justly be leveled at each of the parties in this action. However, the Court has identified at least one instance in which the Funds actually misquoted testimony. *Compare* Funds Mem. at 22 *with* Pollack Tr. at 222–23. Obviously, inaccurate representations of evidence have not been considered.

83. On the other hand, the Funds have failed to articulate what the "generally recognized source" would have been. They cannot pre-

vail at trial on a theory that DLJ breached this express contract provision unless they do so.

84. The amount of the margin calls is relevant, however, to the Funds' bad faith claim, as discussed *supra.*

85. Whether the Funds are estopped from making this argument is relevant to their bad faith claim.

what it terms "grossly excessive" margin calls, not calls in excess by any amount of what the Funds considered accurate. Finally, given the rapid pace of events during the three-day period in question, the Funds are not estopped because they failed to notify DLJ at the time that they considered the margin call amounts to be so high as to constitute a breach of contract.

### C. *Damages*

#### 1. *The Funds are not Estopped from Seeking Liquidation Damages in Connection With Count I*

 Merrill and DLJ contend that the Funds are estopped by their responses to interrogatories in this action from asserting any damages other than bankruptcy-related expenses in connection with Count I.[86] *See, Wechsler v. Hunt Health Sys., Ltd.,* No. 94 Civ. 8294, 1999 WL 672902, at *2 (S.D.N.Y. Aug. 27, 1999) (answers to interrogatories are "judicial admissions that generally estop the answering party from later seeking to assert positions omitted from, or otherwise at variance with, those responses"). The Funds respond that they primarily seek liquidation damages under Count I, not only bankruptcy-related damages, and that their interrogatory responses reveal as much.

The relevant interrogatory by Merrill sought "computation of each category of damages alleged . . . including the amount of such damages, the method of calculation, and the specific events causing each such category of damages." The relevant interrogatory by DLJ sought "the amount of damages claimed against DLJ and the method by which such damages were calculated."

Liquidation and bankruptcy damages were two of the damage categories identified by the Funds in response to these interrogatories. The paragraph setting forth the liquidation damages begins with the phrase "[f]or Merrill's [or DLJ's] improper liquidation of the Funds' securities," and the paragraph setting forth the bankruptcy-related damages begins with the phrase "[f]or Merrill's [or DLJ's] excessive margin calls on the Funds and improper liquidation of the Funds' securities."

The only time the phrase "margin calls" is stated in the text of the interrogatory answer is in the paragraph setting forth the bankruptcy-related damages. The paragraph setting forth the liquidation damages references "improper liquidation of the Funds' securities." However, in the response to Merrill the latter paragraph cross-references other interrogatory answers—which answers the claimed liquidation damages to allegations that the margin calls should not have been issued and were wrongfully inflated—and in the response to DLJ that same paragraph cross-references the expert reports of Campbell and Saha—which reports link the claimed liquidation damages to the DLJ's making of the margin calls. Moreover, neither Merrill nor DLJ asked the Funds to allocate the damages as to the counts in the complaint. Therefore, while the Funds' interrogatory answers certainly could have been worded more artfully, their claim for liquidation damages in connection with Count I does not contravene their interrogatory responses, and therefore they are not estopped from seeking those damages.

#### 2. *The Highest Intermediate Price Rule Applies to Count I*

 In connection with Count I the Funds seek liquidation damages under the highest intermediate price rule, *i.e.,* based on the highest intermediate price of the liquidated securities within a reasonable

---

**86.** Count I is entitled "Breach of Contract—Wrongful Margin Calls and Liquidation" and alleges that the Funds "have been damaged" as a result of improper margin calls by the defendants.

period after the liquidations.[87] The theory for seeking these damages is that because the margin calls were wrongful the liquidations should never have occurred—rather than that the liquidations should simply have been carried out differently.[88]

DLJ and Merrill contend that highest intermediate price damages are available only in cases of conversion and fraud and, therefore, are not available in connection with Count I because it states a breach of contract claim. DLJ and Merrill cite to two Second Circuit cases which they maintain require this result, namely, *Schultz v. CFTC,* 716 F.2d 136 (2d Cir.1983), and *Katara v. D.E. Jones Commodities,* 835 F.2d 966 (2d Cir.1987).

In *Katara,* the plaintiff raised both a common law fraud and a breach of contract claim in connection with the allegedly wrongful liquidation of his commodity futures account by his broker when he failed to meet several margin calls. In the court's discussion of damages, it stated:

> Where a customer's position is involuntarily liquidated because of his failure to meet a margin call, application of the general duty to mitigate damages limits recovery to: the additional amount required to repurchase the same contracts in the market within a reasonable time after liquidation ... measured by the difference between the contracts' liquidation prices and the highest intermediate prices reached by the identical contracts during a reasonable period after the wrongful sale.

835 F.2d at 972. Thus, the court stated broadly that the highest intermediate price rule, which is a formulation of the duty to mitigate, applied in cases involving involuntary liquidation. *Id.* The court did not state the this rule was inapplicable to the plaintiff's breach of contract claim. *Id.*

The court did make a specific reference to the application of this rule to fraud cases, noting that the "duty to mitigate [and therefore, the highest intermediate price rule] applies where it is claimed that the involuntary liquidation was fraudulent." *Id.* at 972. However, read in context, the point of this reference to fraud appears to be that the highest intermediate price rule—which the court characterized as a limitation on recovery, since it reflects the duty to mitigate—applies even in cases of fraud, not that it applies only in such cases. *See id.* (noting that duty to mitigate applies in fraudulent liquidation case after stating application generally to involuntary liquidation). Finally, the court remanded the case for a new trial, on grounds not relevant here, on both the fraud and the breach of contract claim without distinguishing between the two causes of action with respect to the damages standard.

In *Schultz,* 716 F.2d 136, the Second Circuit stated that "[n]early a hundred years ago the Supreme Court set forth the proper rule to be applied in calculating damages when an item of fluctuating value is wrongfully sold, converted *or* not purchased when it should have been." 716 F.2d at 139 (emphasis added). The Supreme Court opinion to which the Second Circuit referred, *Galigher v. Jones,* 129 U.S. 193, 200, 9 S.Ct. 335, 32 L.Ed. 658 (1889), observed that the highest intermediate value measure of damages rule "is most frequently exemplified in the wrongful conversion by one person of stocks belonging to another." Neither *Galigher* nor *Schultz* decision limited this rule to cases of fraud or conversion. Indeed, in *Schultz,* the court again used broad language that encompasses a variety of situa-

---

**87.** The Funds also seek liquidation damages in connection with the other remaining counts of the complaint. With respect to those counts, however, they aver that a different measure of damages applies, *i.e.,* based on the fair market price on the day of liqui-

dation. Thus, the damages sought in connection with Count I are not superfluous.

**88.** The other counts against the defendants challenge the manner in which the liquidations were conducted.

tions, including the one herein. *See* 716 F.2d at 139.

Finally, DLJ contends that the highest intermediate price rule should not be applied to a case involving a type of security that is not traded in a public market or on an exchange, such as CMOs, because in this situation the measure becomes purely speculative. However, although it is true that in *Katara* and *Schultz* the highest intermediate price rule was applied to securities for which daily price quotations are available, *see Katara,* 835 F.2d at 967 (futures contracts based on composite of common stock price index), *Schultz,* 716 F.2d at 138 (pork belly futures contracts), in another case involving application of this damages measure, *Caballero v. Anselmo,* 759 F.Supp. 144, 153 (S.D.N.Y.1991), the securities involved were a minority interest in a closely held corporation for which such quotations would not be available. Therefore, application of this measure of damages is not precluded based on the type of securities at issue here.

In sum, the Funds are entitled to claim liquidation damages measured by the highest intermediate price rule in connection with Count I.[89]

### 3. There are Genuine Issues of Material Fact as to Causation with Respect to Liquidation Damages Under Count I

#### (a) DLJ

█ DLJ contends that the Funds cannot meet their burden to show that its margin calls caused the liquidation and, therefore, that the Funds cannot claim liquidation damages in connection with Count I. According to DLJ, given the Funds' financial straits, they could not have met margin calls even in lower amounts.

Moreover, DLJ points out that under the PSA Agreements the Funds were obligated to repurchase all repoed securities from DLJ for approximately $198 million in April, 1994. This was a contractual obligation which DLJ contends there is no evidence that the Funds could have satisfied. Therefore, DLJ avers, liquidation was inevitable.

As noted earlier, however, there is sufficient evidence in the record to raise a triable issue of fact as to whether the Funds could have met margin calls from DLJ in lower amounts—thus avoiding liquidation. In addition, absent further exploration of the Funds' options with respect to the repurchase deadline, it is too speculative to conclude as a matter of law that the DLJ liquidation was inevitable on that basis.[90]

#### (b) Merrill

Like DLJ, although for slightly different reasons, Merrill contends that its liquidation was inevitable and, therefore, that even if the margin calls were improper Merrill was entitled to liquidate the Funds' accounts. Merrill relies on certain provisions in the repo trade confirmations relating to the right to adequate assurance and to sell the securities upon the other party's default. Merrill contends that the Funds, by not meeting the margin calls, failed to provide adequate assurance of due performance and were therefore in default. Thus, according to Merrill, it had an independent right to liquidate the Funds' securities even if the margin calls were wrongful.

Merrill's right to adequate assurance could be triggered, however, only "upon demand by the other party." Repo Trade Confirmation at 2. Merrill is somewhat

---

89. The defendants have also pointed to this Court's previous dismissal of the Funds' claims for conversion or fraudulent conduct as a basis for concluding that damages available for such claims have been precluded. *See Granite I,* 17 F.Supp.2d at 313. However, given that the claims referenced were dis-

missed on the ground that they were "to a large extent duplicative" of other causes of action in the complaint, that dismissal does not support the defendants' argument. *Id.*

90. The parties have not briefed this issue.

vague as to the demand issue, but implies that the margin calls were themselves a demand for adequate assurance. Such a contention is doubtful at best. The performance owed by the Funds under the contract was the repurchase, by April 25, 1994, of their repoed securities. Nothing in the margin call notice indicated that Merrill was seeking adequate assurance of due performance of the repurchase obligation, and Merrill cites no authority or evidence for the proposition that its margin calls were so intended or should have been so understood. Therefore, Merrill is not entitled to summary judgment as to the liquidation damages sought in connection with Count I.[91]

### 4. *There is no Genuine Dispute of Fact as to Causation in Connection with the Bankruptcy Damages*

■ Both DLJ and Merrill contend that, even if their margin calls were improper, the Funds cannot meet their burden at trial to prove that these margin calls were a proximate cause of the Funds' bankruptcy or that bankruptcy was a foreseeable consequence of either defendant's breach. DLJ and Merrill cite to evidence that the Funds' financial difficulties preceded the margin calls, that those difficulties ultimately prevented the Funds from meeting the overwhelming majority of their short-term financial obligations, that the real culprit was Bear Stearns, and that market conditions played a major role in precipitating the Funds' collapse. Therefore, aver DLJ and Merrill, the Funds would have had to file for bankruptcy even

if their margin calls had never been made and, therefore, they cannot be held liable for the Funds' bankruptcy-related costs.

The Funds object that causation is not an element of their breach of contract claim but, rather, is an inapposite tort standard. Thus, they contend, they are required only to prove their bankruptcy damages were reasonably foreseeable at the time the contract was made. However, the Second Circuit has recently confirmed that causation is an element of a breach of contract claim under New York law:

> Ordinarily, causation is required to recover damages for breach of contract.... Under New York law, in fact, [t]he failure to prove damages is ... fatal to [a] plaintiff's breach of contract cause of action.... Where ... the remedy sought is damages to compensate for a claimant's loss, the usual damages-causation rule for tort and contract breach cases is appropriate [ ].

*LNC Investments, Inc. v. First Fidelity Bank, N.A. New Jersey*, 173 F.3d 454, 464–65 (2d Cir.1999) (internal quotation marks and citations omitted); *see also, e.g., Krofft Entertainment, Inc. v. CBS Songs, A Division of CBS, Inc.*, 653 F.Supp. 1530, 1534 (S.D.N.Y.1987) ("New York contract law adheres to the rule that there can be no recovery where the plaintiff fails to prove that his injury was caused by the defendant's breach."). The Second Circuit defined the "usual damages-causation rule" as "either 'but for' or proximate causation." *LNC Investments*, 173 F.3d at 465.[92]

---

**91.** The Funds contend that Merrill's argument is procedurally improper because it was raised in their reply brief. However, Merrill's argument is responsive to the Funds' argument, discussed in their brief, that they may claim liquidation damages in connection with Count I.

**92.** *Aramony v. United Way of America*, No. 96 Civ. 3962, 1998 WL 205331 (S.D.N.Y. April 27, 1998), is cited by the Funds for the court's statement that "a breach of contract action [under New York law] does not limit damages

according to tort law principles of proximate cause, but instead requires a determination of which injuries were contemplated at the time the contract was made." *Id.* at *6. However, even if the Funds are correct in reading *Aramony* as holding that New York law does not require causation in a breach of contract claim, the fact remains that a year later the Second Circuit Court of Appeals held to the contrary. This court is bound, of course, by the Second Circuit's decision. Moreover, a careful reading of *Aramony* reveals that the

The Funds are not entirely consistent in their argument, as at various points they employ causation language.[93] However, ultimately the Funds insist they are not required to prove causation and fail to point to any evidence in the record as to this issue. Meanwhile, DLJ and Merrill have cited to evidence in support of their position.

Finally, the Funds characterize the Brokers as arguing that they cannot be held liable for the Funds' bankruptcy costs because multiple defendants' breaches are involved. The Funds aver that, while there were multiple breaches, there is a single harm, and allocation of damages among the defendants is appropriate. However, allocation of damages is not a substitute for proving the elements of a breach of contract claim. Rather, allocation of damages is appropriate where the elements of a breach of contract action have been shown, including causation. Indeed, in the damage allocation cases cited by the Funds, a determination of breach, causation, and foreseeability had been made. *See Cruz v. Local Union Number 3 of the Int'l Bhd. of Elec. Workers,* 34 F.3d 1148, 1158 (2d Cir.1994); *Aguinaga v. United Food and Commercial Workers Int'l Union,* 993 F.2d 1463, 1476 (10th Cir.1993).

Therefore, DLJ and Merrill are entitled to summary judgment as to the Funds' claim for bankruptcy-related costs in connection with Count I. This being the case, it is not necessary to address the parties'

arguments as to the element of foreseeability.

## VI. The Funds' Motion for Partial Summary Judgment Against DLJ

### A. Count X: Objection to the Deficiency Claim Asserted by DLJ in the Bankruptcy

DLJ has asserted a $13.9 million claim against the Funds in the Granite bankruptcy proceedings, of which $9.9 million is alleged to have been lost in connection with the repo liquidation: DLJ credited the Funds for securities held in its accounts, and claims that the value of those securities fell short of the Funds' repurchase obligations. Granite Corp. and Granite Partners have each moved for cancellation of DLJ's deficiency claims against them and Quartz has moved for cancellation of that portion of DLJ's claim relating to the repo liquidation.

### 1. The Procedural Propriety of the Funds' Motion

DLJ contends that the Funds' motion seeks summary judgment for less than an entire count of the complaint with respect to both Counts X and IX and, therefore, is procedurally defective.

 Rule 56(a) provides that a plaintiff "seeking to recover upon a claim ... may ... move ... for a summary judgment in the party's favor upon all or any part thereof," and Rule 56(b) affords the same right to a defendant. Fed. R.Civ.P. 56(a) and (b). A party need not

court considered the concept of "proximate cause" to include both a causation rule and a foreseeability rule, and that the quoted language may actually have been an expression of the court's view that breach of contract actions have their own rules as to foreseeability rather than a view that such actions do not require causation. *See id.* at **5–6.

The Funds also cite *Coastal Power Int'l v. Transcontinental Capital Corp.,* 10 F.Supp.2d 345, 366 (S.D.N.Y.1998), *aff'd* 182 F.3d 163 (2d Cir.1999), for the proposition that they are not required to show that a given defendant's breach was the *exclusive* cause of their

bankruptcy. This contention is correct. However, neither DLJ nor Merrill has argued that the Funds must prove exclusive causation.

**93.** For example, they assert that "DLJ and Merrill, along with other brokers, made improper and excessive margin calls on the Funds that led to the Funds insolvency," Plaintiffs' Mem. Law In Opposition To Defendants' Motion For Summ. J. at 24, and that their bankruptcy was the "cumulative consequence" of the defendants' separate contract breaches, *id.* at 29.

move for summary judgment on every claim where multiple claims are asserted. *See United States v. Kocher,* 468 F.2d 503, 508–09 (2d Cir.1972) (single foreclosure action affecting ten parcels of land involved multiple claims—one per parcel—rather than single claim, for purposes of Rule 54(b) certification). Moreover, in a suit involving multiple parties and/or claims, it is procedurally proper, to seek summary judgment as to some parties, some claims, or certain claims in relation to certain parties. *See generally* Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, 10A *Federal Practice and Procedure* § 2715 (3d ed.1998).

However, despite the language of Rule 56(a) permitting a party to seek summary judgment on "all or any part" of a claim, entry of a partial judgment as to a single claim is not permitted under the Federal Rules. Fed.R.Civ.P. 56(a); *see In re Air Crash Disaster Near Warsaw, Poland,* 979 F.Supp. 164, 166 (E.D.N.Y.1997); *In re F & L Plumbing and Heating Co.,* 114 B.R. 370, 375 (E.D.N.Y.1990). Rather, partial adjudication of a claim is governed by Rule 56(d), which directs the Court, "when judgment is not rendered upon the whole case or for all the relief asked ... [to] if practicable ascertain what material facts exist without substantial controversy." Fed. R.Civ.P. 56(d); *see In re Air Crash,* 979 F.Supp. at 166–67; *see generally* Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, 10B *Federal Practice and Procedure* § 2737 (3d ed.1998).

■ Count X objects to three.proofs of claim filed by DLJ in the bankruptcy proceeding: a claim against Granite Corp. in the amount of approximately $3.9 million, a claim against Granite Partners in the amount of approximately $6 million, and a claim against Quartz in the amount of approximately $4 million. Thus, the total

amount objected to is approximately $13.9 million. The Funds' motion as to Count X seeks an order of summary judgment with respect to approximately $9.9 million, *i.e.,* that portion of DLJ's claims pertaining to the repo liquidation. This amount represents the entire amount sought by DLJ as to Granite Corp. and Granite Partners, respectively, but only a portion of the amount sought by DLJ as to Quartz. The remainder of the claim against Quartz, as to which the Funds do not seek summary judgment, pertains to the liquidation of two forward-purchase contracts.

DLJ equates each count in the Second Amended Complaint with a "claim" and contends that the Funds' motion is improper because it does not seek dismissal of Count X in its entirety. However, "the test [of] whether or not there are a number of different claims [is whether they] ... could have been separately enforced." *United States v. Kocher,* 468 F.2d 503, 509 (2d Cir.1972) (citation omitted); *see In re Centennial Textiles,* 220 B.R. 177, 181 (S.D.N.Y.1998) (claim is separable for purposes of Rule 54(b) certification where involves "at least some different questions of fact and law and could be separately enforced). It is the claims at issue rather than the number of formal counts which determines whether summary judgment may be sought. *See Aetna Casualty & Surety Co. v. Giesow,* 412 F.2d 468, 470 (2d Cir.1969); *Centennial Textiles,* 220 B.R. at 181.[94]

Under this principle, Count X is best understood as a grouping together of multiple claims, *i.e.,* the objections to each of three proofs of claim filed by DLJ in the bankruptcy proceedings against Granite Corp., Granite Partners, and Quartz, respectively. Therefore, at least with respect to Granite Corp. and

---

94. Indeed, DLJ has moved for summary judgment with respect to Count I against Granite Partners and Quartz, but not against Granite Corp., and Merrill but not DLJ has moved for summary judgment with respect to Count II against all the Funds. Earlier in this case the Court granted DLJ's motion to dismiss Count VIII of the First Amended Complaint (the Funds' UCC claims) in their entirety, but only granted Merrill's motion as to Count VIII insofar as it related to Quartz. *See Granite I,* 17 F.Supp.2d at 304.

Granite Partners, the Funds' Rule 56(a) motion is procedurally proper because summary judgment is sought as to the entirety of DLJ's claims against each of these parties.[95]

The cases cited by DLJ do not warrant a different conclusion. Although the court in *In re F & L Plumbing and Heating Co.*, 114 B.R. 370, 375 (S.D.N.Y.1990), held that a motion for partial summary judgment was faulty because "it fail[ed] to dispose entirely of one count of the complaint," in that case the count was asserted by a single plaintiff against a single defendant, and therefore there was no issue of multiple parties and/or claims being contained in a single count. *See id.* at 372. Another case cited by DLJ, *In re Air Crash Disaster Near Warsaw, Poland*, 979 F.Supp. 164, 166 (E.D.N.Y.1997), did not discuss this issue in terms of counts of a complaint but instead simply held based on the theory of the claim and the underlying facts that the plaintiffs had asserted a single, indivisible claim for relief. *See id.* at 167.

■■ However, with respect to Quartz, the Funds seek summary judgment only with respect to a portion of DLJ's bankruptcy claim, *i.e.*, the portion concerning the repo liquidation. The Funds do not seek summary judgment as to the portion of DLJ's claim concerning the forward-purchase contracts. Although DLJ lists these aspects of its claim separately on the proof of claim, and there may be some different questions of fact involved, this is insufficient to conclude that these are separable claims. *See Centennial Textiles*, 220 B.R. at 181 (discussing standard for deeming claims separable). Therefore, this aspect of the Funds' summary judgment motion as to Count X is denied as procedurally improper.

The same principles apply to the Funds' motion as to Count IX. Count IX alleges

that DLJ failed to make certain principal and interest distributions to Granite Corp. and Granite Partners as required by the PSA Agreement. The Funds seek summary judgment as to the entirety of the amount allegedly owed to Granite Corp. and, therefore, is procedurally proper with respect to Granite Corp.[96]

### 2. There is a Genuine Dispute of Material Fact as to the Funds' Motion on Count X

DLJ's claim in the bankruptcy proceeding is that when it liquidated the securities in the Funds' repo accounts pursuant to Option B, *i.e.*, by crediting the value of the Funds' securities to those accounts, the total value obtained fell short of what the Funds were required to pay to close the repo accounts. *See* PSA Agreement ¶ 11(d)(i)(B) (dealer may liquidate repo account by crediting defaulting party in amount equal to price of securities in account). DLJ seeks to have the Funds reimburse it for this claimed deficiency in the amount of approximately $9.9 million.

■■■ A claim in bankruptcy must be disallowed if it is unenforceable against the debtor under non-bankruptcy law. *See* 11 U.S.C. § 502(b)(1). As the party objecting to the claim, the Funds have the burden of putting forth evidence sufficient to negate the *prima facie* validity of the bankruptcy claim. *See In re St. Johnsbury Trucking Co.*, 206 B.R. 318, 323 (Bankr.S.D.N.Y. 1997), *aff'd* 221 B.R. 692 (S.D.N.Y.1998), *aff'd*, 1999 WL 248153, 173 F.3d 846 (2d Cir.1999). The ultimate burden of persuasion to prove the loss claimed, however, remains with the claimant. *See id.*

■ The Funds raise two arguments in opposition to DLJ's claim. First, they contend that DLJ proceeded under Option A, rather than Option B, with respect to

**95.** Certification under Rule 54(b), however, is a separate question and is addressed *infra*.

**96.** The Funds initially sought summary judgment as to the February 1994 payment alleg-

edly owed to Granite Partners—although not the March 1994 payment—but subsequently withdrew this aspect of their motion.

the 23 securities sold by March 31, 1994. Therefore, the Funds aver that DLJ was obligated to credit them with the proceeds from these sales. *See* PSA Agreement ¶ 11(d)(i)(A) (dealer may liquidate repo account by selling securities and crediting proceeds to obligation owed by defaulting party). Second, the Funds contend that, irrespective of whether DLJ proceeded under Option A or Option B, DLJ's claim is subject to Article 2 of the N.Y. U.C.C., which limits a seller's damages for a breach of contract to purchase securities to the contract price minus resale proceeds. N.Y. U.C.C. § 2-706(1); *see Bache & Co. v. Int'l Controls Corp.,* 339 F.Supp. 341, 349 (S.D.N.Y.), *aff'd,* 469 F.2d 696 (2d Cir. 1972).

This leaves the 8 securities not sold by March 31, and which were later sold by DLJ at prices that were lower than the amounts credited to the Funds during the liquidation. The Funds contend that the proceeds realized from the sales of these securities are irrelevant to DLJ's deficiency claim or, in other words, that DLJ must credit the Funds with these securities at the values attributed to them during the liquidation. If DLJ is obligated to credit the Funds with the sale proceeds of the 23 securities, under either of the two scenarios outlined above, and with the 8 securities valued as of the liquidation, then DLJ's deficiency claim would be worth at the most $754,110, rather than $9.9 million.[97]

DLJ had the right in "its sole discretion" to choose whether to conduct its liquidation under Option A or Option B. PSA Agreement ¶ 11(d). There is evidence that on March 30, 1994, DLJ considered both options, determined that Option A was not in the best interest of either DLJ or the Funds, and decided to proceed under Option B. Also on March 30, DLJ informed ACM, Granite Corp., and Granite Partners

by FAX that "in light of [the Funds'] failure to meet the margin call[s] and in view of the fact that there does not seem to be a ready market for the securities in [Corp.'s and Partners' accounts], we intend to take the securities into inventory and hedge our positions." On March 31, 1994, DLJ sent an equivalent FAX to Quartz. Friel, a DLJ manager, also testified that DLJ decided to use the valuations from its most recent margin call for purposes of crediting the Funds' accounts in the liquidation—a procedure consistent with implementation of Option B, but not Option A.

However, DLJ's traders did not make the bookkeeping entries showing the crediting of the securities from the Funds before the close of business on March 30. Instead, these transactions were first entered on trade blotters and then into DLJ's trading system late on the following day, March 31, "as of March 30."[98] By the time these entries were recorded on March 31, DLJ had already sold 23 securities to its institutional customers—at prices above the values credited to the Funds. In addition, although according to DLJ its Option B liquidation was essentially instantaneous with its decision on the afternoon of March 30 to initiate a liquidation, DLJ took additional steps to accomplish acquisition of the Funds securities: it created a separate account—the T93 account—and transferred the securities into that account. Those transfers, as just mentioned, were not recorded until March 31. Moreover, the crediting—or acquisition by DLJ—of the securities required one transaction, while the sale to DLJ's institutional customers required another transaction.

There is also an internal inconsistency in the Funds' version of events. On the one hand, they aver that DLJ treated the Funds' accounts as one portfolio for pur-

---

**97.** The Funds contend that in fact there is no deficiency because DLJ must further offset its claim by the $2.36 million in hedging profits realized on the T93 account by March 31, 1994.

**98.** There is evidence, however, that "as of" entry of trades is a common way of recording trades that occurred on the preceding day.

poses of the liquidation.[99] On the other hand, they insist that DLJ proceeded under Option A with respect to some securities, and Option B with respect to others.

In the end, it cannot be concluded as a matter of law that DLJ elected to proceed under Option A. All that the Funds have done is raise a genuine issue of material fact as to this question. Therefore, DLJ's deficiency claim will not be dismissed on this basis.

■ Article 2 of the N.Y. U.C.C. does contain damage mitigation provisions applicable to a contract to purchase securities, see N.Y. U.C.C. § 2–706(1), and "New York's courts adhere to the universally accepted principle that a harmed plaintiff must mitigate damages," *Air et Chaleur, S.A. v. Janeway*, 757 F.2d 489, 494 (2d Cir.1985) (seller of securities must attempt to mitigate through resale). However, the parties to such a contract may also prescribe their own remedies, including the measure of damages and the method of mitigation. *See* N.Y. U.C.C. §§ 1–102(3), 2–719; *Wilson Trading Corp. v. David Ferguson, Ltd.*, 23 N.Y.2d 398, 402–03, 297 N.Y.S.2d 108, 244 N.E.2d 685 (N.Y.1968); *Matco Elec. Co. v. American Dist. Telegraph Co.*, 156 A.D.2d 840, 842–43, 549 N.Y.S.2d 843 (N.Y.App.Div.1989).

The default provisions of the PSA Agreement specify what the seller, *i.e.*, the dealer, may do in the case of a buyer default, which is liquidate the repo account under either one of two options. *See* PSA Agreement ¶ 11(d). The PSA Agreement further specifies the amount to be credited to the defaulting buyer under each option—either the actual sale price of the

securities, in the case of Option A, or the price obtained from a generally recognized source, in the case of Option B. *See id.* These provisions prescribe the measure of damages and the mitigation of damages.[100] Thus, the damages mitigation provision of the N.Y. U.C.C. is inapposite.

Of course, the Funds are not compelled to accept whatever results were obtained in the DLJ liquidation. This is the gravamen of their liquidation claims against DLJ. Whether it proceeded under Option A or Option B, DLJ was subject to certain standards and constraints. If it proceeded under Option A, it was required to sell the securities in a recognized market at prices reasonably deemed satisfactory. *See* PSA Agreement ¶ 11(d)(i)(A). If it proceeded under Option B, it was required to give credit in an amount equal to a price from a generally recognized source or the most recent closing bid from such a source. *See* PSA Agreement ¶ 11(d)(i)(B). In addition, it was required at all times to exercise its power to liquidate in good faith. *See Granite I*, 17 F.Supp.2d at 305. If it is found at trial that DLJ did not credit the Funds properly then, of course, DLJ's deficiency claim will be reduced accordingly and may fail entirely. This claim cannot, however, be dismissed as a matter of law on the theories asserted herein.

## B. *Certification of Granite Corp.'s Claim Under Count IX is not Warranted*

■ The Funds seek summary judgment pursuant to Rule 56 and entry of final judgment pursuant to Rule 54(b) with respect to Granite Corp.'s claim for the

---

**99.** This is why, according the Funds, DLJ must offset its deficiency claim by the total amount of hedging profits received from trading in the T93 account, which contained securities from the various Fund accounts.

**100.** The Funds insist that this interpretation of the PSA Agreement creates the possibility of a windfall to the dealer under Option B, because the dealer can credit the securities at one price, claim a deficiency, and then recover that deficiency by reselling them at a high-

er price than the amount credited. The logical reading of Option B, however, is that at the point at which the securities are credited by the dealer, the market risk associated with those securities is assumed by the dealer. Thus, the dealer bears the risk of future losses—if, as occurred in the case of 8 of the Funds' securities, it cannot sell the securities for the amount credited—and enjoys the benefit of future gains.

missed December 1993 principal and interest payment. DLJ concedes that this payment is owed. However, because the DLJ deficiency claim is still pending against the Funds, this small payment is appropriately treated as an accounting offset when it is finally determined what—if anything—is owed DLJ after trial. Therefore, certification under Rule 54(b) will not be granted.

### VI. *Merrill's Motion for Summary Judgment Against the Funds as to Counts II And VIII*

In addition to seeking summary judgment as to Count I, discussed *supra,* Merrill seeks summary judgment as to Count II, the claim for bad faith liquidation of the Funds' repo positions, and Count VIII, the claim for breach of its duty under the U.C.C. to liquidate in a commercially reasonable manner.[101]

#### A. *Count VIII—Commercially Unreasonable Liquidation*

#### 1. *There is a Genuine Dispute of Material Fact as to Whether the Granite Corp. and Granite Partners Transactions Were Collateralized Loans*

 Count VIII of the Second Amended Complaint alleges liquidations in violation of Article 9 of the U.C.C., which requires that the right to liquidate securities held pursuant to secured transactions be exercised in a commercially reasonable manner. *See* N.Y. U.C.C. § 9–504(3) (McKinney 1990). Merrill contends that Article 9 does not apply.

Article 9 applies to collateralized loans but not to purchase and sale arrangements. *See Granite I,* 17 F.Supp.2d at 275. In *Granite I,* this Court dismissed Count VIII as to all transactions in which a PSA Agreement was executed, because that agreement provides expressly that the repo transactions were intended to be purchase and sale agreements. *See id.* at 302. The repo trade confirmations, however, which are the only documents executed with respect to the Granite Corp. and Granite Partners accounts, are ambiguous in this regard. *See id.* at 302, 304–05. Thus, extrinsic evidence is required to determine the nature of these transactions. *See id.*

Merrill points to testimony by employees of both the Funds and Merrill that they were not aware of and did not view there to be any differences between the Merrill repo transactions with Granite Corp. and Granite Partners, on the one hand, and the Funds' other repo transactions. The Funds, for their part, point to deposition testimony from some of these same individuals that they understood the repo transactions as loan arrangements, with the securities serving as collateral for those loans. In addition, various Merrill internal documents refer to the repos as loans or financing arrangements.

The testimony cited is subject to different reasonable interpretations. On the one hand, this testimony is not specific enough to conclude as a matter of law that the parties intended the repo trade confirmations to be purchase and sale arrangements.[102] On the other hand, the fact that employees of both parties understood the

---

**101.** The Funds aver that a genuine dispute of material fact as to Count I precludes Merrill from obtaining summary judgment as to Counts II and VIII on the theory that if the jury finds Merrill's margin calls to be wrongful then the jury will have to conclude that the liquidation was in bad faith and commercially unreasonable. Counts II and VIII are distinct causes of action involving distinct legal standards. A breach of contract—the issue in Count I—may or may not involve bad faith or commercially unreasonable conduct.

**102.** Moreover, although Merrill cites to testimony by six witnesses, there are evidentiary problems with three of them: John lacks personal knowledge of the issue, *see* John Tr. at 799, Contino has personal knowledge of an extremely limited universe of repurchase transactions, and only of specific problems not necessarily including the issue here, *see* Contino Tr. at 389–90, and Dendinger's comment is of doubtful relevance given the context in which it was made, *see* Dendinger Tr. at 83.

repo transactions as loans is only marginally helpful to the Funds, since there is no doubt that one of the characteristics of all repo transactions is that they are a means of obtaining financing. *See Granite I*, 17 F.Supp.2d at 298. The fact that certain Merrill documents reflect the financing aspect of these transactions is, similarly, not dispositive. Nor are the statements made in Merrill's financial statements, which are accounting documents. *See id.* at 304 (accounting treatment of repo does not determine whether it is a loan, or purchase and sale, as matter of commercial law) (citations omitted).

Both Merrill and the Funds contend that the express terms of the repo trade confirmations demonstrate that the transactions were, in Merrill's view, purchase and sale arrangements, or, in the Funds' view, collateralized loans. Unsurprisingly, given the hybrid nature of repo transactions, there are terms which support Merrill's view, and terms which support the Funds' view. *See Granite I*, 17 F.Supp.2d at 301 (citation omitted). As this Court already held in *Granite I*, the repo trade confirmations are ambiguous. *See id.* at 304–05.

Merrill also urges that policy considerations support its view of the repo trade confirmations. There are, indeed, policy considerations which support a finding that repo transactions are purchase and sale agreements rather than secured loans subject to Article 9 of the U.C.C. *See Granite I*, 17 F.Supp.2d at 302. However, these considerations are less forceful here, where the issue is a small set of agreements specific to Merrill and two of the Funds rather than the industry-wide PSA Agreement. Thus, interpreting the repo trade confirmations as involving collateralized loans will not have the same broad repercussions on the securities marketplace as would interpreting the PSA Agreement in that manner. *See* 17 F.Supp.2d at 303. Moreover, although trade custom and usage weights in favor of interpreting the repo trade confirmations

as involving purchase and sale arrangements, the fact that the industry-wide PSA Agreement was not executed could be interpreted as a sign that the parties intended these transaction to be different.

Thus, the question of the parties' intent as to the Granite Corp. and Granite Partners transactions revolves primarily around disputed interpretations of testimonial and documentary evidence, and cannot be resolved as a matter of law.

### 2. *There is a Genuine Dispute of Material Fact as to Whether Merrill's Liquidation Was Commercially Reasonable*

The commercial reasonableness requirement is set forth in U.C.C. § 9–504(3), which provides in relevant part that "every aspect of the disposition [of a debtor's collateral] including the method, manner, time, place and terms must be commercially reasonable." N.Y. U.C.C. § 9–504(3) (McKinney 1990). The term "commercially reasonable" is not specifically defined but is elucidated by § 9–507(2), which states in relevant part:

> The fact that a better price could have been obtained by a sale at a different time or in a different method from that selected by the secured party is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner. If the secured party either sells the collateral in the usual manner in any recognized market therefore or if he sells at the price current in such market at the time of his sale or if he has otherwise sold in conformity with reasonable commercial practices among dealers in the type of property sold he has sold in a commercially reasonable manner.

N.Y. U.C.C. § 9–507(2) (McKinney 1990). Contrary to what is at times the implication in the Funds' legal memorandum, Merrill did not owe a fiduciary duty to the Funds whereby it was required to put the Funds' interests ahead of its own. However, as the secured party Merrill did have a

duty to make "a good faith attempt to dispose of the collateral to the parties' *mutual* best advantage." *SNCB Corp. Fin. Ltd. v. Schuster*, 877 F.Supp. 820, 828 (S.D.N.Y.1994) (internal quotation marks and citation omitted) (emphasis added), *aff'd without op.*, 71 F.3d 406 (2d Cir.1995).

"The primary focus of commercial reasonableness is ... the procedures employed for sale." *In re Zsa Zsa Ltd.*, 352 F.Supp. 665, 671 (S.D.N.Y.1972). Section 9–507(2) provides specifically that price is not alone determinative. N.Y. U.C.C. § 9–507(2) (McKinney 1990); *see In re Excello Press*, 890 F.2d 896, 905 (7th Cir.1989) (observing that price is "another part of looking at the circumstances of the sale").

The Funds contend that New York law recognizes two separate and distinct tests, *i.e.*, a "proceeds" test and a "procedures" test, and that a jury could find a liquidation to be commercially unreasonable based solely on the fact that the prices obtained were "well below" fair market prices. Funds Mem. at 42. In making this argument the Funds rely on *Bankers Trust Co. v. J.V. Dowler & Co., Inc.*, 47 N.Y.2d 128, 417 N.Y.S.2d 47, 390 N.E.2d 766 (N.Y.1979) and *First Interstate Credit Alliance, Inc. v. Clark*, No. 89 Civ. 3263, 1989 WL 149078, at *2 (S.D.N.Y. Dec. 4, 1989), *rev'd and vacated on other grounds*, 930 F.2d 910 (2d Cir.1991) (unpublished summary disposition). However, in *Bankers Trust* the New York Court of Appeals did not have to decide this question because, while the court recognized that some authorities had suggested that "optimizing resale price is the prime objective," while other authorities had focused on "the procedures employed," the court concluded that in the case before it the sale was satisfactory under either test. *See* 47 N.Y.2d at 135, 417 N.Y.S.2d 47, 390 N.E.2d 766. In *1st Interstate* the court confronted the obverse situation, *i.e.*,

where the sale was "questionable enough to prevent summary judgment" under either test. 1989 WL 149078, at *2. Again, the court did not have to decide whether price alone could be determinative. *See id.* Moreover, the analysis in *Zsa Zsa Ltd.*, 352 F.Supp. at 671–72, and *Excello Press*, 890 F.2d at 905, namely, that price is only one element to be considered, is more consistent with the language of the N.Y.U.C.C. and therefore a more persuasive interpretation of New York law than the analysis in *First Interstate*, 1989 WL 149078, at **2–3. *See* N.Y. U.C.C. §§ 9–504(3) (referencing "method, manner, time, place, *and* terms") (emphasis added) and 9–507(2) (stating that "fact that a better price could have been obtained is not ... of itself sufficient") (McKinney 1990).[103]

◼ The inquiry into commercial reasonableness is a fact-intensive one that requires an inquiry into all the circumstances of the liquidation. *See Excello Press*, 890 F.2d at 905 (applying New York law and stating "[w]hether a sale [is] commercially unreasonable is, like other questions about 'reasonableness,'" a fact-intensive inquiry"); *Zsa Zsa Ltd.*, 352 F.Supp. at 670 ("It is the aggregate of circumstances in each case—rather than specific details of the sale taken in isolation—that should be emphasized in a review of the sale."), *aff'd without op.*, 475 F.2d 1393 (2d Cir.1973). Thus, "no magic set of procedures will immunize a sale from scrutiny," *Excello Press*, 890 F.2d at 905 (citations omitted). Similarly, the relative importance of price as a factor depends in part on the extent of any discrepancy between the price and the value of the collateral: a low price "may signal the need for close scrutiny" of the procedures employed. *Excello Press*, 890 F.2d at 905; *see Zsa Zsa Ltd.*, 352 F.Supp. at 671 ("A wide discrepancy between the sale price and the

**103.** In addition, both the Funds and Merrill have urged that a ruling in their favor is warranted based on their different interpretations of the Second Circuit's summary order in *1st Interstate*, 1991 WL 52536, 930 F.2d 910 (2d Cir.1991) (unpublished summary order), reliance on that disposition would be contrary to the Local Rules of the Court of Appeals for the Second Circuit. *See* 2d Cir. R. 0.23.

value of the collateral signals a need for close scrutiny ... even though a seemingly low return is usually not dispositive on the question of commercial reasonableness.") (citation omitted).[104]

According to the calculations of the Funds' expert, Campbell, the prices credited by Merrill to the Funds in the liquidation were on average 13 percent lower than fair market prices. This discrepancy, while it does not create a genuine issue for trial standing alone, could be found to be an indication of unreasonableness.[105]

In addition, Merrill bought several securities itself and then resold them to TCW at a profit of just under $500,000—or just over 2%—later the same day. This is evidence that Merrill may have failed to maximize the return on the Funds' securities in the liquidation. *See In re Solfanelli*, 230 B.R. 54, 67–68 (M.D.Pa.1999) (creditor acted in commercially unreasonable manner under identical statute to N.Y. U.C.C. § 9–504(3) because *inter alia* failed to maximize security values where sold majority of securities to itself and then resold at higher price two days later), *aff'd*, 203 F.3d 197 (3d Cir.2000). Moreover, prior to the auction TCW had given Merrill indications of interest in the securities which TCW later bought in the resale, and Merrill submitted bids in the auction

that were below the prices TCW had indicated it was willing to pay—in the hope of thereby earning a small profit. This is evidence that Merrill may have improperly diverted profits to itself.

Moreover, Merrill including only other broker-dealers in its auction, and did not include institutional investors. Broker-dealers are in the business of buying securities and then reselling them at a profit. There is evidence that customers would be motivated to pay higher prices than would broker-dealers, and that it was unusual for broker-dealers to trade CMOs with each other. Three of the other broker-dealers engaged in liquidating the Funds' securities included retail customers in their auctions. In addition, Merrill knew that at least two of the six broker-dealers included in its auction were already liquidating their own portfolios of the Funds' CMOs, and that another broker had outstanding margin calls as to the Funds. One participant, Lehman, did not submit any bids, while another, Salomon, bid on only two securities. Bids by three of the auction participants, DLJ, Bear Stearns, and Kidder, were below Campbell's fair market price valuations. TCW's prices for four bonds were higher than any of the bids for those bonds received in the auction.[106] This evi-

104. The Funds cite to Malkiel's report *inter alia*. However, since Malkiel's report is inadmissible, it is not considered here. However, the Funds have also cited to other record evidence concerning the issue of commercial reasonableness, which evidence is considered.

105. As explained earlier, price is not in and of itself dispositive of commercial reasonableness. Moreover, even if there were a separate and distinct "proceeds" test, the 12% discrepancy alleged here is not sufficient to raise a triable issue of fact standing alone. In *First Interstate*, 1989 WL 149078, at *3, cited by the Funds, the proceeds on the sale of the debtor's tractor, in percentage terms, were almost 70% less than what debtor had paid, 50% less than earlier model, and 100% less than later model. Similarly, in *In re Sackman*, 158 B.R. 926, 937 (S.D.N.Y.1993), the foreclosure price on a debtor's house was no more than 21% of the value of the debtor's interest in the loan,

and in *Leasing Serv. Corp. v. Broetje*, 545 F.Supp. 362, 368 (S.D.N.Y.1982), the liquidation price was approximately 58% less than the alleged fair market value.

However, contrary to the implication in Merrill's memorandum of law, Campbell's figures are still relevant to the analysis, and may be considered by the jury in conjunction with other evidence of the liquidation circumstances.

106. The Funds also contend that Merrill engaged in a per se violation of Article 9 of the U.C.C. because the auction was a private sale and a secured party is prohibited from purchasing goods for itself in a private auction unless the collateral is "of a type customarily sold in a recognized market or is of a type which is the subject of widely distributed standard price quotations." N.Y. U.C.C. § 904(3); *United Orient Bank v. Green*, 215 B.R. 916, 925 and n. 41 (S.D.N.Y.1997).

dence supports the contention that Merrill knew or should have known that bids received from the other broker-dealers were unlikely to and did not reflect fair market values.

Furthermore, earlier in March 1994, Merrill did not bid on certain securities offered by Askin and claimed that the time allowed to respond—approximately one day—was insufficient for it to evaluate the securities and formulate bids. However, during the auction Merrill gave bidders less than a day to submit bids. This is evidence that Merrill did not give bidders sufficient response time.

Merrill points out that, however, that even accepting Campbell's figures, the 12% average discrepancy between the prices obtained and fair market value is not the type of discrepancy identified in the case law as giving cause for alarm. There is also evidence that it was not normal to seek bids from customers—and that Askin himself believed broker-dealer-only auctions were the best way to maximize proceeds. Although some of the dealers included were already liquidating the Funds' accounts, and Merrill knew this, the auction participants were also identified by Merrill as being the most active dealers in the CMO market. In addition, the PSA Agreement does not require that all market participants be included, and that, indeed, if it had elected to proceed under Option B that it would have been permitted to price a security on the basis of a single "generally recognized source." PSA Agreement ¶ 11(d)(i)(B).[107] Merrill also extended the bidding time (by one half

hour) when requested to do so by one bidder. Moreover, under all the circumstances, including the very real threat of a precipitous decline in the value of the Funds' securities, it may have been reasonable for Merrill to limit the response time as it did. On these and the other points discussed above there are genuine disputes of material fact which preclude summary judgment as to whether Merrill acted in "the parties' mutual best advantage." *SNCB Corp.*, 877 F.Supp. at 828.[108]

Merrill further contends that it is entitled to summary judgment on the theory that its liquidation was "in conformity with reasonable commercial practices among dealers in the type of property sold." N.Y. U.C.C. § 907(2) (McKinney 1990) (defining such sales as commercially reasonable per se). Merrill avers that its auction conformed with accepted commercial practice. However, Merrill offers little in the way of evidence as to an accepted commercial practice for the liquidation of CMOs.

In the main, Merrill relies on two decisions, *Bankers Trust*, 47 N.Y.2d 128, 417 N.Y.S.2d 47, 390 N.E.2d 766, and *Washburn v. Union Nat'l Bank & Trust Co.*, 151 Ill.App.3d 21, 104 Ill.Dec. 242, 502 N.E.2d 739, 742 (1986), for the proposition that the solicitation of bids from broker-dealers and acceptance of the highest bid was in accordance with accepted commercial practice. However, these cases neither involve CMOs nor purport to establish a general standard of reasonableness applicable here. *See Bankers Trust*, 47 N.Y.2d at 133–35, 417 N.Y.S.2d 47, 390

Whether there is a "recognized market" for the Funds' CMOs, and the contours of such a market if it exists, is a matter about which there is some uncertainty based on the record and the relevant authorities. Because denial of Merrill's summary judgment motion is warranted on other grounds, this issue need not be resolved here.

**107.** Merrill also relies on certain statements by Soltas in an affidavit regarding institutional customers' expressions of interest or lack thereof in participating in an auction. However, these statements do not weigh in favor

of Merrill's summary judgment argument because they are double hearsay if considered for the truth of the matters asserted therein.

**108.** Merrill also stresses that the bankruptcy Trustee observed that Merrill's "blind" bid approach netted the Funds more money than if Merrill had used the practice, employed by Bear Stearns, of deeming the securities into its account at a fraction above the highest outside bids. However, evidence that Bear Stearns acted more egregiously than Merrill does not require the conclusion that Merrill's conduct was commercially reasonable.

N.E.2d 766 (discussing secured party's disposition of municipal bonds); *Washburn,* 151 Ill.App.3d at 23, 26, 104 Ill.Dec. 242, 502 N.E.2d 739 (discussing secured party's disposition of "Ginnie Mae" bonds, *i.e.,* bonds issued by the Government National Mortgage Association). Moreover, in *Washburn* it was undisputed that the secured party, the bank, "followed the usual procedure in arranging the sale of the bonds." 104 Ill.Dec. 242, 502 N.E.2d at 742. Thus, there was no need for the court to determine what might be the accepted practice. In addition, in neither *Bankers Trust* nor *Washburn* were there allegations that the secured party improperly diverted profits to itself, nor did the creditors themselves participate in the sales. *See Bankers Trust,* 47 N.Y.2d at 133–35, 417 N.Y.S.2d 47, 390 N.E.2d 766; *Washburn,* 104 Ill.Dec. 242, 502 N.E.2d at 742.[109]

Merrill also contends that its liquidation was governed by an industry "three bid rule" and, therefore, since Merrill solicited six broker-dealers (including its own CMO trading desk) and received at least three bids on each security, the liquidation was commercially reasonable as a matter of law. There is evidence to support Merrill's contention. However, there is also evidence, including the opinion of DLJ's expert, Rahl, and the factual findings of the bankruptcy trustee, that indicates a lack of a generally accepted commercial

practice for the liquidation of CMOs. Therefore, it cannot be said as a matter of law that the three bid rule was the applicable commercial practice and, therefore, that Merrill conducted the liquidation "in conformity with reasonable commercial practices among dealers in the type of property sold." N.Y. U.C.C. § 907(2).[110]

Finally, another way in which a liquidating party can demonstrate that it disposed of collateral in a commercially reasonable way is if it "sells the collateral in the usual manner in any recognized market therefore." N.Y. U.C.C. § 902(2) (McKinney 1990). Merrill also avers that it is entitled to summary judgment under this provision. However, the evidence does not permit resolution as a matter of law of either what the "usual manner" or a "recognized market" would have been.

Therefore, Merrill is not entitled to summary judgment as to Count VIII.[111]

### B. *Count II—Bad Faith Liquidation*

Count II alleges that DLJ and Merrill breached the implied covenant of good faith and fair dealing in liquidating the Funds' securities. More specifically, Count II alleges that DLJ and Merrill did not liquidate the securities at fair market value or comport with the "generally recognized source" clause in the PSA Agreement. Merrill, but not DLJ, seeks summary judgment as to Count II.[112]

---

109. It may be that the accepted commercial practice for CMOs is no different than it is for other securities. However, Merrill offers no evidence on this score either.

110. In its reply memorandum Merrill raises the argument that its liquidation was in conformity with accepted practice because, according to Merrill, the liquidation complied with the requirements of the PSA Agreement, and the PSA Agreement was a codification of the governing industry standards. This argument fails for several reasons. First, insofar as it is a new argument, it is improperly raised in Merrill's reply brief. Second, Merrill does not explain what the accepted commercial practice is based on the PSA Agreement but, rather, simply notes the absence of a requirement in the PSA that it offer the

securities "to all market participants—or ... to any particular number or type of market participants." Merrill Reply Mem. at 21. Finally, Merrill's argument in this regard is inconsistent with its "three bid rule" argument since, according to Merrill, under the PSA Agreement it was not required to solicit bids at all.

111. This provision also requires, of course, that the sale have occurred "in a recognized market." As discussed *infra,* see n. 103, whether or not there was a recognized market for the Funds CMOs is not resolved herein.

112. The Funds contend that a commercially unreasonable liquidation is necessarily a liquidation conducted in bad faith. If this were

### 1. There is a Genuine Dispute of Material Fact as to Whether the Merrill Liquidation Was Conducted in Good Faith

The good faith standard under New York law has been previously discussed herein. To recap briefly, there is "[i]mplicit in all contracts is a covenant of good faith and fair dealing in the course of contract performance," and this covenant prohibits either party from acting in a manner "which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Dalton,* 639 N.Y.S.2d 977, 663 N.E.2d at 292, (citations and internal quotations omitted). However, this duty cannot be used to create independent obligations beyond those agreed upon and stated in the express language of the contract. *See Warner Theatre,* 1997 WL 685334, at *6.

Merrill contends that its good faith is established as a matter of law because it liquidated the Funds' securities in accordance with the express terms of the PSA Agreement and repo trade confirmations, as applicable. The Quartz securities were governed by the PSA Agreement which, pursuant to Option A, permitted Merrill to "immediately sell, in a recognized market at such prices or prices [Merrill] may reasonably deem satisfactory." PSA Agreement ¶ 11(d)(i)(A). The Granite Corp. and Granite Partners securities were governed by the repo trade confirmations, which gave Merrill the right to "sell the securities for a transaction ... (any such sale ... being at the risk of the defaulting party."). Repo Trade Confirmations at 2.

However, as this Court previously held in *Granite I,* a party may be in breach of the duty of good faith and fair dealing "even if it is not in breach of its express contractual obligations." 17 F.Supp.2d at 305 (*quoting Chase Manhattan Bank, N.A. v. Keystone Distribs., Inc.,* 873 F.Supp. 808, 815 (S.D.N.Y.1994)). Merrill had broad discretion to sell the Quartz securities at a price it "reasonably deem[ed] satisfactory," PSA Agreement § 11(d)(i)(A), and to "sell the [Granite Corp. and Granite Partners] securities for a transaction," Repo Trade Confirmation.[113] However, the fact that a broker-dealer is vested with broad discretion under a contract does not mean that it is thereby afforded the right to act in bad faith in liquidating its customer's account. *See Kaplan v. First Options of Chicago,* 143 F.3d 807, 818 (3d Cir.1998) (although broker-dealer had "extraordinarily broad discretion" under contract with customer to close customer's account and liquidate margined securities, it could not do so in bad faith). Indeed, the duty of good faith and fair dealing "requires the party vested with discretion under the contract to exercise that discretion reasonably and with proper motive, ... not ... arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties.'" *Id.* (internal quotation marks and citations omitted).

With respect to the prices obtained by Merrill in the auction, Merrill points out that there is nothing in either the PSA Agreement or the repo trade confirmations that required it to obtain fair market value for the securities. Merrill avers that the

the case, then the fact that Merrill is precluded from obtaining summary judgment as to Count VIII would also preclude it as to Count II. However, as this Court previously held in *Granite I,* "[t]he phrase 'commercially reasonable manner' ... has been given special meaning under Article 9 of the UCC." 17 F.Supp.2d at 306. Thus, while there may be some overlap in terms of the evidence that is relevant to these two claims, it would not be proper to collapse them into a single legal standard.

113. Neither the PSA Agreement nor the repo trade confirmations use the word "discretion." The right to exercise discretion with respect to the price obtained is implicit, however, in the PSA Agreement's provision that the securities may be sold at a price "reasonably [deem]ed to be satisfactory." The same is true of the phrase "may ... sell the securities for a transaction" in the repo trade confirmations.

Funds are attempting to impose independent obligations beyond those agreed upon and stated in the contract, which is contrary to the principle that the implied covenant of good faith "cannot add to, detract from, or alter the terms of the contract itself." *Granite I*, 17 F.Supp.2d at 306 (citations omitted).

Merrill is correct that, assuming *arguendo* that it did not obtain fair market value for the securities, its failure in this regard does not in and of itself warrant a finding of bad faith. However, evidence on this matter, as well as on the other matters discussed in connection with Count VIII—including Merrill's participation in the auction, the TCW resales, the restriction of the auction to certain broker-dealers, and the amount of time allowed for the formulating of bids—is relevant to the question of whether Merrill acted arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties. Indeed, the evidence as to these matters is sufficient to give rise to a genuine dispute of material fact as to whether Merrill's liquidation was consistent with the implied covenant of good faith and fair dealing.

Finally, the Funds raise the argument, contrary to their earlier submissions in this matter, that Merrill proceeded under Option B rather than Option A with respect to the securities its own trading desk bought at the liquidation auction. Therefore, according to the Funds, Merrill was obligated to obtain a price for these securities from a "generally recognized source." PSA Agreement ¶ 11(d)(i)(B). Since there is no dispute that Merrill did not do so, the Funds aver that it necessarily acted in bad faith. However, the Funds cite no authority or evidence for the proposition that Option A applies only to liquidations in which the broker-dealer sells the securities to a third party, and the PSA Agreement itself does not warrant this interpretation. The evidence is, rather, that Merrill proceeded under Option A. Therefore, the provisions governing Option B are irrelevant.

## VII. The Funds' Cross Motion Against Merrill

The Funds have cross-moved for summary judgment against Merrill on Counts I, II and VIII.

### A. The Cross–Motion On Count I

The Funds contend that there is no genuine dispute of fact as to Merrill's liability under Count I, *i.e.,* whether its margin calls were improper. The premise for this argument is that Merrill was only permitted to make margin calls if the value of the collateral in the repo accounts declined below 102 percent of the outstanding repo obligations, whereas Merrill's margin calls were based on the 20% hair cut amount.

The repo trade confirmation agreements permit the dealer to demand additional collateral through a margin call when "the market value of the securities for a transaction is less than the agreed upon percentage of the outstanding purchase price." Repo Trade Confirmation at 2. The agreements further provide that "[m]argin percentage shall at all times be equal to 102% of the repurchase principal plus accrued repurchase interest to date unless otherwise agreed." *Id.* The PSA Agreement, executed in the case of Quartz, limits the dealer's right to seek additional collateral to circumstances where the margin deficit exceeds "a specified percentage of the Repurchase Prices for such Transactions (which amount or percentage shall be agreed to by Buyer and Seller prior to entering into any such Transactions.)" PSA Agreement ¶ 4(d). The Quartz repo trade confirmations contain the "102% . . . unless otherwise agreed."

There is no dispute as to the governing contractual provision. Nor is there any dispute that Merrill made its margin calls based on the 20% "haircut" amount, rather than based on the 102% figure referred to in the repo trade confirmations, and that at that time the value of the securities in the Funds' accounts was at least 102% of

their outstanding obligations. However, Merrill contends that the parties "otherwise agreed," as permitted by the repo trade confirmation agreements, that the required maintenance level would be identical to the "haircut" established by the parties when they entered into each repo transaction. Repo Trade Confirmation at 2.

Merrill alleges that before entering into each repo transaction, its salesperson discussed the terms with a representative of ACM on behalf of the Funds, and that at the time the parties agreed to a haircut for a repo transaction they also agreed—orally—to designate the same percentage as the margin maintenance level for that transaction. The Funds object that Merrill is barred by the New York statute of frauds from relying on purported oral modifications of the written repo trade confirmations. The Funds further contend that, even if Merrill's contention were not thus barred, there is insufficient evidence to give rise to a genuine dispute of material fact as to this issue.

■ The New York statute of frauds does not apply to Merrill's argument because the only terms required to be in writing by the statute of frauds in effect at the time of these transactions were the quantity and the price. *See* former N.Y. U.C.C. § 8–319 (McKinney 1990); *Tweedy, Browne Co., L.P. v. Hodges,* No. 92 Civ. 9005, 1994 WL 517464, at *4 (S.D.N.Y. Sept. 21, 1994). The repo trade confirmations complied with this requirement. The margin maintenance requirement does not involve quantity or price. Moreover, the confirmations specifically provided that the maintenance requirement was "102% ...

unless otherwise agreed." Repo Trade Confirmations at 2. Thus, if the parties orally "otherwise agreed" that would not have been a modification of the written agreement, since such an agreement was contemplated in the repo trade confirmations themselves.

Merrill points primarily to Askin's deposition testimony and the affidavits submitted by certain Merrill employees, including Ellison, Peckholdt, and Dendinger, for the contention that the parties "otherwise agreed." Merrill also notes evidence that, pursuant to industry practice, it had the right to set the margin percentage equal to the haircut level. The Funds, for their part, point to other testimonial evidence as to what the parties actually agreed, the daily reports generated by Merrill for the repo accounts, and evidence that it was also industry practice that the parties to a repo transaction would agree on a "trigger point" for margin calls. The Funds also contend that Merrill is bound by the testimony of McGovern, as Merrill's corporate designee testifying in a Rule 30(b)(6) deposition, that he was not aware of any agreement to alter the margin percentage.

■ Thus, resolution of this issue primarily turns on issues of witness credibility and the interpretation of testimonial evidence. Contrary to the Funds' contention, Merrill is not limited as to this matter by the testimony of McGovern, because the Rule 30(b)(6) deposition notice did not demand a witness who could testify as to the margin maintenance agreements.[114] The evidence offered by Merrill, while not without its weaknesses, is sufficient to raise a genuine dispute fact as to what the parties agreed.[115] Therefore, the Funds

114. The notice sought a deposition of a witness who could testify regarding "[t]he margin calls made by Merrill on the Funds in March of 1994, including the following subjects: a) the decision to issue margin calls ... b) determination of the amount of the margin calls [ ]."

115. Merrill's characterization of Askin's deposition testimony is misleading. However,

contrary to the Funds' assertion, Askin's testimony does not "unequivocally support" its summary judgment motion either. Funds Reply Mem. at 8. Dendinger's affidavit is flawed because it does not demonstrate personal knowledge of whether the Funds agreed to designate the margin maintenance level as equal to the haircut percentage, given that the alleged agreement to do so was oral and

are not entitled to summary judgment on Count I.

### B. *The Cross–Motion On Counts II and VIII*

The Funds' cross-motion as to Counts II and VIII is predicated on their obtaining summary judgment as to Count I, since they contend that if they are correct that the margin calls should never have occurred then the liquidations must have been commercially unreasonable and in bad faith. Since the Funds are not entitled to summary judgment as to Count I, their cross-motion on Counts II and VIII necessarily fails.

### VIII. *The Motion to Modify the Confidentiality Order*

The ABF Plaintiffs have sought an order removing the confidentiality designation from all documents produced by the Brokers in the Investor Actions, and from the deposition testimony in those actions of former or present employees of the Brokers. The Brokers recognize that many of these materials will necessarily become matters of public record in the context of a trial, but oppose the motion.

The date of the trial of these action has yet to be determined and time remains to determine whether any or all of the trial evidence should remain confidential. The omnibus motion is denied at this time with leave granted to renew as to particular materials.

### *Conclusion*

Therefore, for the reasons set forth above, the motions for summary judgment are granted in part and denied in part, the motion to strike expert evidence is granted in part and denied in part, and the motion to modify the confidentiality order is denied at this time. The parties are directed to confer regarding the setting of a pretrial conference date subsequent to April 2, 2001 for scheduling purposes.

Settle judgment on notice.

It is so ordered.

---

Dendinger did not speak directly to any representative of the Funds.

The Funds contend that Ellison's affidavit is entitled to no weight because his deposition testimony reflects a somewhat different recollection from his affidavit as to the exact period of time he had relevant discussions with Askin. However, the inconsistency is insufficient to conclude that Merrill has only raised a "sham issue[ ] of fact." *Mack v. United States,* 814 F.2d 120, 124 (2d Cir.1987).